No. 16-17050

IN THE

RECEIVED
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FEB 10 2017

FILED
DOCKETED _____
DATE _____ INITIAL

**UNITED STATES COURT OF APPEALS**

FOR THE NINTH CIRCUIT

---

PATRICIA HARDING MORRISON
for the Estate of TOMMY MORRISON
*Plaintiff & Appellant,*

v.

QUEST DIAGNOSTICS INCORPORATED
JOHN HIATT
DR. MARGARET GOODMAN
NEVADA STATE ATHLETIC COMMISSION
MARC RATNER
*Defendants & Respondents.*

Appeal from the United States District Court for the District of Nevada
-Southern Division-
The Hon. Richard F. Boulware II, Judge (case number 2:2014-cv-01207)

---

**APPELLANT'S OPENING BRIEF**

---

PATRICIA HARDING MORRISON
P.O. Box 454,
Rose Hill, KS 67133
Tel. No. (865) 296-9973
e-mail: tommyandtrishamorrison@yahoo.com

Plaintiff, *Pro Se* & Appellant,
Personal Representative/ Administratrix for the
ESTATE OF TOMMY MORRISON

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...    ...   ...   ...   ...   ...   ...   x

INTRODUCTION...   ...   ...   ...   ...   ...   ...   ...   ...   01

STATEMENT OF JURISDICTION...   ...   ...   ...   ...   ...   22

PROCEDURAL HISTORY……   ...   ...   ...   ...   ...   ...   22

STATEMENT OF THE ASSIGNMENTS OF ERROR...   ...   ...   26

QUESTIONS PRESENTED FOR REVIEW...   ...   ...   ...   ...   **27**

STATEMENT OF RELATED CASES & PROCEEDINGS... ...   ...   30

STATEMENT OF FACTS... ...   ...   ...   ...   ...   ...   ...   30

FEBRUARY 07th,1996 to FEBRUARY 10th,1996...   ...   ...   ...   **31**

1.     Tommy "The Duke' Morrison submitted an NSAC licensing application to fight in a professional boxing bout on February 10th,1996, in Las Vegas, Nevada...   ...   ...   ...   ...   ...   31

2.     TOMMY's Promoter was Mr. Don King... ...   ...   ...   ...   31

3.     TOMMY was 'self-managed' for the bout...   ...   ...   ...   31

4.     NSAC issues the Boxing Contract for both fighters ...   ...   ...   31

5.     The application called for TOMMY to be clinically and physically examined by a licensed physician. TOMMY was mentally and physically cleared to fight and receive a license... ...   31

6.     Application called for TOMMY to sign a medical release form allowing NSAC to receive <u>'pre-bout'</u> medical data on TOMMY...   <u>32</u>

7.     An original or certified clinical laboratory report 'showing that applicant was not infected with the human immunodeficiency virus' was required... ...   ...   ...   ...   32

8.  NSAC called for TOMMY to submit to a blood draw... ...     ...     32

9.  QUEST selected and purchased tests approved by the
    FDA for the intended use of 'screening' for 'antibodies', but not
    'diagnostic' for the 'human immunodeficiency virus',
    nor HIV-1 infection...   ...     ...     ...     ...     ...     ...     ...     33

10. QUEST's alliance with NSAC providing results misrepresenting
    to be a definitive 'showing of the human immunodeficiency virus'
    departed from clinical laboratory practices and manufacturers'
    intended uses... ...     ...     ...     ...     ...     ...     ...     ...     33

11. QUEST, by phone, on February 10th,1996, directly informed
    NSAC that TOMMY's blood was 'positive for the human
    immunodeficiency virus'...   ...     ...     ...     ...     ...     ...     33

12. NSAC do not request proof of 'antibodies', nor a 'negative' report... 34

13. QUEST reported results of tests as a definitive showing
    of the human immunodeficiency virus...   ...     ...     ...     ...     35

14. No evidence has been presented by QUEST from the test kit company,
    FDA, or CLIA, such as the analyses, research, or studies, that they
    abided by any standard of laboratory practice...   ...     ...     ...     35

15. February 10th,1996, QUEST reported TOMMY's medical results
    to NSAC, by phone... ...     ...     ...     ...     ...     ...     ...     35

16. RATNER, Executive Commissioner for NSAC, re-disclosed
    personal health information on TOMMY to unauthorized
    third parties...   ...     ...     ...     ...     ...     ...     ...     ...     36

17. RATNER used QUEST's 'lab report' as means of medical denial... 36

18. TOMMY was immediately flown out of Las Vegas the night
    of February 10th,1996... ...     ...     ...     ...     ...     ...     ...     37

19.   TOMMY provided all medical requirements to obtain a license…   37

FEBRUARY 11th,1996 to JULY,2007…   …   …   …   …   …   **38**

20.   TOMMY was repeatedly tested, but with the same 'accepted
      algorithm' of tests known to react to 'autoimmune antibodies'
      although TOMMY, and his physicians, were never put on notice
      of this non-disclosure of 'FACT' by QUEST…   …   …   …   38

21.   CDC does not make diagnoses for any physician. CDC confirms
      the 'testing algorithm' also reacts to autoimmune
      disorders and autoimmune antibodies… … …   …   …   …   39

22.   False or misleading information is determined by the effect
      the label and labeling has on recipients as to whom the
      claims are addressed… …   …   …   …   …   …   …   39

23.   TOMMY's physicians did not test for a differential diagnosis…   40

24.   TOMMY and his physicians were not on notice of the
      shocking information uncovered in this action. The blood of humans,
      and dogs, with up to one hundred (100) other conditions will also
      react to the tests used by QUEST, and its subsidiaries,
      on TOMMY's blood…   …   …   …   …   …   …   …   40
.
25.   TOMMY's physicians produced only QUEST's clinical lab
      reports in their 'Affidavit of Records'…   …   …   …   …   40

26.   TOMMY, his former wives, and mother, had no reason
      to believe otherwise …   …   …   …   …   …   …   …   41

27.   PHYSICIANS continued to write prescriptions for AZT,
      and other 'HIV' medications, based solely on a clinical lab report…   41

28.   THE NEW YORK PHYSICIAN, Dr.HO, was unable to produce
      the testing methods of 'isolation and purification' of any evidence
      of the virus in TOMMY's blood… …   …   …   …   …   41

JULY,2007 to AUGUST,2011…   …   …   …   …   …   …   **42**

29. GOODMAN, head of NSAC Medical Advisory Board,
    requested TOMMY's 1996 test results from a 'physician
    and renowned pathologist named DR. JOHN HIATT' at QUEST...    42

30. HIATT retrieved TOMMY's test results for GOODMAN
    without a signed medical release consent form and against
    state regulations and federal CLIA regulation...   ...   ...   43

31. Dr.VOY's email confirms he did not diagnose TOMMY
    with the human immunodeficiency virus in 1996...   ...   ...   43

32. DR.OSIO   was TOMMY's personal physician between 2009
    and 2011 and found no evidence of HIV... ...   ...   ...   ...   45

AUGUST,2011 to DECEMBER 08th,2011...   ...   ...   ...   ...   **45**

33. TOMMY was arrested August 2011 and was in solitary
    confinement for twenty-three (23) days...   ...   ...   ...   ...   45

34. TOMMY was arrested again for the second time...   ...   ...   45

35. After twenty-five (25) days of incarceration, bailed out, and
    headed back to Tennessee, TOMMY's flight pulled back to
    the gate and he was taken into custody at Atlanta Airport...   ...   46

36. The very next day, TOMMY was arrested again for the fourth time...46

37. Six hundred and forty-four (644) hours in jail...   ...   ...   ...   46

38. December 01st,2011, TOMMY was admitted for a one (1)
    hour surgery on his chest bite...   ...   ...   ...   ...   ...   46

DECEMBER 08th,2011 to SEPTEMBER 18,2013...   ...   ...   ...   **47**

39. Between December,2011 and September 01,2013, TOMMY was
    hospitalized for wound care, physical therapy, IV nutrition...   ...   47

40. July,2012, TOMMY's blood was tested by Boston Mass.
    General Hospital and Diagnosis found no evidence of the virus...   47

41. November,2012, TOMMY was diagnosed with Guillain-Barre and Miller-Fisher Syndrome......    ....    ...    ...    ...    ...    47

42. Extensive testing was performed on TOMMY's blood and cerebral spine fluid (CSF) between 2012 and 2013...    ...    ...    47

43. No 'AIDS' defining diseases were detectable in TOMMY's blood, cerebral spine fluid, tissue cultures, saliva or sperm...    ...    ...    48

44. August 23,2013, Plaintiff received an email in ICU from ROCHE confirming that their ROCHE tests used on TOMMY throughout his life, do not detect HIV infection, and do not diagnose HIV (human immunodeficiency virus) ...    ...    ...    48

45. Final Discharge Summary issued on September 02,2013...    ...    48

46. UNMC in Omaha, Nebraska, openly admitted that the ROCHE test had been the test they had been using for the thirty (30) years to diagnose 'HIV' in his patients... ...    ...    ...    ...    ...    48

47. One week prior to death, TOMMY was placed in a medically induced coma... ...    ...    ...    ...    ...    ...    ...    ...    49

48. Cause of Death: Death Certificate issued September 04th,2013, was reported as: pseudomonas septicemia, cardiac arrest, multi-organ failure, and septic shock...    ...    ...    ...    ...    49

49. TOMMY's blood was drawn September 01,2013, for a post mortem blood autopsy to finally rule-in, or rule-out, the virus... ...    ...    49

50. September 17th,2013, TOMMY's postmortem blood results scientifically confirmed that his blood was not infected with the human immunodeficiency virus, and no 'aids' defining diseases, no p31 nor p32...    ...    ...    ...    ...    ...    ...    49

DECEMBER 21/23rd,2013 to JULY 24th,2014... ...    ...    ...    ...    **50**

51. December 21st and December 23rd,2013, Plaintiff began investigating the fraudulent events of February 10th,1996...    ...    50

52. July 24th,2014, Morrison v Quest et al case was filed...    ...    ...    51

vi

53.  Discovery in 2014, further revealed that Dr. John Hiatt (HIATT)
     was neither a licensed physician nor renowned pathologist...  ...     51

JULY 30th,2014, to OCTOBER 08th,2014...        ...      ...      ...      ...     **51**

54.  July 30th,2014, Ms. Delores Faye Caldwell, not a party to this case,
     hacked into TOMMY's medical data without written consent...             51

55.  August 27th,2014, the District Court issued Summons... ...      ...     53

56.  September 12th,2014, QUEST, HIATT and RATNER were served... 53

57.  September 15th,2014, NSAC were served... ...      ...      ...      ...     53

58.  September 16th,2014, GOODMAN was served... ...      ...      ...     53

59.  October 03rd,2014, the Attorney General's Office entered on
     behalf of RATNER, GOODMAN, and NSAC...  ...      ...      ...     53

60.  October 08th,2014, Ms. Delores Faye Caldwell, aka
     Faye. D. Caldwell from Texas, entered as *Pro Hac Vice*
     for QUEST and HIATT...      ...      ...      ...      ...      ...      ...     53

OCTOBER 08th,2014 to OCTOBER 25th,2016... ...      ...      ...      ...     **53**

61.  Docket History... ...      ...      ...      ...      ...      ...      ...     54

SUMMARY OF THE ARGUMENT...      ...      ...      ...      ...      ...     **54**

STANDARD OF REVIEW... ...      ...      ...      ...      ...      ...     55

ARGUMENT AND ASSIGNMENT OF ERROR...      ...      ...      ...     **55**

A.   THE DISTRICT COURT'S LEGAL CONCLUSIONS SHOULD BE
     REVIEWED DE NOVO AND ITS FACTUAL FINDINGS FOR
     SUBSTANTIAL EVIDENCE...      ...      ...      ...      ...      ...     56

vii

      AS TO DOCKET #174 and #185…  …  …  …  …  …  56

      AS TO PRO HAC VICE COUNSEL CALDWELL…  …  …  57

      AS TO HIATT……  …  …  …  …  …  …  …  59

      AS TO QUEST…  …  …  …  …  …  …  …  61

      AS TO NSAC… …  …  …  …  …  …  …  …  63

      AS TO RATNER…  …  …  …  …  …  …  …  64

      AS TO GOODMAN… …  …  …  …  …  …  …  65

B.    MORRISON'S CLAIMS ARE WITHIN THE STATUTE OF
      LIMITATIONS…  …  …  …  …  …  …  …  66

C.    MORRISON SATISFIED ALL THE ELEMENTS FOR HER
      FIRST CLAIM FOR NEGLIGENCE…  …  …  …  …  67

D.    MORRISON SATISFIED ALL THE ELEMENTS FOR HER
      SECOND CLAIM FOR DEFAMATION……  …  …  …  68

E.    MORRISON SATISFIED ALL THE ELEMENTS FOR HER
      THIRD CLAIM FOR SLANDER… …  …  …  …  …  69

F.    MORRISON SATISFIED ALL THE ELEMENTS FOR HER
      FOURTH CLAIM FOR LIBEL…  …  …  …  …  …  69

G.    MORRISON SATISFIED ALL THE ELEMENTS FOR HER
      FIFTH CLAIM FOR FRAUD…  …  …  …  …  …  70

H.    MORRISON SATISFIED ALL THE ELEMENTS FOR HER
      SIXTH CLAIM FOR NEGLIGENT
      MISREPRESENTATION…  …  …  …  …  …  …  70

I.     MORRISON SATISFIED ALL THE ELEMENTS FOR HER
       SEVENTH CLAIM FOR INTENTIONAL INFLICTION OF
       EMOTIONAL DISTRESS…  …      …      …      …      …      …      71

J.     MORRISON SATISFIED ALL THE ELEMENTS FOR HER
       EIGHTH CLAIM FOR INTENTIONAL INTERFERENCE
       WITH A CONTRACT…      …      …      …      …      …      …      72

K.     MORRISON SATISFIED ALL THE ELEMENTS FOR HER
       SECOND AMENDED COMPLAINT (DKT#105)…      …      …      73


CONCLUSION…      …      …      …      …      …      …      …      …      **73**

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS…  …      …      …      …      …      75

CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS…      …      76

CERTIFICATE OF SERVICE…      …      …      …      …      …      …      77

APPENDIX…      …      …      …      …      …      …      …      …      **A,B,C,D**

# **TABLE OF AUTHORITIES**

## **CASES**

*C.E.Appellant v.Prairie Fields Family Medicine P.C.,*
Appellee 287 Neb.667 Supreme Court of Nebraska No. S-13-455... ...    60

*Cooper v. Laboratory Corp. of America Holdings, Inc.,*
*150 F.3d 376,379 (4th Cir.1998)...*    ...    ...    ...    ...    ...    ...    04

*Davis v. Preston.,*
118 Tex.303,16 S.W.2d 117 (1929)...    ...    ...    ...    ...    ...    23

*Daubert.,*
509 U.S. at 593-95, 113 S.Ct. at 2796-97, 125 L.Ed.2d at 482-83...    ...    10

*Fed.Trade Comm'n v Health Formulas, LLC.,*
Case: 2:14-cv-RFB-GWF...    ...    ...    ...    ...    ...    ...    ...    14

*Goodson-Todman Enters v.Kellogg Co.,*
513 F 2d.913.914 (9th Circuit.1975)...    ...    ...    ...    ...    ...    55

*Hamilton v. Blackman.,*
915 P.2d 1210,1218 (Alaska 1996)...    ...    ...    ...    ...    ...    24

*Ishikawa v. Delta Airlines, Inc.,*
343 F.3d 1129,1134 (9th Circ.2003)...    ...    ...    ...    ...    ...    13

*Martinez v. Eighth Jud.Dist.Ct.of State of Nev.*
729 P.2d 487,488 (Nev.1986)...    ...    ...    ...    ...    ...    ...    57

*Palmer.,*
*80 Cal.App.3d at 254,145 Cal.Rptr.at 473*...    ...    ...    ...    ...    10

*People v. Kelly.,,*
supra, at pp.32-36;...    ...    ...    ...    ...    ...    ...    ...    11

*People v. Law.,*
40 Cal.App.3d 69,73 [114 Cal.Rptr.708, (1974)......    ...    ...    ...    11

# TABLE OF AUTHORITIES
## (continued)

*People v. Kelly.,*
Supra 17 Cal.3d at page 24… …      …      …      …      …      …      11

*Sergio Casillas Ramirez v County of San Bernardino.,*
806 F.3d 1002 (9th Cir.2015)   …      …      …      …      …      …      …      24

*Shinkle v. Union City Body Co.,*
94 F.R.D. 631,637 (D.Kan.1982)…   …      …      …      …      …      …      23

*State v. Armstead.,*
 432 So.2d 837,840. (La.1983)…      …      …      …      …      …      …      11

*Williams and Harlan.,*
94 F.R.D. at 638…      …      …      …      …      …      …      …      …      23

# ACTS, REGULATIONS, RULES & STATUTES

## Acts

FDCA Section 502…   …      …      …      ...      …      …      …      passim

FDCA Section 301…   …      …      …      …      …      …      …      59,60,61

FDCA§301(q)(2)…      …      …      …      …      …      …      …      …      12

FDCA§§502(q)(1),502(r)…   …      …      …      …      …      …      …      7,63

False Claims Act,31 U.S.C.§§3729-33…   …      …      …      …      …      7

FTC Act, 15 U.S.C.§§45(a) & 52…   …      …      …      …      …      26,27,60

FTC Act, Sections 5(a)…      …      …      …      …      …      …      … 28,60

FTC Act, Section 12…   …      …      …      …      …      …      …      28

FTC Act, Sections 12 to 15…   …      …      …      …      …      …      33

FTC Act, 12-15…      …      …      …      …      …      …      …      34

xi

## ACTS, REGULATIONS, RULES & STATUTES
### (continued)

**Federal Statutory Authorities**

8  U.S.C.§1342c...        ...        ...        ...        ...        ...        ...        ...        ...passim

15 U.S.C.§§45(a) & 52...        ...        ...        ...        ...        ...        ...        ... 28,60

18 U.S.C.§287... ...        ...        ...        ...        ...        ...        ...        59,61,63

18.U.S.C.1035... ...        ...        ...        ...        ...        ...        ...        ...        20

18 U.S.C.§1347...        ...        ...        ...        ...        ...        ...        ... 59,66

21 U.S.C.§331(q)(2)... ...        ...        ...        ...        ...        ...        ...        ...        12

21 U.S.C.§352 Section 4 (r)(2)...        ...        ...        ...        ...        ...        ...        13

21 U.S.C.§§352(q)(1),352(r)...        ...        ...        ...        ...        ...        ...        7

31 U.S.C.§§3729-33... ...        ...        ...        ...        ...        ...        ...        7

42 U.S.C.§263a.  ...        ...        ...        ...        ...        ...        ...        ...        52

**Federal Rules & Regulations**

21 CFR 601.14......        ...        ...        ...        ...        ...        ...        ...        61

21 CFR 601.12......        ...        ...        ...        ...        ...        ...        ...        61

42 CFR 492.1291(f)... ...        ...        ...        ...        ...        ...        ...        ... 58,60

42 CFR 493.1253(b)(2)(iv)... ...        ...        ...        ...        ...        ...        ...        28

Fed.R.App.P.32(a)(7)(B)...        ...        ...        ...        ...        ...        ...        ...        75

Fed.R.App.P.32(a)(7)(B)(iii)...        ...        ...        ...        ...        ...        ...        75

Fed.R.App.P.32(a)(5)......        ...        ...        ...        ...        ...        ...        ...        75

Fed.R.App.P.32(a)(6)......        ...        ...        ...        ...        ...        ...        ...        75

Fed.R.Civ.P. 26(a)(1)......        ...        ...        ...        ...        ...        ...        ...        58

# ACTS, REGULATIONS, RULES & STATUTES
## (continued)

Fed.R.Civ.P. 26(g)...   ...   ...   ...   ...   ...   ...   ...   ...   58

Fed.R.Civ.P. 15...   ...   ...   ...   ...   ...   ...   ...   ...   2,73

Fed.R.Civ.P. 56(c)...   ...   ...   ...   ...   ...   ...   ...   ...   55

**State Statutory Authorities**

LR.IA.10-1,10-2(c)...   ...   ...   ...   ...   ...   ...   ...   ...   58

LR 7-3(a)...   ...   ...   ...   ...   ...   ...   ...   ...   ...   56

LR 7-3(b)...   ...   ...   ...   ...   ...   ...   ...   ...   ...   56

NAC 467.027(3)...   ...   ...   ...   ...   ...   ...   ...   ...   1

NRAP 4(a)(1)...   ...   ...   ...   ...   ...   ...   ...   ...   ... 22,26

NRPC.3.4...   ...   ...   ...   ...   ...   ...   ...   ...   ...   58

NRPC.4.4...   ...   ...   ...   ...   ...   ...   ...   ...   ...   58

NRPC.5.5(a)(2)...   ...   ...   ...   ...   ...   ...   ...   ...   58

NRPC.5.5(b)...   ...   ...   ...   ...   ...   ...   ...   ...   ...   58

NRPC.5.5(c)...   ...   ...   ...   ...   ...   ...   ...   ...   ...   58

NRS.ANN§§357.010......   ...   ...   ...   ...   ...   ...   52,61,63

NRS.ANN§652.190...   ...   ...   ...   ...   ...   ...   ...   52,58,59

NRS.ANN§652.193...   ...   ...   ...   ...   ...   ...   ...   ... 52,59

NRS.7.285...   ...   ...   ...   ...   ...   ...   ...   ...   58

NRS.11.350...   ...   ...   ...   ...   ...   ...   ...   ...   67

NRS.11.930(3)(d)...   ...   ...   ...   ...   ...   ...   ...   ...   67

NRS.49.215...   ...   ...   ...   ...   ...   ...   ...   ...   64,65,66

xiii

## ACTS, REGULATIONS, RULES & STATUTES
### (continued)

NRS.49.235…      …      …      …      …      …      …      …      …      59

NRS.199.210…   …      …      …      …      …      …      …      … passim

NRS.199.220…   …      …      …      …      …      …      …      …      63

NRS.205.110…   …      …      …      …      …      …      …      …   59,63,64

NRS Section 441 A.150 section 3… …      …      …      …      …   …6,7,30

NRS.467.01037…      …      …      …      …      …      …      …      …      65

NRS.467.0104… …      …      …      …      …      …      …      …      …      65

NRS.467.020…   …      …      …      …      …      …      …      …      …      64

NRS.467.027(4)…      …      …      …      …      …      …      …   … 21,27

NRS.467.027(4)(b)…      …      …      …      …      …      …      … 21,27

NRS.467.030(4)…      …      …      …      …      …      …      …      …      72

NRS.467.100…   …      …      …      …      …      …      …      …      …      65

NRS.467.110…   …      …      …      …      …      …      …      …      …      65

NRS.467.120…   …      …      …      …      …      …      …      …      …      65

NRS.467.1005… …      …      …      …      …      …      …      …      …      65

NRS.629.061…   …      …      …      …      …      …      …   …. 60,64,65,66

## MISCELLANEOUS

ABA Model Rule 8.3……      …      …      …      …      …      …      …      57

SUPREME COURT RULING 77… …      …      …      …      …      …      …      58

TITLE 42§263a…      …      …      …      …      …      …      …      …      54

xiv

# OTHER SOURCES

*Electron Microscopy.,*
U.S. Patent #4,647,773; #4464465 (HIV patent)   ...     ......  ...     11,29,48

*Cancer Res. 1990 Sep.1;50 (17 Suppl): 5628-5630.,*
Strandstrom HV et al. Studies with canine (dog) blood...     ...     ...     3

**APPENDIX:...   ...      ...      ...      ...      ...      ...      ...      ...      A,B,C,D**

**<u>A.</u>**

*Glossary*......      ...      ...      ...      ...      ...      ...      ...      ...      **APP.A.01**

*Peer Reviewed Articles Referencing Autoimmune Disorders.,*
Studies of cross-reactivity and characteristics of individuals with
autoimmune disorders undergoing "HIV" testing...     ...     ...     **APP.A.27**

*Physicians Questionnaire.,* Obtaining a differential diagnosis...     **APP.A.14**

*Docket History.,*
MORRISON's docket entries of critical filings and fact based
Exhibits overlooked by the district court...  ...     ...     ...     ...     **APP.A.49**

**<u>B.</u>**

Opinion and Order...      ...      ...      ...      ...      ...      ...      ...      **APP.B.277**

Judgment of Entry...      ...      ...      ...      ...      ...      ...      ...      **APP.B.278**

Notice of Appeal...      ...      ...      ...      ...      ...      ...      ...      **APP.B.279**

Opposition to Bill of Costs...  ...      ...      ...      ...      ...      ...      **APP.B.283**

Notice to Stay Judgment...      ...      ...      ...      ...      **APP.B.284,285,286**

# APPENDIX
# (continued)

## C.

Motions Hearing Transcript September 08th, 2016...    ...    ...    **APP.C.A**

Motions Hearing Transcript March 01st, 2016...   ...    ...    **APP.C.B**

Motions Hearing Transcript September 14th,2015...    ...    ...    **APP.C.C**

## D.

NSAC BOXING CONTRACTS...   ...    ...    ...    ...    **APP.D.1**
TM363,296,314,315,398,218,217 (NSAC Exhibits)

QUEST Stolen Data Printed July 30th, 2014 for Caldwell...    ...    **APP.D.8**
QDI 438, QDI 459 (QUEST Exhibits).
Hundreds of other pages exist, but not included in Appendix D.)

xvi

## INTRODUCTION

**THE COURT:** "**We wouldn't even be having this discussion if the test was specific for the existence of the virus or not. That's obviously why there's even the possibility of a claim the tests didn't test for the virus**".

*Hon. Judge Richard F.Boulware II.*
*(APP.C-A page 39:22-25 Hearing Sep. 08th 2016)*

This is an appeal following a hearing on September 08th,2016, in an action in the District Court of Nevada where the court erred in granting summary judgment (hereinafter MSJ) in Defendants' favor.

The action was filed on July 24th,2014, by Plaintiff-Appellant, surviving spouse ("MORRISON") and *heir at law for Tommy "The Duke" Morrison,* Two-Time Heavyweight Boxing Champion of the World, aka Tommy Gunn in Rocky V, against **Nevada Defendants**: Quest Diagnostics Incorporated; John Hiatt; and 'state defendants' Dr. Margaret Goodman; Marc Ratner and Nevada State Athletic Commission.

**STATE DEFENDANTS:** "**All that is required to comply with the regulation is to show that the applicant is not infected with the HIV virus. (NAC 467.027(3)).**"

*Deputy Attorney General*
*(dkt#249page.5:14-16)*

**STATE DEFENDANTS:** "**As stated numerous times, no diagnosis of HIV was made on February 10,1996, or at any other time by any State Defendant.**"

*Deputy Attorney General*
*(dkt#249page.5:11-12)*

1

**QUEST/HIATT**: "Neither Quest Diagnostics nor Hiatt ever –
in 1996, 2007, or through the present- made any statements or
communications about Tommy Morrison or his HIV status to
the media or third parties.

*Counsel Caldwell*
*(dkt#208 page 14:14-16)*

**DR.VOY**: "It is important for you to understand that Dr.Voy
did not diagnose and never has diagnosed Mr. Morrison as
'HIV positive'.

*Counsel Mortensen for VOY*
*(APP.B.dkt#283 page 28:14-15)*

A QUEST lab report, or 'phone call' on February 10th,1996, and throughout

this lawsuit is a communication, and a statement to third parties.

MORRISON argues triable issues remain. Defendants' *dkts#174#175*

pertained to the Amended Complaint not SAC *dkt#105* pursuant to *FRCP 15*;

Defendants replaced *dkt#174* with *dkt#185*; 'who' and 'with what' determined

TOMMY's blood was '*positive for the human immunodeficiency virus (HIV)*'

when *"the tests didn't test for the virus",* that led to the cancellation of the bout,

and a *multi-million-dollar* fight contract; boxing license; *immediate* indefinite

suspension from boxing, and TOMMY's life spiraling into despair with no-one

wanting to breathe the same air, nor be in the same room, or gym as him, on

February 10th, 1996.

Until TOMMY's blood was found **not** to have the virus *(scientifically*

*known as a 'retrovirus', abbreviated as-HIV),* in his post mortem blood, it had

always been *accepted* truth for TOMMY and his physicians, that a 'positive for

2

HIV' QUEST *lab report* using QUEST tests could only mean one thing *positive for the human immunodeficiency virus, a retrovirus (HIV).*

But, hidden from TOMMY, and the public, are **packet inserts** with warnings, limitations and disclaimers on QUEST tests.

> **THE COURT:** "The issue is, based upon what was accepted and understood for testing for HIV in 1996, was this not in fact a reasonable and accepted method for testing for the virus? Do you have any information to suggest that it was not an accepted method for testing for HIV at the time?"

*(APP.C-A pages 8:7-8, 22-25; 9:1-2 Hearing Sep. 8th, 2016)*

What was accepted and understood, ***but undisclosed until this action,*** the 'standard HIV-1 antibody testing method' has always reacted to *proteins* and *'antibodies to autoimmune disorders' and other interferences*, and is not a method for testing for the virus. Manufacturers of these tests, CDC, QUEST, and FDA are informed, but not TOMMY and the public.

Defendants had knowledge of the information on *other* antibody reactions; and acted in deliberate ignorance of the truth or falsity of the information they reported to TOMMY, NSAC, and physicians; and acted in reckless disregard of the truth of the information. The *information* being, blood with *autoimmune disorders* react to QUEST testing, yet not infected with 'HIV'. *(see Cancer Res.1990 Sep. 1;50(17 Suppl):5628-5630; where 50% of the **dogs** reacted to the Western blot test).*

3

QUEST owed a duty to TOMMY when it purchased 'HIV-1 antibody tests' to disclose they were *not intended for use* as a determination of the virus/HIV.

The courts recognize a laboratory owes a duty to its test subject, regardless of whether a contractual relationship exists between them. *See Cooper v. Laboratory Corp. of America Holdings, Inc., 150 F.3d 376,379 (4th Cir.1998).*

Decisions in other jurisdictions weigh in favor of finding laboratories having a duty to individuals whose specimens they test. To hold otherwise deprives thousands of individuals from an opportunity to challenge or receive any recourse for repercussions they may suffer due to negligent, unintended, and inaccurate reporting for the human immunodeficiency virus.

Granting MSJ and terminating this case demonstrates a lack of concern for the public **to receive, know, and accept, all accepted facts QUEST has known for over 20 years** surrounding their testing, reporting, and *falsifying a diagnosis* of 'HIV'.

Intentionally omitting to *rule-out* autoimmune antibodies prior to releasing a lab report for TOMMY, physicians, and NSAC to rely upon as conclusively 'positive for HIV' is **extreme, outrageous and utterly intolerable**.

4

**THE COURT:** "**What they detect it appears to be is his reaction to antibodies. That's what they say**".

*(APP.C-A page 7:19-20 Hearing Sep. 08th, 2016)*

**TEST MANUFACTURER: ABBOTT: "At present there is no recognized standard for establishing the presence or absence of HIV-1 antibodies in human blood."**

*Undisclosed FDA packet insert for Elisa Test.*
*(APP.A page.17)*

TOMMY's *autoimmune antibodies* were reacting to the tests, just as the *undisclosed* packet inserts warn.

However, the court relied upon the written word on a <u>lab report</u> authored by a <u>corporation,</u> a phony physician, a boxing commission, and *ignored* FDA, FTC statutory authority *and* manufacturers' *packet inserts.*

The court ignored MORRISON's rebuttal expert witness testimony, two independent pathology reports *not authored by QUEST*, a physician's Affidavit (the only affidavit by a physician describing his care of over three years), and email from the 1996 Las Vegas physician's attorney, all concluding TOMMY was either not personally diagnosed by them with 'HIV', or reported no evidence of the 'retrovirus' (HIV) in TOMMY. Photo images of TOMMY's blood were presented to the court absent of 'HIV', no viral particles and no abnormalities.

Yet, the court concluded TOMMY's reaction could <u>only be specific to</u> 'HIV', because QUEST <u>lab reports</u> say so.

5

**THE COURT:** "So you're saying it wasn't reasonable for them to rely upon that for making the determination that he was HIV positive".

**MORRISON:** "Correct".

**THE COURT:** "and that they had an obligation to produce that".

*(APP.C-A page:9:20-24 Hearing Sep.08th,2016)*

MORRISON, FDA, *and* Nevada Law contend that a QUEST lab report is

not to be relied upon as a determination of any disease, including HIV positive:

> **NRS Section 441 A.150 section 3:**
> **A laboratory director shall, in the manner prescribed**
> **by the board, notify the health authority of the identification**
> **by his medical laboratory of the presence of any communicable**
> **disease in the jurisdiction of that health authority.**
> **The health authority shall not presume a diagnosis of a**
> **communicable disease on the basis of the notification received**
> **from the laboratory director.**
>
> *NRS Section 441 A.150 section 3*

**STATE DEFENDANTS:** "There was absolutely no reliance on the 1996 Quest test."

*Deputy Attorney General*
*(dkt#217page.11:27)*

**STATE DEFENDANTS:** "Plaintiff attempts to mislead this Court into believing that the State Defendants state that they did not rely on Quest's findings in 1996, but that is absolutely not the case."

*Deputy Attorney General*
*(dkt#249page.7:4-6)*

**QUEST/HIATT:** "...only the NSAC relied on the test results."

*Counsel Caldwell*
*(dkt#208page.12:25-27)*

6

> **QUEST/HIATT: "Morrison further contends counsel for
> Defendants is concealing from the Court that Quest Diagnostics
> clinical laboratory reports are bogus because she contends they
> are not a diagnosis of HIV. Morrison's contentions are legally
> and factually frivolous."**
>
> *Counsel Caldwell*
> *(dkt#226page.7:2-5)*

Defendants had, and have, an obligation to inform TOMMY, physicians, and

NSAC, that a <u>lab report</u> signed by a *QUEST laboratory director* was not, is not,

reasonable for them, or any court, to rely upon as a finding/diagnosis of 'positive

for HIV' *(Federal False Claims Act,31 U.S.C.§§3729-33). NRS Section 441*

*A.150 section 3.*

A definitive diagnosis of 'positive for HIV' cannot be reported by **QUEST,**

**as a matter of law.** *NRS Section 441 A.150 section 3.*

Defendants' misbranding of tests, false and misleading advertising and omis-

sion of warnings, precautions, side effects and contraindications violate *FDCA§§*

*502(q)(1),502(r); 21 U.S.C.§§352(q)(1),352(r).*

Incarcerations; intubations; medically induced coma; *non-disclosure of test*

*kit warnings*; delayed discovery rule; Stay on proceedings; and <u>health care fraud</u>

continuing to this day; dates of due diligence; discovery of **shocking**, undisclosed,

information of public interest when undergoing QUEST testing and reporting, and

applying for a boxing license in Nevada, tolls the statute of limitations.

7

The court erred in assigning and endorsing the promotion of unapproved false claims of a diagnosis of 'HIV' on TOMMY based on QUEST lab reports.

*First*: QUEST tests do not detect the *'HIV-antibody-making'* virus.

*Second:* QUEST tests are indeed FDA approved *but* FDA approved *only* to <u>*screen*</u> for various proteins and *autoimmune antibodies*, but <u>*not as a diagnosis*</u> of HIV (the human immunodeficiency virus).

> **THE COURT: "From 1996 until Tommy Morrison's death in 2013, he was repeatedly tested, diagnosed, and treated for HIV and/or AIDS by various physicians".**
>
> *(APP.B.dkt#277 page:3:18-19)*

Evidence establishes TOMMY was repeatedly tested with tests that do not diagnose 'HIV/AIDS', and was repeatedly shown <u>QUEST lab reports</u> *as a* diagnosis. *(APP.B.dkt#283, pages:13-24)*.

Deposition testimony presented by Defendants established no physician conducted tests for a *differential diagnosis* to rule-out *autoimmune disorders*, and any treatment prescribed was based solely upon a <u>lab report</u>, no physical or clinical presentation, patient history, or symptoms of 'HIV'.

> **THE COURT: "On September 1,2013, Tommy Morrison died. His discharge summary at the time of his death included a diagnosis of HIV."**
>
> *(APP.B.dkt#277 page:4:6-8)*

8

A 'discharge summary' from a lab report on testing where **both** test kit company "ROCHE", and FDA, (as discovered on Aug.23,2013) have placed in their *packet inserts*, (based on clinical trials), the following disclaimer:

> **ROCHE PCR: "The Amplicor HIV-1 Monitor test, is <u>not</u> intended to be used as a screening test for HIV or as a diagnostic test to confirm the presence of HIV infection".**

Further proof was presented to the court. An email directly from ROCHE:

> **ROCHE:          "Thank you for your interest. Because there have been several different emails over the past few days, we want to be clear regarding the intended use of the Roche FDA-approved COBAS AmpilPrep/COBAS Taqman HIV-1 Test, v2.o. A copy of the package insert for this test is attached, and the 'intended use' statement can be found on page.2. Please note that neither this test nor any other Roche Diagnostics assay is intended for use as a diagnostic test to confirm the presence of HIV-1 infection."**

> *August 23rd, 2013 Sarah I. Mosley, PhD, Manager PAS, Medical and Scientific Affairs at Roche Diagnostics Corporation.*

The **FINAL DIAGNOSIS** on <u>September 17th, 2013</u>, superseded the final discharge, and confirmed 'no budding retroviruses' (HIV is a retrovirus) and 'no abnormalities' in TOMMY's blood, and ignored by the court.

> **THE COURT: "Patricia Morrison alleges that, after Tommy Morrison's death, electron microscopy revealed that he never had HIV. However, she has provided no evidence to support this allegation, and the uncontroverted evidence demonstrates that Mr. Morrison was repeatedly diagnosed with and received treatment for, HIV, from 1996 through 2013.**

> *(APP.B dkt#277page:4:9-11)*

9

QUEST and HIATT, withheld the **Final Diagnosis** they had subpoenaed. At the September 08th,2016, Hearing, Counsel Caldwell attempts to discredit the **Final Diagnosis.**

> **CALDWELL: "---- this idea of an electron microscope, there is no evidence, expert, which is what would be required in this case, that an electron microscope is the way one discovers it's HIV. So that cannot be a triggering event, absent expert testimony. Of which there – the only testimony is Dr.Branson who says no".**

*(APP.C-A page.24:13-18 Hearing Sep.08th,2016)*

*First,* it was with the *electron microscope* 'HIV' was first discovered, and patented, by Dr. Robert Gallo, chief of the National Cancer Institute laboratory of Tumor Cell Biology, and accepted by the Health and Human Services secretary Margaret Heckler on April 23, 1984, *before* any QUEST tests were invented. *Electron Microscopy* has been empirically tested, subjected to peer review and in publications on 'HIV' since 1984 and generally accepted worldwide within the scientific community. *See generally, Daubert, 509 U.S. at 593-95, 113 S.Ct. at 2796-97, 125 L.Ed.2d at 482-83; U.S. Patent ##4,647,773; #4464465.*

*Second,* scientific journals alone establish value and reliability of the electron microscope. In *Palmer*, the appellate court based general acceptance of this scientific technique exclusively on published articles. *Palmer, 80 Cal.App.3d at 254,145 Cal.Rptr.at 473.*

*Third,* In *Kelly,* the court noted a unanimity of scientific opinion regarding

10

the value and reliability of *electron microscopy* and no useful purpose would have been served by requiring expert testimony on that point. *People v. Kelly, supra, 17 Cal.3d at page 24*. However, Dr. Moses, MORRISON's Expert Rebuttal Witness, shall voluntarily testify at Trial on electron microscopy, *inter alia.*

*Fourth,* QUEST tests do not determine the virus and **their reports** are analogous to *State v. Armstead (La.1983), 432 So.2d 837,840.)* simply *"represent a self-generated record of its operations"*. The *electron microscope* however produces micrographs of the blood itself discriminating between viruses, bacteria, atoms, proteins, antibodies, all too small to be viewed by the human eye.

*Fifth*, Dr. Branson, a QUEST expert, says **"no"** to electron microscopy now rendering the '**existence**' of HIV a *'global issue'* and photo- images of HIV viral particles *under electron microscope* on CDC, and other websites *moot.*

Whether a particular technique has gained general acceptance in the scientific community can be ascertained by reference to both **legal** and **scientific** publications and to **judicial** decisions. *People v. Kelly, supra, at pp.32-36; People v. Law (1974) 40 Cal.App.3d 69,73 [114 Cal.Rptr.708].*

QUEST views this accepted technology as a threat. Two independently performed electron microscopy examinations, pathology reports, and photo images of TOMMY's blood showed no budding retroviruses, no viral particles, no antibodies to HIV, no abnormalities.

11

There were glaring flaws and contradictions in Defendants' testimony. For example, QUEST informed the court their lab report is, but is *also not* a diagnosis; the lab report can, but *cannot* be used for treatment, the lab report is, but *is not,* proof of 'HIV Status'.

QUEST/HIATT and its expert witness, never met TOMMY, had no patient history, did not perform clinical and physical examinations, did not know TOMMY had *autoimmune disorders, not contagious in the ring.*

Disclosure of test kit packet inserts, manufacturers' disclaimers, instructions, warnings, patient history, clinical and physical examinations, *ruling-out* a *differential diagnosis* such as *autoimmune disorders* is the 'standard of care' in rendering a diagnosis of HIV, or any disease. *(APP.A. pages: 14-26)*

Defendants owed TOMMY a 'duty of care', and because of 'QUEST's phone call' on February 10th, 1996, directly to NSAC, he was suspended from his profession and suffered a life-long negligent infliction of emotional distress.

QUEST **departed** from the 'standard of laboratory practice and care' by producing lab reports *falsifying a pre-determined-patient-specific-diagnosis* of the human immunodeficiency virus for NSAC.

It is a prohibited act to submit any device-related report that is false or misleading in any material respect. *FDCA§301(q)(2); 21 U.S.C.§331(q)(2).*

12

The Ninth Circuit Court, in *Ishikawa,* concluded it was "common law duty to exercise reasonable care to avoid harming people by negligence". *See Ishikawa v. Delta Airlines, Inc., 343 F.3d 1129,1134 (9th Circ.2003).* It was forseeable that QUEST's negligent reporting, accepted by NSAC, harmed TOMMY.

The court also relied on QUEST reports as a *patient-specific-diagnosis* of HIV, against FDA mandates and manufacturers' *intended use* of their tests. *(APP.B.dkt#283 pages:25-26).* This is an execution of a scheme called continuing health care fraud violating *U.S. Code§352 Section 4(r)(2).*

What were the distinguishing characteristic findings by the court between 'HIV antibodies' and 'autoimmune antibodies'?

> **CALDWELL: '----but when you have P31 or P32, it's never been known to have a false positive. So the algorithm was what was ordered, and that's what was done in 1996 forward."**

> **THE COURT: "Right".**

> *(APP.C-A page.15:14-17 Hearing Sep.08th,2016)*

**Wrong.** Counsel misleads the court by stating p31 and p32 are conclusive for 'HIV'.

*First,* p31 is also found **in fish**.

*Second,* p32 is a mitochondrial/cell surface protein overexpressed in certain **cancer cells.** Neither are specific for HIV. Peer reviewed medical literature confirms p32 is exclusively localized in the mitochondrial matrix and this has

13

been verified using an *electron microscope* and published in the *'Journal of Biological Chemistry'*.

**No p31 or p32** were found in TOMMY's blood under <u>electron microscope</u>.

The only 'claim' to 'accuracy of HIV' by Defendants, are their very own self-serving, self-generated **lab reports**, <u>over-and-over again.</u>

Defendants' factual false claim of TOMMY's blood harboring the 'virus' involved an *incorrect* description of 'goods' and 'services'.

QUEST's deceptive conduct, deceptive marketing, unsubstantiated claims of HIV existing in anyone's blood based on 'goods' they use and 'services' of a <u>lab report</u> do not constitute a diagnosis of any disease, including HIV.

Defendants' conduct is analogous to *Fed. Trade Comm'n v Health Formulas, LLC. case 2:14-cv-RFB-GWF-dkt#201-1 page 13:6-23; misrepresenting, or assisting others in misrepresenting, expressly or by implication, any material fact to consumers concerning any good or service, such as: **8:** any material aspect of the performance, efficacy, nature, or central characteristics of a good or service.*

QUEST would need to perform additional testing to *rule-out* autoimmune disorders, over one hundred, *(APP.A page:18-48)* causing antibody reactions to their tests on TOMMY before 'accurately' reporting any 'HIV' status. This they did not do, and still do not do.

14

Defendants' legally false claim of 'positive for HIV' in TOMMY's blood appears *on its face* to be true, but does not comply with any <u>contractual term</u> imposed by *test kit manufacturers* or any standard of clinical laboratory practice or care.

Defendants' expert witness confesses that 'the testing algorithm' does not work on everyone's blood and will react 'positive' for <u>*autoimmune antibodies.*</u>

In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the **Estate of Tommy Morrison** against whom the judgment was rendered.

Where reasonable minds could draw different conclusions from facts and circumstances presented, *triable issues of material fact remain*, as they do in this case. **Different conclusions exist.**

For example: physicians present <u>lab reports</u> *as <u>the</u>* 'diagnosis', ***but*** QUEST *now* confesses they do not diagnose.

For example: Defendants claim TOMMY's blood was infected with the human immunodeficiency virus, ***but* the court and the test kit companies** confirm QUEST tests do <u>*not*</u> detect the human immunodeficiency virus.

For example: QUEST contradict themselves and claim <u>lab reports</u> confirm TOMMY's blood was infected with the human immunodeficiency virus, ***but*** renowned pathologists, virologists, microbiologists, and scientists confirm there

15

were no viral particles, no abnormalities, nor *retroviruses (scientific terminology for HIV)* in TOMMY's blood.

Deposition testimony establishes *ruling-in* or *ruling-out* of autoimmune antibodies and a *differential diagnosis* <u>did not occur to the physicians between 1996 and 2013</u>. A triable issue requiring cross-examination at Trial by fact finders.

<u>No</u> affidavits on record from physicians contending they personally made *physicians-diagnoses* of 'HIV' in TOMMY's blood.

**TOMMY's blood should be presumed innocent until proven guilty, at Trial, where witnesses are under Oath and testify, and cross-examination takes place.**

The court's determination was based upon a *presumption level (regarded as)* and not a *scientific level*.

***For the very first time,* <u>all the facts on the 'accepted testing algorithm' are coming to light, twenty years later, and the public need to be informed.</u>**

Rather than protect the unsuspecting TOMMY, his legacy, and **the public interest**, the court failed to do a 'balancing of interest test' and favored <u>a corporation</u> producing its own self-serving <u>lab reports</u>.

TOMMY's blood contained *autoimmune antibodies not contagious in the ring* and no evidence of any 'AIDS' defining diseases. *(APP.A Glossary page.3.)*

16

TOMMY's blood did not harbor the retrovirus (HIV) at any time, and not at death; p31/p32 were not detected in TOMMY's blood under *electron microscope,* just as gp41 and gp120/160 were also <u>absent</u>.

There are five Defendants in this case.

**THE COURT: "As to NSAC, Ratner, and Goodman, ("the State Defendants"), Plaintiff has failed to show any affirmative duty imposed by law that they owed Mr. Morrison and breached."**

*(APP.B.dkt#277 page.10:25-26)*

**NSAC** issued the February 10, 1996, Boxing Agreement but have not disclosed it *(APP.D);* ignored the physicians report that TOMMY was mentally and physically fit to receive a license and box; used a 'QUEST phone call communication' as a *medical denial*; self-interpreted results and *regarded them as* 'positive for human immunodeficiency virus'; released bout and medical information to unlicensed unauthorized *third parties*; all the time relying on a <u>lab report</u>, *inter alia…*

**RATNER** acted outside the scope of his duties delivering medical information in a <u>*secret*</u> ringside meeting to unauthorized *third parties*, cancelling TOMMY's license, bout, issuing an immediate indefinite suspension whilst relying on a <u>lab report</u> he *regarded as* 'positive for the human immunodeficiency virus-HIV'; ignored the physician's clinical and physical report medically

17

clearing TOMMY as mentally and physically fit to receive a license and to fight, *inter alia...*

**GOODMAN** intentionally, fraudulently, in violation of State and Federal laws, contacted HIATT for TOMMY's personal health information without a patient-physician relationship; without signed medical release forms; went to the media outrageously and recklessly misrepresenting HIATT's academic qualifications and TOMMY's medical status; used her own personal 'blog' intentionally to harm the reputation, credibility and career of TOMMY (not a Nevada applicant in 2007); and as a physician knowingly did not disclose QUEST tests react to *autoimmune antibodies* not contagious in the ring, *inter alia…*

> **DISTRICT COURT of Nevada holding**:
> **"… the Court finds that, within the context of the claims in this lawsuit, the Defendants acted reasonably based upon the information they received and the tests that were performed."**
>
> *(APP.B.dkt#277 page.13;24-26)*

**HIATT**, as uncovered by MORRISON, is not a licensed physician nor renowned pathologist, never has been, still portrays himself as one in the media and on government websites *(APP.B dkt#283 page 6:1-27);* disregarded Nevada State Clinical Laboratory Test Release Laws, QUEST Privacy Policies; violated the laboratory standard of care; released personal health information on TOMMY to *third parties* without signed medical release forms; misled the court on tests

18

used on TOMMY as reliable and accurate **only** for the presence of the 'human immunodeficiency virus-HIV', and withheld information on QUEST tests reacting to <u>autoimmune antibodies</u>, *inter alia...*

**QUEST,** with a checkered history of fraud, deceit, negligence, misrepresentation; withholding facts on their testing reacting to *autoimmune antibodies;* concealing *packet inserts* in their possession, custody and control from the court; misrepresenting QUEST *lab reports* as conclusive for the presence of the human immunodeficiency virus ('positive for HIV') to NSAC in TOMMY's blood; misbranding *<u>FDA approved 'antibody screening tests'</u>* as definitive conclusive '*<u>diagnostic</u>'* tests for the human immunodeficiency virus, and HIV infection; not informing physicians <u>nationwide</u> of limitations of testing **they** purchased, performed, interpreted and reported on TOMMY's blood from 1996 to 2013, *inter alia.*

**Defendants did not act 'reasonably'. Their actions are without repercussion, all with the swift flourish of a pen on *docket #277.***

Further trial issues of material fact exist.

For example: how the court determined the difference between TOMMY's *autoimmune antibodies* and alleged 'HIV' antibodies to rule on a MSJ in the *absence* of the *'HIV-antibody-making-virus'* itself, and no *p31 or p32.*

19

The two pathology reports provided by MORRISON were peer-reviewed by scientists in the field of microbiology and virology where TOMMY's actual **blood** was examined by authentic, licensed physicians, board certified pathologists; *versus* QUEST lab reports authored by a corporation employing a phony physician and fake pathologist and using tests that do not determine the virus-HIV are triable issues. *(18.U.S.C.1035).*

TOMMY and the public, were never 'on notice' of these findings.

To substantiate Defendants' claims, underlying or supporting data and documents relevant to an assessment of 'HIV' in TOMMY's blood such as laboratory protocols, reports, drafts of such documents reviewed by the test sponsor or any **Persons not employed by Defendants** *must be produced.* Defendants failed to produce. No competent, reliable human clinical tests or studies to consider Defendants' claims of 'accuracy' for 'HIV' are on the record.

Triable issues exist as *to* the 'accuracy' of QUEST reporting 'positive for HIV' on TOMMY in any state in the United States, at any time.

There is no statute of limitations on *continuing health care fraud, negligent misrepresentation and fraud upon the court.*

No evidence exists on the record from test kit manufacturers themselves claiming any 'accuracy' for QUEST to provide lab reports for the presence, or

absence, of the human immunodeficiency virus based on QUEST testing and reporting to NSAC, TOMMY, or physician.

**Defendants are 'misbranding medical devices' by producing *falsified diagnoses* and altering the *intended uses* of tests in violation of the FTC Act, and FDA regulations.**

It has been held that equitable tolling applies principally if MORRISON has actively been misled by Defendants.

It has also been held that the federal equitable tolling doctrine does not require wrongful conduct on the part of the Defendants when **fraud** and **misrepresentation** exists, as in this action.

As uncovered in this action, <u>no QUEST test</u> *'shows that the applicant is infected with the human immunodeficiency virus'* although QUEST continues to provide false evidence to satisfy NSAC's licensing Rule. *<u>NRS.467.027(4)</u>* *<u>NRS.467.027(4)(b).</u>*

Unless the public and physicians are informed, NSAC will continue to rely on QUEST's health care fraud and fraudulent misrepresentation.

**TOMMY's case cannot be underestimated and shall set a precedent to others both <u>in and out of the ring.</u>**

21

## STATEMENT OF JURISDICTION

This appeal comes from the final order by the United States District Court for Nevada, Southern Division.

The lower court had jurisdiction of this case and granted MSJ in favor of Defendants-Respondents on October 24th,2016. *(APP.B.dkt#277).*

Pursuant to *NRAP 4(a)(1), "a notice of appeal must be filed after entry of a written judgment or order, and no later than 30 days after the date that written notice of entry of the judgment or order appealed from is served."*

This Court has jurisdiction because the order under review is final and disposed of all issues presented.

Notice of Entry was filed and served on October 25th,2016, *(APP.B.dkt#278)* and MORRISON timely filed the Notice of Appeal on November 3rd,2016, with the Ninth Circuit Court of Appeals. *(APP.B.dkt#279)*

## PROCEDURAL HISTORY

July 24th, 2014, Plaintiff-Appellant ("MORRISON"), filed a civil complaint against Nevada Defendants-Respondents, Quest Diagnostics Incorporated ("QUEST") a Corporation in Nevada; John Hiatt ("HIATT") individual; Nevada State Athletic Commission ("NSAC") unknown entity; Marc Ratner ("RATNER") individual; Dr. Margaret Goodman ("GOODMAN") individual.

22

The court ordered a **Stay** on proceedings from December,2014, to October,2015.

During a telephonic hearing in December 2014, MORRISON, *heir at law of decedent Tommy Morrison,* informed Hon. Magistrate Judge Leen application for Administrator was in Probate Court and was being finalized.*(analogous to Shinkle v Union City Body Co., 94 F.R.D.631,637 (D.Kan.1982) where a survival action was timely brought by the 'heirs at law of the decedent Victor Shinkle', after the statute of limitations had run, one of Victor's heirs was appointed as administrator of the estate. The court allowed the plaintiff to be changed from the heirs of Victor Shinkle to "Mary Catherine Shinkle as administrator of estate" and ruled that this amendment related back to the filing of the original complaint even though made more than 2 years after the cause of action arose. 94 F.R.D.at 637. The court further held that "[t]his result also agrees with the Tenth Circuit's interpretation of Kansas Supreme Cases," i.e., Williams and Harlan. 94 F.R.D. at 638.*

A Discovery Schedule was ordered and TOMMY's widow was permitted to refile the Complaint under status of Administrator. *(APP.C.C.Hearing Sep.14,2015).* TOMMY's widow filed *dkt#79* for the Estate of Tommy Morrison. *See Davis v. Preston 118 Tex.303,16 S.W.2d 117 (1929) where widow amended her pleadings to assert Adminstratrix capacity.*

23

Claims from the original complaint included: Negligence, Defamation, Slander, Libel, Fraud, Negligent Misrepresentation, Intentional Infliction of Emotional Distress, Intentional Interference with a Contract. *See Hamilton v. Blackman; 915 P.2d 1210,1218 (Alaska 1996) representatives may relate back to date of original complaint.*

February 09th,2016, within the time set in the Scheduling Order, where parties may freely amend their pleadings **without** leave of court, MORRISON timely filed a Second Amended Complaint *(dkt#105)* because the court enlarged discovery to include medical data from *February 11th,1996*, through death, not just *pre-bout* medical data of February 10th,1996. The SAC claims additional years where QUEST's fraud was prevalent with physicians accepting lab reports as definitive diagnoses of 'HIV'. *In Sergio Casillas Ramirez v. County of San Bernardino,806 F.3d 1002 (9th Circ.2015) a timely filed SAC mooted pending motions to dismiss and reversed the district court's grant.*

Discovery now involved other states, other physicians, however still using the very same 'algorithm of testing' that detects *autoimmune antibodies and other interferences not contagious in the ring.*

Discovery ended May 08th,2016. Dispositive Motions due on or before June 08th,2016.

24

June 06th,2016, NSAC, RATNER, GOODMAN filed a motion to exceed page limit on MSJ.

June 08th,2016, QUEST, HIATT, filed MSJ *(dkt#175).*

June 08th,2016, NSAC, RATNER, GOODMAN filed MSJ *(dkt#174)* **exceeding the page limit.**

June 20th,2016, court **denied** NSAC, RATNER, GOODMAN's June 06th,2016, motion to exceed page limits. *(dkt#180)* and no extension of time was granted.

June 23rd,2016 NSAC, RATNER, GOODMAN filed a second MSJ *(dkt#185), **15 days outside of the scheduling order.***

September 08th,2016, MSJ Hearing was held on dkts#*174, #175,* but not on MSJ *dkt#185,* nor on the SAC *dkt#105.*

September 26th,2016, Defendants' Motions to Dismiss were denied without prejudice, as pending MSJ *(dkts#174#175)* encompassed the same arguments. *(dkt#263).* **October 24th,2016, case was terminated.** *(dkt#277).*MSJ was granted erroneously on the *FAC. (dkt#79).*

MORRISON's timely filed *SAC* rendered the *FAC, MSJ's,* and *Motions to Dismiss,* as moot.

October 25th,2016, Clerk's Judgment was entered. *(dkt#278)*

25

November 03rd,2016, MORRISON filed a Notice of Appeal. *(dkt#279)*
*NRAP4(a)(1).*

QUEST and HIATT filed *Bill of Costs* at the Court of ***Nebraska,*** not Nevada.
MORRISON opposed *Bill of Costs*, *(APP.B.#283)* and requested a Stay on
judgment pending appeal. *(APP.B.#284,285,286).*

## STATEMENT OF THE ASSIGNMENTS OF ERROR

**TOMMY**, and his legacy, suffered, and the public will continue to suffer
substantial harm resulting from Defendants' violations and unlawful acts or
practices.

Absent injunctive relief Defendants are likely to continue to injure
applicants and consumers, reap unjust enrichment, and harm the public interest.

In the court's current ruling, packet inserts, manufacturers' disclaimers,
warnings, reactions to QUEST tests by *non-HIV-related-conditions*, and the true
meaning of a 'QUEST lab report' will continue to be fraudulently concealed from
the public.

QUEST lab reports, under the lower court's ruling, permit unlicensed
physicians (HIATT)(RATNER); boxing commissions (NSAC); non-patient-
physician relationships (GOODMAN), media outlets (ESPN, New York Times),
judges, courts, or corporations (QUEST) to deliver TOMMY, or anyone, a
diagnosis of a **loathsome disease**, *human immunodeficiency virus,* based on tests

26

that do not detect the *'virus'* and without ruling-out non-HIV-related conditions that trigger a reaction to QUEST tests.

Science matters. However, the court has ruled the *electron microscope,* as used in the discovery of HIV in 1984, and used by scientists all over the world, **is no longer credible.**

## QUESTIONS PRESENTED FOR REVIEW

**1.    NSAC accepts QUEST lab reports to satisfy: *NRS.467.027(4);* *NRS.467.027(4)(b)* 'must provide an original or certified copy of results which: show that the applicant or unarmed combatant is not infected with the human immunodeficiency virus':**

a.    Whether QUEST can scientifically show TOMMY was infected with the human immunodeficiency virus?

b.    Whether QUEST lab reports are in violation of the manufacturers' own test kit disclaimers, warnings and limitations?

c.    Whether Defendants have represented, directly or indirectly, that the use of QUEST testing detects HIV- the *human immunodeficiency virus?*

d.    Whether Defendants' representations are false, misleading, or were not substantiated at the time each representation was made?

27

**2.     The standard of 'HIV antibody' tests detect, as discovered in this action, *autoimmune antibodies*, but not the retrovirus itself (HIV):**

a.     Whether the court's findings included *physicians from 1996 to 2013* ruling-out a *differential diagnosis* of *autoimmune disorders* before the court accepted QUEST lab reports as *positive for 'HIV'?*

b.     Whether the court's findings included *Defendants in 1996* ruling-out *autoimmune antibodies* before the court accepted QUEST lab reports as *positive for 'HIV'?*

c.     Whether the making of the representations set forth by Defendants also constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of *Section 5(a) and 12 of the FTC Act, 15 U.S.C.§§ 45(a) & 52?*

**3.     *42 CFR 493.1253(b)(2)(iv).* The Code of Federal Regulations - Analytical Specificity – The laboratory must determine the extent to which the method measures the analyte for which it is reporting results:**

a.     Whether the record shows QUEST methodology for distinguishing between 'HIV-antibodies' and '*autoimmune antibodies*' before reporting results?

28

**4.     HIV discovery was patented. U.S. PATENT #4,647,773; #4464465; and legally documented claims of the technique used and scientific terminology:** *retrovirus; virus observed by electron microscopy; detected by reverse transcriptase assays or by electron microscopic observation; EM=electron microscopy; Electron microscopic examinations showed that the cells released considerable amounts of virus.*

**On the other hand, Quest sells, performs, interprets tests that do not detect the human immunodeficiency virus:**

a.     Whether the court erred in accepting <u>QUEST lab reports</u> over two pathology reports using accepted, peer-reviewed technology that *scientifically* showed <u>no</u> abnormalities, <u>no</u> retroviruses and <u>no</u> antibodies specific to HIV in TOMMY's blood under electron microscopy?

b.     Whether the court erred in siding with QUEST concluding HIV has never been discovered, photo imaged, measured or seen under an *<u>electron microscope</u>*?

c.     Whether <u>*no*</u> virus observed by electron microscopy, <u>*no*</u> virus detected by microscopic observation, in TOMMY's blood creates a *<u>triable issue of material fact?</u>*

*/ / /*

29

**5.    Pursuant to: _NRS Section 441 A.150 section 3_: 'A laboratory director shall, in the manner prescribed by the board, notify the health authority of the identification by his medical laboratory of the presence of any communicable disease in the jurisdiction of that health authority. <u>The health authority shall not presume a diagnosis of a communicable disease on the basis of the notification received from the laboratory director.</u>':**

a.    Whether the court erred in presuming a diagnosis of HIV on the basis of notification (<u>a lab report</u>) received from a QUEST laboratory director?

b.    Whether the physicians and 'State Defendants' erred in presuming a diagnosis of HIV on the basis of notification (<u>a phone call, or lab report</u>) received from a QUEST laboratory director?

<u>STATEMENT OF RELATED CASES AND PROCEEDINGS</u>

This case has not been before the Court previously.

<u>STATEMENT OF FACTS</u>

Facts are based on chronicle events in the time sequence of their occurrence, with pertinent court rules, references to the record and Opinion and Order.

Facts are accurate, not redundant or unnecessary to this appeal and incorporate TOMMY's medical and health status on February 10th, 1996, through death.

30

**FEBRUARY 07th,1996 to FEBRUARY 10th,1996**

1.     **Tommy "The Duke' Morrison submitted an NSAC licensing application to fight in a professional boxing bout on February 10th,1996, in Las Vegas, Nevada…**

…To participate in professional bouts of unarmed combat in the State of

Nevada, one must obtain a license from NSAC. Applicants must comply with

requirements found in Nevada Revised Statutes and Nevada Administrative Code,

which includes proof that the applicant meets the medical requirements to obtain a

license.

2.     **TOMMY's Promoter was Mr. Don King…**

…on February 10th,1996.          *(not Tony Holden dkt#277 page 3:9-11).*

3.     **TOMMY was 'self-managed' for the bout…**

…his application reflects that.

4.     **NSAC issues the Boxing Contract for both fighters …**

…to sign prior to the fight with purses to be deposited with NSAC under

Articles of Agreement.          *(see APP.D)*

> **The COURT: "Ms. Morrison has failed to produce**
> **evidence of a valid and existing contract from February 1996."**

*(dkt #277page 14:10-11)*

NSAC have withheld the Boxing Contract from this court. *(APP.D)*

5.     **The application called for TOMMY to be clinically and physically examined by a licensed physician. TOMMY was mentally and physically cleared to fight and receive a license…**

31

…and on February 07th,1996, Dr.Voy submitted the physicians medical clearance to NSAC.

6. **Application called for TOMMY to sign a medical release form allowing NSAC to receive 'pre-bout' medical data on TOMMY…**

…and valid for one year from the date signed, (February 09th,1996) on *pre-bout* medical data. NSAC produced a signature on a release form which is not a probable signature of TOMMY. Evidence in the form of a handwriting forensic expert is on the record.

7. **An original or certified clinical laboratory report 'showing that applicant was not infected with the human immunodeficiency virus' was required…**

…but not a 'negative' clinical laboratory report. TOMMY was instructed by NSAC he could not fight without a blood test to *show that his blood 'was not infected with the human immunodeficiency virus'.* TOMMY relied upon the 'lab' to provide such evidence.

8. **NSAC called for TOMMY to submit to a blood draw…**

…being one of over 2,400 blood draws performed by Dr.Ghanem's medical practice for NSAC, TOMMY's blood was drawn and sent to QUEST in Nevada (formerly APL hereinafter "QUEST") to test for the *human immunodeficiency virus.* Dr.Ghanem was also NSAC's chairman.

32

**9.     QUEST selected and purchased tests approved by the FDA for the intended use of 'screening' for 'antibodies', not 'diagnostic' for the 'human immunodeficiency virus', nor HIV-1 infection...**

...and QUEST performed and interpreted TOMMY's blood sample using equipment and methods selected and controlled by QUEST, and reported results 'Positive for HIV' to NSAC on February 10th,1996. QUEST is not in compliance with test kit manufacturers' instructions, nor with FDA labeling regulations. QUEST knew the testing 'algorithm' also detects *antibodies to autoimmune disorders* as warned within test kit company's instructions.

**10.    QUEST's alliance with NSAC providing results misrepresenting to be a definitive 'showing of the human immunodeficiency virus' departed from clinical laboratory practices and manufacturers' intended uses...**

...and *departed* from any 'standard of laboratory practice or care' by not reporting results to the 'ordering physician' on February 10th,1996, or February 12th,1996, *(dkt#277page.3:7-9)* and not following test kit company warnings. QUEST departed from laboratory practices by **tampering** with the lab report adding Dr.Robert Voy's name, who was *not* the 'ordering physician' of the tests on TOMMY.

**11.    QUEST, by phone, on February 10th,1996, directly informed NSAC that TOMMY's blood was 'positive for the human immunodeficiency virus'...**

...unbeknown to TOMMY the tests react 'positive' to autoimmune disorders and auto-antibodies in his blood. QUEST fraudulently reported results of

33

'antibody' testing as results for the 'human immunodeficiency virus'. NSAC required proof of the *human immunodeficiency virus*.

QUEST knowingly made, used or caused to be made, a false record (lab report) and misbranded tests (using *antibody screening tests* as **diagnostic tests** for the virus) to cause a false and fraudulent claim of 'positive for HIV' in TOMMY's blood. Not only in 1996, but throughout this action.

QUEST and HIATT's conduct, statement, false record, omissions, and negligence, were material to NSAC's decision to cancel TOMMY's license, first fight of a multi-million-dollar-fight contract with Don King and be indefinitely suspended from boxing. Being accused of having a **loathsome disease** caused great emotional harm to TOMMY, his profession, family, and now Legacy.

**12.    NSAC do not request proof of 'antibodies', nor a 'negative' report...**

...QUEST forever labelled TOMMY as 'Positive **for HIV'**. QUEST, and HIATT, have not presented a fair balance of information to the court relating to side effects, safety, reliable scientific data, and effectiveness of their products used at any time throughout TOMMY's life. QUEST claim not to possess any of the above information, because it is in the hands of *third parties*.

FTC is charged with regulating the advertising of many medical devices under *section 12 to 15 of the FTC Act,* which prohibit false misleading advertising of certain products that FDA regulates.

34

**13.  QUEST reported results of tests as a definitive showing of the human immunodeficiency virus...**

...but a "POSITIVE WESTERNBLOT" also means positive for HLA

antibodies in autoimmune disorders unrelated to HIV. (*APP.A.27*)

**14.  No evidence has been presented by QUEST from the test kit company, FDA, or CLIA, such as the analyses, research, or studies, that they abided by any standard of laboratory practice...**

...and QUEST representations of findings that TOMMY harbored the

'virus' on February 10th,1996, *and beyond,* fails to substantiate that the

representation is true without competent and reliable clinical and scientific

evidence. When such tests are human clinical tests, all underlying or supporting

data must be available for inspection and production to the Court, including the

methodology of isolation and purification of the virus.

QUEST have no authority to provide NSAC, any physician, or this court,

with *"an original or certified copy of a clinical laboratory report to show that an*

*applicant (TOMMY) is conclusively infected with the human immunodeficiency*

*virus".*

**15.  February 10th,1996, QUEST reported TOMMY's medical results to NSAC, by phone...**

...and no evidence supports QUEST reported TOMMY's test results to the

unknown 'ordering physician' departing from the standard of laboratory practice

and care. QUEST tampered with the test report by placing Dr.Voy's name as the

35

ordering physician, but VOY did not order the test, and did not receive any results in 1996 even if he had been the ordering physician.

## 16. RATNER, Executive Commissioner for NSAC, re-disclosed personal health information on TOMMY to unauthorized third parties...

...not named on the medical release form, and without the 'ordering physician' or TOMMY present.

On February 10th, 1996, RATNER, called a *third party* to meet him by the ring, to come alone, to not bring TOMMY. The *third party* was Tony Holden who was not TOMMY's promoter because Don King was; nor his manager because TOMMY was self-managed.

The medical release only allowed NSAC, on or before <u>February **09th**, 1996,</u> *another NSAC error,* to receive *pre-bout* medical information on TOMMY. Tony Holden did not work for NSAC. TOMMY's attorney on February 10th,1996, was not present and was not named Stuart Campbell. Nevertheless, RATNER, against state, federal, and NSAC rules, re-disclosed QUEST results to Holden and Holden's attorney.

## 17. RATNER used QUEST's 'lab report' as means of medical denial...

...without consulting TOMMY's physician for a *differential diagnosis* to rule-out autoimmune disorders producing autoantibodies reacting to QUEST testing.

RATNER informed Holden of the cancellation of the bout, and immediate indefinite suspension from boxing.

36

TOMMY was not present at this secret ringside meeting, nor was the 'ordering physician', and neither was Dr.Voy.

NSAC contend Holden was TOMMY's 'advisor', and conclude that an 'advisor' can lawfully receive personal medical and 'bout' information.

It is irrelevant whether someone is a self-proclaimed 'advisor'. RATNER violated NSAC's licensing rules and Articles of Agreement on the Official Boxing Contract stating *"verbal agreements are not recognized by the commission." (APP.D)*

## 18. TOMMY was immediately flown out of Las Vegas the night of February 10th,1996...

...RATNER and the 'advisor' decided due to 'media swarming' TOMMY must be immediately flown out of Las Vegas.

RATNER testified he never met with TOMMY on February10th,1996. TOMMY arrived back in Oklahoma that night, and the media were already talking 'HIV' in TOMMY's blood. Plaintiff was living in Las Vegas at the time of the events.

TOMMY's life immediately began to spiral into despair turning to drugs, depression, stigma, harassment, discrimination and no-one wanting to shake his hand or look him in the eye.

## 19. TOMMY provided all medical requirements to obtain a license...

37

...a physician's report medically clearing TOMMY as mentally and physically fit to fight and receive a license; a clinical laboratory report that *did not show* that TOMMY's blood had the *human immunodeficiency virus*; weigh-in obligations met, pre-fight medical examinations by Nevada ringside physicians performed. <u>TOMMY complied.</u>

### FEBRUARY 11th,1996 to JULY,2007...

**20.    TOMMY was repeatedly tested, but with the same 'accepted algorithm' of tests known to react to 'autoimmune antibodies' although TOMMY, and his physicians, were never put on notice of this non-disclosure of 'FACT' by QUEST...**

...TOMMY never exhibited symptoms, signs, clinical or physical evidence of the virus.

Physicians, as testified by TOMMY's previous two wives, were unaware of *packet inserts or limitations* of testing QUEST were purchasing and reporting on TOMMY's blood.

TOMMY's autoimmune disorders were reacting to the testing, as they do with the 'accepted algorithm'.

But, physicians solely relied upon a <u>QUEST lab report</u> <u>every time</u> to demonstrate to TOMMY, and wife, that he was testing '*positive for the human immunodeficiency virus*'.

Two decades of the same 'algorithm' where the blood of someone that harbors autoimmune disorders create an abundance of auto-antibodies triggering

a reaction totally innocent of the human immunodeficiency virus, as scientifically

discovered on September 17th,2013, in Omaha, Nebraska, independently

supported by Boston Mass. General Hospital, in 2012. Both occasions where

TOMMY's actual blood was looked at, and not just a QUEST lab report.

21.  **CDC does not make diagnoses for any physician. CDC confirms the
     'testing algorithm' also reacts to autoimmune disorders and
     autoimmune antibodies...**

...and CDC does not refer specific testing or trade names, does not regulate

testing, does not see the patient, cannot report a positive result, or diagnoses for

the presence of the human immunodeficiency virus.

> **THE COURT: "All of the testing, including by the
> Center for Disease Control (CDC),
> came back positive for HIV".**
>
> *(dkt#277page 3:13-14),*

No scientific evidence exists on the record that TOMMY's blood was

'positive for the human immunodeficiency virus' at any time **by CDC.**

> **" However, nobody at the FDA will be able to advise you
> regarding which test or tests to employ...CDC-INFO is not
> able to recommend a brand name of a HIV test to you as
> CDC is not the regulatory agency for the approval of these tests."**
>
> *David Banks FDA Office*
> *Of Special Health Issues*
> *(APP.B dkt#283page 26:14-16)*

22.  **False or misleading information is determined by the effect the label
     and labeling has on recipients as to whom the claims are addressed...**

39

…and the manufacturers informed QUEST, and HIATT at the time of their purchase, *the intended use, benefits and risks* stated in the labeling or advertising consistent with the product's FDA approved or cleared labeling, **consistent as in:**

**FDA has not approved their testing as a diagnosis of the human immuno-deficiency virus, nor HIV infection.**

**23.     TOMMY's physicians did not test for a differential diagnosis…**

…that cause reactions to the testing because they took as 'truth' a QUEST <u>lab report</u> as a definitive diagnosis of the human immunodeficiency virus.

Physicians for <u>twenty or more years</u> have relied solely upon a <u>lab report</u> believing QUEST results could only mean one thing – *'the virus HIV that causes AIDS'*, and the need for a *differential diagnosis* was not required, and prescriptions for AZT must be written immediately upon reading a <u>lab report</u>.

**24.     TOMMY and his physicians were not on notice of the shocking information uncovered in this action. The blood of humans, and dogs, and up to one hundred (100) other conditions will also react to the tests used by QUEST, and its subsidiaries, on TOMMY's blood…**

…and TOMMY's WIDOW was also not aware of these undisclosed facts until 2014, and TOMMY was never put 'on notice'.

**25.     TOMMY's physicians produced only <u>QUEST clinical lab reports</u> in their 'Affidavit of Records'…**

…without clinical or physical examinations, patient history, ruling-in or ruling-out autoimmune disorders and without ruling-out non-HIV-related

40

disorders. *(APP.A page14)*. The <u>Standard of practice and care</u>, for a definitive diagnosis of any disease is not just by looking at a <u>QUEST lab report</u>.

**26. TOMMY, his former wives, and mother, had no reason to believe otherwise ...**

...that QUEST and HIATT were concealing information. Between 1996 and 2008, TOMMY's first and second wife testified in depositions that TOMMY was repeatedly tested, received prescriptions from physicians upon the presentation of a QUEST <u>lab report</u>. They even believed 'HIV' was an autoimmune disorder and were never informed or shown any *packet inserts* with warnings from tests purchased by QUEST for the physicians.

**<u>Physicians merely check a box that states 'HIV' on a QUEST requisition form without knowing the names and intended use, limitations, warnings, of the tests being used by QUEST.</u>**

**27. PHYSICIANS continued to write prescriptions for AZT, and other 'HIV' medications, based solely on a clinical lab report...**

...and, as testified by the second wife, TOMMY took the prescribed medications. However, the 'advisor', Holden, testified TOMMY did not take these medications. TOMMY publicly voiced 'HIV' medications came with deathly side-effects and was not going to take them.

**28. THE NEW YORK PHYSICIAN, Dr.HO, was unable to produce the testing methods of 'isolation and purification' of any evidence of the virus in TOMMY's blood...**

41

...and MORRISON requested HO's 'sealed documents' be unsealed for the

record so the methodology, if any, of isolation of the virus could be replicated.

But no scientific evidence of isolation of 'HIV' existed in TOMMY's blood in the

'sealed records'. The court erred by not unsealing them and prejudiced

MORRISON. *No records have been under seal throughout this case.*

This was evidence that supported MORRISON's claims.

## JULY,2007 to AUGUST,2011...

**29.     GOODMAN, head of NSAC Medical Advisory Board, requested TOMMY's 1996 test results from a 'physician and renowned pathologist named DR. JOHN HIATT' at QUEST...**

...and NSAC's contact. GOODMAN had no patient-physician relationship

with TOMMY; no signed consent form. TOMMY was not applying for a 2007

license in Nevada and no reason existed for GOODMAN to request any

information from HIATT other than to go to her media contacts to intentionally,

and recklessly harm TOMMY.

TOMMY was not under the jurisdiction of any NSAC rules.

GOODMAN got involved in 1996 medical health information, in so doing,

violated state and federal laws.

GOODMAN, a licensed physician, admitted she knows nothing about HIV

testing; has not read *packet inserts* of tests used on TOMMY and admits she said

HIATT was a renowned pathologist and physician.

42

In 2007, TOMMY, weighing 220lbs, (not suffering any 'wasting-syndrome') attempted a comeback in West Virginia, which did not require 'HIV' testing.

TOMMY publicly questioned QUEST 1996 lab report he had never seen, nor received, on February 10th,1996. TOMMY requested proof of the results and no-one could provide them.

Discovery in **2014** uncovered HIATT is not a licensed physician or a pathologist. These articles remain on the internet to this day to continually further harm TOMMY's legacy.

**30.** **HIATT retrieved TOMMY's test results for GOODMAN without a signed medical release consent form and against state regulations and federal CLIA regulations...**

...GOODMAN went to the media, used her personal blog, informing the public HIATT was a physician and renowned pathologist.

HIATT revealed to the court **he** knows nothing about HIV tests; does not know how to interpret them; cannot diagnose; has never met TOMMY.

GOODMAN publicly reports HIATT was the physician that *reviewed the 1996 results*.

HIATT's professional status as 'renowned pathologist and physician' remains unchanged on the world-wide-web. On government websites HIATT is an M.D. *(APP.B dkt#283 page 6:1-28)*

**31.** **Dr.VOY's email confirms he did not diagnose TOMMY with the human immunodeficiency virus in 1996...**

43

…and found him physically and mentally fit to fight and receive a boxing license on February 10,1996.

> **" Hello Tommy, You are correct, I did not diagnose you as having AIDS. I did your required licensing exam and found you physically qualified and fit to box at the time. I certainly approve your desire to get a boxing license."**

*Dr.Robert Voy, MD*
*(APP.B dkt#283page26:6-9)*

Defendants argue TOMMY was 'put on notice' on July 15th,2011, that he did not have HIV. But TOMMY also read the media frenzy created by GOODMAN and HIATT in 2007 informing the public it was <u>DR. HIATT</u> who reviewed his results.

HIATT and GOODMAN's actions are a contributing negligence to a twenty year downward spiral in TOMMY's life and equally liable for claims beginning February 10th,1996.

A simple 'google search' uncovers HIATT and GOODMAN's public revival of February 10th,1996, testing and <u>lab report</u> and HIATT's falsification of academic credentials, and their false, fraudulent, negligent misrepresentations of HIV in TOMMY.

A public retraction is warranted and must be given as much public exposure as their reporting received from 2007 in mainstream and international media outlets, and every boxing site- <u>in the world.</u>

44

HIATT and GOODMAN were negligent and no appropriate standard of care was undertaken by them.

TOMMY read the media reports and believed HIATT was a 'renowned physician and pathologist' involved in the QUEST 1996 <u>lab report</u> and diagnosis of HIV <u>to the day he died.</u> (MORRISON's personal knowledge).

## 32. DR.OSIO was TOMMY's personal physician between 2009 and 2011 and found no evidence of HIV…

…and under Dr.Osio's monthly visits and care, for three years, requiring prescriptions only for ADD and allergies.

**Dr.Osio's Affidavit** confirms he found no presentation, no signs, no symptoms and no clinical or physical evidence of HIV.

Dr. Osio shall testify at trial. *Another triable issue of material fact.*

## <u>AUGUST,2011 to DECEMBER 08th,2011…</u>

## 33. TOMMY was arrested August 2011 and was in solitary confinement for twenty-three (23) days...

…in Tennessee and extradited to Kansas, under a Kansas Sealed Fugitive Warrant of Arrest, later found to be for just an $80 South Dakota, 2001, unpaid fine.

During incarceration, TOMMY was bitten and infected by an insect bite, a *brown recluse or tick,* on the side of his chest.

## 34. TOMMY was arrested again for the second time...

45

…just one day after release on bail, was back in jail for two days for allegedly 'loitering' at a sunglass stand at a Walmart store before going to the airport to return to Tennessee.

35.  **After twenty-five (25) days of incarceration, bailed out, and headed back to Tennessee, TOMMY's flight pulled back to the gate and he was taken into custody at Atlanta Airport…**

…now on drug charges, later to be released and placed on a flight eight hours later, when drug tests came back negative.

36.  **The very next day, TOMMY was arrested again for the fourth time…**

…and in jail for one day now under DUI charges, his car was totaled and the other car *hit and ran*. DUI charges were dropped when tests came back negative.

37.  **Six hundred and forty-four (644) hours in jail…**

…six hundred and nineteen (619) hours were in solitary confinement.

38.  **December 01st,2011, TOMMY was admitted for a one (1) hour surgery on his chest bite…**

…but came out of hospital one week later to discover the surgeon had left twelve (12) FEET of surgical gauze in TOMMY's chest, undocumented, for one week. The home health nurse pulled twelve FEET of gauze out of TOMMY's chest on December 08th,2011, **discovered by MORRISON.**

That night TOMMY's leg gave way, his head went through a wall, fell on his neck and to the ground.

46

**DECEMBER 08th,2011 to SEPTEMBER 18,2013...**

39.  **Between December,2011 and September 01,2013, TOMMY was
     hospitalized for wound care, physical therapy, IV nutrition**...

...a g-tube was inserted. TOMMY's voice-box was paralyzed from the fall

causing torticollis, malnutrition and aspiration pneumonia. MORRISON became

TOMMY's voice and durable power of attorney.

40.  **July,2012, TOMMY's blood was tested by Boston Mass. General
     Hospital and Diagnosis found no evidence of the virus...**

...results and photo images of TOMMY's blood from a renowned CLIA

licensed hospital and pathology department were ignored by the court.

41.  **November,2012, TOMMY was diagnosed with Guillain-Barre and
     Miller-Fisher Syndrome...**

...and was intubated to help him breathe and received four rounds of IVIG

treatment. TOMMY went in and out of seven intubation procedures each lasting

seven to ten days.

42.  **Extensive testing was performed on TOMMY's blood and cerebral
     spinal fluid (CSF) between 2012 and 2013...**

...and revealed *autoimmune disorders*; mononucleosis; Epstein Barr;

rheumatoid arthritis; bilateral maxillary sinusitis; allergies; B-12 deficiency;

hemolytic anemia; Coombs; Adrenal insufficiency; Addison's Disease;

Hypothyroidism; High Globulin; Chronic Traumatic Encephalopathy from one of

the most brutal knock-outs in history of boxing against Ray Mercer; *inter alia.*

47

43. **No 'AIDS' defining diseases were detectable in TOMMY's blood, cerebral spinal fluid, tissue cultures, saliva or sperm...**

...or macrophages, throughout TOMMY's medical examinations. No

HTLV I or HTLV II; no Kaposi Sarcoma; no Pneumocystis carcinii pneumonia;

no lymphadenopathy. *No 'round giant cells' releasing HIV/virus* in his blood

under *electron microscope* to even be consistent with the discoverer's findings in

'HIV infected' blood. *(see U.S. PATENT #4,647,773; #4464465)*

44. **August 23,2013, Plaintiff received an email in ICU from ROCHE confirming that their ROCHE tests used on TOMMY throughout his life, do not detect HIV infection, and do not diagnose HIV (human immunodeficiency virus) ...**

...and cannot be used as the diagnosis by any physician.

45. **Final Discharge Summary issued on September 02,2013...**

...presented by Defendants included a diagnosis of HIV infection using the

very same ROCHE test that does *not* diagnose HIV, nor HIV infection, <u>as per the</u>

<u>manufacturer, and FDA.</u>

46. **UNMC in Omaha, Nebraska, openly admitted that the ROCHE test had been the test they had been using for thirty years to diagnose 'HIV' in patients...**

...and on TOMMY without any approval from the test kit company, or FDA.

But, QUEST and HIATT already knew ROCHE test cannot be used as a diagnosis

of HIV, nor HIV infection, because *packet inserts* are in their possession,

supporting MORRISON's claims. *(APP.A page49dkts#125/262).*

48

TOMMY's post mortem blood result of **September 17th, 2013,** superseding the *final discharge*, scientifically concluded TOMMY's blood did not contain any 'budding retroviruses' (HIV is a retrovirus), and no abnormalities. *(APP.A page49dkts#125/262).* This document was in Defendants' possession but not disclosed.

MORRISON presented the **September 17th,2013, Final Diagnosis,** but ignored by the court.

**47. One week prior to death, TOMMY was placed in a medically induced coma…**

…and on the night of September 01,2013, TOMMY died.

**48. Cause of Death: Death Certificate issued September 04th,2013, was reported as: pseudomonas septicemia, cardiac arrest, multi-organ failure, and septic shock…**

…but Media were quick to report TOMMY's death as 'AIDS' citing back to the 'diagnosis of HIV' in Las Vegas, Nevada, on February 10,1996.

**49. TOMMY's blood was drawn September 01,2013, for a post mortem blood autopsy to finally rule-in, or rule-out, the virus…**

…and was performed at one of the most renowned pathology laboratories in the nation equipped for bio-terrorism, HIV, and Ebola.

**50. September 17th,2013, TOMMY's postmortem blood results scientifically confirmed that his blood was not infected with the human immuno-deficiency virus, and no 'aids' defining diseases, no p31 nor p32…**

49

...and on September 18th,2013, the physician from UNMC called MORRISON informing her TOMMY was negative and the **Final Diagnosis,** dated **Sep.17th,2013,** was faxed to her. Defendants withheld this document that was in response to their *subpoenas*.

## DECEMBER 21/23rd,2013 to JULY 24th,2014...

51.    **December 21st and December 23rd,2013, Plaintiff began investigating the fraudulent events of February 10th,1996...**

...December 21/23,2013. Due diligence began.*(APP.Bdkt#283pages25-29)*

Did <u>test kit</u> <u>companies</u> diagnose HIV, *<u>no,</u>* they just make the tests, they do not see the patient.

Did <u>physicians</u> diagnose HIV in TOMMY, *<u>no</u>*, they said the <u>lab report</u> does that.

Did <u>other clinical laboratories</u> diagnose HIV, (except for QUEST in Vegas) they do not diagnose any disease, not even HIV.

MORRISON asked <u>FDA</u> whether a <u>clinical laboratory report</u> is a diagnosis of HIV, *<u>they said no</u>*, a 'lab report' just assists in making a diagnosis.

**Then in 2014, MORRISON uncovered QUEST is using tests not approved by the U.S. Food and Drug Administration for detecting or diagnosing the human immunodeficiency virus.**

QUEST are not abiding by manufacturers' instructions and not disclosing or abiding by *packet inserts* containing disclaimers, warnings, limitations, side effects.

**QUEST still do not warn physicians, or patients, of non-HIV-related conditions triggering reactions to their testing.**

MORRISON requested *methods* used in isolating the actual 'virus' in TOMMY's *blood*, but no evidence was forthcoming.

No evidence of 'viruses' in TOMMY's *sperm* in 2001 by Boston physicians.

Defendants disregarded MORRISON's requests for information during due diligence.

52. **July 24ᵗʰ,2014, Morrison v Quest et al case was filed…**

…as a negligence case based on due diligence by TOMMY's widow and heir at law.

53. **Discovery in 2014, further revealed that Dr. John Hiatt (HIATT) was neither a licensed physician nor renowned pathologist…**

…despite what remains in the media and on government websites.

**JULY 30ᵗʰ,2014, to OCTOBER 08ᵗʰ,2014…**

54. **July 30ᵗʰ,2014, Ms. Delores Faye Caldwell, not a party to this case, hacked into TOMMY's medical data without written consent…**

…or request of consent from the surviving spouse; without Defendants being served summons and complaint (because the court had not issued summons'

51

yet for *Pro Se* Plaintiff to serve on Defendants); without having been admitted into the case as **Pro Hac Vice; *and*** without court ordered subpoenas.

Caldwell withheld TOMMY's Personal and Protected Health Information from his WIDOW, and the Court, from **July 30th,2014 to March,2016.**

> **CALDWELL:** " *we didn't know how the Court wanted to handle confidentiality,"*
>
> *Counsel Caldwell*<br>*(APP.C.B page 5:22-23).*

State Clinical Laboratory Test Release Laws do not permit Caldwell to demand reports from any state on TOMMY without consent from the surviving spouse. *Nev.Rev.Stat.Ann.§652.190; Nev.State.Ann.§652.193.* and HIV/AIDS Confidentiality Laws require release to patient only or *surviving spouse as heir at law,* or physicians, or by court ordered subpoena.

Caldwell was not licensed in the State of Nevada at the time she conducted her Discovery for her Nevada Defendants-Respondents.

**All courts have the inherent equitable power to vacate a judgment that has been obtained through the commission of fraud upon the court.**

In 2007, (and July 30th, 2014) for any test conducted, controlled, sponsored in whole or in part, Defendants failed to establish and maintain reasonable procedures to protect the confidentiality, security and integrity of personal health information collected from or about TOMMY.

Defendants departed from the Standard of Care, Privacy and Laboratory practices and procedures to protect TOMMY's personal information.

**55.  August 27th,2014, the District Court issued Summons...**

...per Nevada law, for this *Pro Se* Plaintiff to serve on each Defendant.

**56.  September 12th,2014, QUEST, HIATT and RATNER were served...**

...Summons and Complaint.

**57.  September 15th,2014, NSAC were served...**

...Summons and Complaint...

**58.  September 16th,2014, GOODMAN was served...**

...Summons and Complaint.

**59.  October 03rd,2014, the Attorney General's Office entered on behalf of RATNER, GOODMAN, and NSAC...**

...and Attorney Keith Weaver entered on behalf of QUEST and HIATT.

**60.  <u>October 08th,2014,</u> Ms. Delores Faye Caldwell, aka Faye. D. Caldwell from Texas, entered as *Pro Hac Vice* for QUEST and HIATT...**

...three months after Caldwell's unknown, unauthorized practice of law, and third-party intrusion and breach of personal health information on TOMMY, without the court and widow's knowledge until **<u>March 2016.</u>**

Caldwell further re-disclosed to third parties between July 30th,2014 and March,2016.

**<u>OCTOBER 08th,2014 to OCTOBER 25th,2016...</u>**

53

**61.    Docket History**...

...numerous motions and objections by Defendants in a concerted effort to silence MORRISON.

## SUMMARY OF THE ARGUMENT

The magnitude of Defendants' fraud is revealed in TOMMY'S action. QUEST's *health care fraud* and deceit upon the medical community, TOMMY, and the public, is nationwide and continuing.

Physicians receive a *phone call, fax, report*, from a CORPORATION, and in turn, are handing QUEST interpretations as a definitive diagnosis of HIV on the unsuspecting TOMMY.

Evidence in this Appeal establishes the existence of a ruling which ought not, in equity and good conscience, be enforced; a valid defense to the alleged claim upon which the ruling is founded; fraud which prevented MORRISON from obtaining the benefit of her defense from the ruling; counsel(s) and Defendants' had a duty to disclose; that shows a willful blindness or reckless disregard for the truth; that the ruling shall be reversed based on Defendants' non-disclosures.

Defendants have demonstrated an unconscionable plan or scheme designed to improperly influence the court in its decision.

QUEST lab reports and 'services' are simply designed, pursuant to FDA, CLIA regulations, CDC guidelines, and *TITLE 42§263a,* to assist in rendering a

diagnosis, and not a *scheme* to exclude clinical and physical examinations, signs, symptoms, patient history, and the elimination process of ruling-out other medical conditions and differential diagnoses, *before* condemning the stigma of 'HIV'.

Appellant MORRISON is likely to succeed on the merits as this case is subject to *de novo review.*

## STANDARD OF REVIEW

Summary judgment is an extreme remedy and should not be used to deprive a litigant of a formal trial if there is a genuine issue of material fact.

Courts have stated that so long as there was the "slightest doubt as to the facts," a genuine issue of material facts existed within the meaning of FRCP 56(c) and summary judgment was inappropriate. *See e.g. Goodson-Todman Enters .v. Kellogg Co., 513 F.2d 913,914  (9ᵗʰ Circuit.1975).*

At summary judgment stage, trial courts determine whether the parties are disputing a material issue of fact. It does not resolve the factual issues.

## ARGUMENT AND ASSIGNMENT OF ERROR

### THE COURT: "Plaintiff has presented no evidence of false information supplied by any of the Defendants in this case.

*(dkt#277page10:25-26)*

In this appeal, the Estate of Tommy Morrison challenges the lower court's findings with respect to all causes of action.

55

The appeal calls for a mixed standard of review.

In part, the review is for substantial evidence, to the extent that MORRISON argues that the court reached factual conclusions for which there was no substantial evidence *(APP.A page 49 #127-132),* and that it expressly found an absence of any evidence in MORRISON's favor in a key area in which there was plenty of such evidence. *(APP.A page 49 dkts#125,200,202,203,219,262).*

However, part of MORRISON's argument concerns what Defendants' obligations to TOMMY actually *were* under the law.

The court applied what MORRISON contends were incorrect standards. Issue of law are subject to *de novo* review.

## A.  THE DISTRICT COURT'S LEGAL CONCLUSIONS SHOULD BE REVIEWED DE NOVO AND ITS FACTUAL FINDINGS FOR SUBSTANTIAL EVIDENCE...

### AS TO DOCKET #174 and #185:

**(i)  NSAC, RATNER, GOODMAN filed a motion to exceed pages *(dkts#167/168*) on MSJ. Regardless they filed *dkt#174*.**

The Court denied their motion *(dkt#180)* then erred in granting MSJ *(dkt#174)*. Defendants exceeded page limits violating *LR 7-3(a); LR 7-3(b).*

**(ii)  MSJ filing due on or before June 08th,2016. NSAC, RATNER, GOODMAN replaced *dkt#174* with *dkt#185* on June 23rd,2016.**

Defendants' second MSJ *(dkt#185)* was filed <u>15 days late</u>. Filing a motion to exceed page limits does not stay the *deadline* for the underlying motion. Defendants' MSJ does not pertain to the SAC. The court erred in granting MSJ *(dkt#174)* because it was replaced with *dkt#185* and <u>filed 15 days late.</u>

### AS TO PRO HAC VICE COUNSEL CALDWELL:

**(i)** **July 30th, 2014, TOMMY, and his widow, were victims to CALDWELL's unauthorized practice of law and third-party intrusion into QUEST data base and breach of personal health information on tests ordered by TOMMY's physicians, lab results, Physicians' names, addresses, <u>social security number</u>, and insurance information.**

CALDWELL had no written permission from the surviving spouse on or before **July 30th,2014, and** further exposed stolen data with her employees in **Texas** (who are bound by *ABA Model Rule 8.3* to report Caldwell's illegal conduct.)

The court had not issued Summons' and MORRISON had not served summons' and complaint until **September 2014.**

CALDWELL was licensed in **Texas, but not Nevada.**

This action was filed in Nevada against QUEST, a Nevada Corporation, and HIATT, a Nevada individual. *See Martinez v. Eighth Jud.Dist.Ct.of State of Nev.*

57

*729 P.2d 487,488 (Nev.1986) "In a court of law, only a licensed attorney may be duly authorized to represent a client. See SCR 77; NRS 7.285."*

CALDWELL was admitted ***Pro Hac Vice Counsel*** on **October 08th, 2014.**

November **2015**, CALDWELL, used names and addresses from July 30th,2014 stolen data and subpoenaed physicians, *without a court order,* using TOMMY's last four digits of his social security number.

MORRISON and the court, were unaware of CALDWELL's unlawful acts and withholding hundreds of **printed documents dated July 30th,2014** *(APP.D 8)* from **July 30th, 2014, to March 01,2016.** All the stolen documents were evidence and relevant to MORRISON's claims and the release of **all** these stolen documents was therefore necessarily admissible.

December 01st,2014, during the exchange of Initial Disclosures, CALDWELL now in her capacity as *Pro Hac Vice* still did not disclose these documents. The record demonstrates recklessness as CALDWELL engaged in unauthorized practice of law in a Nevada litigation on behalf of Nevada Defendants. CALDWELL violated: *Rule 26(a)(1) and Rule 26(g); 42 C.F.R.§ 493.1291(f); Rule LR IA 10-1, 10-2(c); Nev.Rev.Stat.Ann.§652.190; NRS.7.285; NRPC5.5(a)(2); NRPC.5.5(b); NRPC.5.5(c); NRPC.3.4; NRPC.4.4.*

**(ii)  CALDWELL offers in evidence clinical laboratory reports as accurate diagnoses of HIV.**

58

QUEST lab reports are not capable of *'showing that an applicant is infected with the human immunodeficiency virus'* violating *FDCA Section 502; FDCA Section 301.*

**(iii) CALDWELL's 1996 lab report was altered and falsified with the name of Dr.Robert Voy as the 'ordering physician'.**

Voy was not the 'ordering physician' of TOMMY's tests.

CALDWELL violated: *NRS 199.210; 8 U.S. Code §1342c;18 U.S.C.§287; 18 U.S.C.§1347 and NRS.205.110.*

**AS TO HIATT:**

**THE COURT: "Dr. Hiatt's only involvement in the underlying facts of this litigation was to report to Dr. Margaret Goodman, in 2007, the reports Quest had on file regarding the 1996 testing of Mr. Morrison's blood".**

*(dkt#277page 10:2-4)*

**(i) HIATT in 2007 disclosed *"reports Quest had on file regarding the 1996 testing of Mr. Morrison's blood." to GOODMAN.***

HIATT without written or verbal consent released testing information to *third parties.* HIATT breached his duty of confidentiality and *QUEST Patient Privacy Policies.*

HIATT violated *NRS49.235; NRS.Ann.§652.190; Nev.State.Ann.§652.193; NRS.205.110.*

*See C.E.Appellant v. Prairie Fields Family Medicine P.C.,Neb.667.S-13-455.* autoimmune conditions cause false positives, unconsented unprivileged disclosure to third party.

**(ii)  HIATT falsifies his academic credentials in the media and portrays himself as a *licensed physician* and *renowned pathologist*.**

**HIATT allowed GOODMAN to further disclose TOMMY's personal health information with the media and third parties.**

HIATT is *not* a licensed physician nor pathologist but permits false information to remain on social and government websites for a new audience to read to this day.

HIATT violated: *NRS 199.210; NRS 629.061; CLIA Regulations 42 CFR 493.1291(f).*

**(iii)  HIATT provides TOMMY's laboratory reports between 1996 and 2013 from out-of-state third parties.**

HIATT procures lab reports as accurate diagnoses of the human immuno-deficiency virus (HIV) using tests not intended for the virus, nor HIV infection.

HIATT violated: *NRS 199.210; 8 U.S. Code §1342c; FTC.ACT Section 5(a),15 U.S.C.§45(a); FDCA Section 301; FDCA Section 502.*

**(iv)  HIATT presented the February 10,1996, lab report with Dr.Voy's name as the ordering physician of TOMMY's tests.**

Voy was not the 'ordering physician'.

HIATT violated: *NRS 199.210; 8 U.S. Code §1342c.*

**AS TO QUEST:**

**THE COURT: "As to Quest, its testing of Mr. Morrison's blood sample in 1996 met the clinical laboratory standard of care for HIV-1 antibody testing in 1996, and no evidence has been presented to controvert the accuracy of the results."**

*(dkt#277page.11:3-5)*

**(i)     QUEST knew that the clinical laboratory standard of care for HIV-antibody testing in 1996 tested positive for autoimmune antibodies.**

QUEST knowingly made a false claim of 'positive for HIV' on TOMMY to a government agency, NSAC, which is a crime under federal law.

QUEST cannot produce a lab report for NSAC, or TOMMY, showing the human immunodeficiency virus in TOMMY's blood.

QUEST violated: *18 U.S.C.§287; Nev.Rev.Stat. Ann.§§357.010; NRS 199.210/ 8 U.S. Code §1342c; FDCA Section 502; FDCA Section 301; 21CFR 600.12; 21 CFR 600.14.*

**THE COURT: "Quest used the HIV-1 antibody testing algorithm recommended by the CDC to test for HIV. To the extent that Plaintiff is challenging Quest's methodology for testing Mr. Morrison's blood, Quest Diagnostics complied with the standard of care for clinical laboratory HIV testing in 1996, as the undisputed evidence demonstrates."**

*(dkt#277page.11:8-11)*

**(ii)    QUEST produced a 1996 'lab report' with a physician's name that did**

**not order the testing. Even if that physician had ordered the testing he did not receive the lab report until 15 YEARS later.**

QUEST did not comply with the standard of care for clinical laboratory HIV testing in 1996 because QUEST did not rule-out *autoimmune antibodies* as warned by the manufacturers. Evidence of TOMMY's *autoimmune disorders* were consistent with the CDC 1996 algorithm.

**(iii)   No evidence of clinical or physical presentation, no wasting syndrome, no VIRUS capable of producing HIV antibodies, no AIDS defining diseases found in TOMMY's blood, sperm, saliva, macrophages or tissues to form a legal diagnosis of a *loathsome disease.***

The court failed to properly formulate and apply *the legal definition* for the Standard of Care for defining a diagnosis of the human immunodeficiency virus.

**(iv)   QUEST offers clinical laboratory reports from out-of-state third parties between 1996 and 2013 as deceptive definitive diagnoses of the human immunodeficiency virus (HIV) using tests not intended for the virus, nor HIV infection.**

Knowingly offering false evidence to the court, TOMMY, and physicians, is a crime. Procuring a QUEST lab report dated February 10,1996, or any other dated lab reports as a diagnosis of HIV, and altering and falsifying the name of the ordering physician is a crime.

QUEST violated state and federal laws. *NRS 199.210; 18 U.S.C.§287; Nev.Rev.Stat.Ann.§§357.010;8 U.S. Code §1342c; NRS 205.110; FDCA Section 502.*

**(v)  QUEST MSJ dkt#175.**

A SAC was timely filed. QUEST's *dkt#175* pertains to the FAC.

### AS TO NSAC:

**(i)    "NSAC does not enter into contracts with fighters
        to take part in specific fights"**

*Deputy Attorney General
(dkt#239pages10-11)*

NSAC produced other Boxing Contracts but failed to present the February 10th,1996, Boxing Contract that <u>is</u> in their possession. *(APP.D)*

NSAC destroyed or concealed important evidence from MORRISON and the court. NSAC violated *NRS.199.220.*

**(ii)   NSAC requires an original or certified copy of a clinical laboratory
        report that '*shows that an applicant's blood is not infected with the
        human immunodeficiency virus.*'**

QUEST cannot provide such a report. QUEST does not purchase, perform, interpret and report on tests detecting the presence of the human immuno-deficiency virus.

63

QUEST provided NSAC with fraudulent fabricated evidence with the intent to falsify a diagnosis/medical decision of the human immunodeficiency virus in TOMMY's blood using tests that detect antibodies, and antibodies to *autoimmune disorders*. NSAC violated: *NRS 199.210; 8 U.S. Code §1342c.*

### AS TO RATNER & NSAC:

**THE COURT: "Plaintiff has raised no evidence to prove that Quest's reporting of a positive HIV test result to NSAC in 1996, nor NSAC's subsequent reporting to Mr. Morrison's promoter and attorney that Mr. Morrison could not be cleared for a fighting license due to medical reasons were false"**

*(page.12:10-13 dkt#277).*

**(i)      RATNER disclosed TOMMY's 'lab results' to third parties.**

The *third parties* did not have consent to receive medical information on TOMMY. TOMMY and the 'ordering physician' were not invited to the *secret* meeting. RATNER violated: *NRS.199.210; NRS 205.110; 8 U.S. Code§1342c; Nev.Rev.Stat.§629.061; NRS.49.215. NRS.467.020.*

**(ii)      RATNER informed *third parties* of the cancellation of the bout,**

**license, and immediate indefinite suspension without consulting**

**the 'ordering physician'.**

No person may participate, directly or indirectly in any professional contest unless licensed.

The *third parties* were not licensed, nor were they TOMMY'S promoter or attorney.

64

TOMMY was self-managed but RATNER did not meet with TOMMY on February 10th,1996, instead told *third parties* to 'get him out quick, the media is swarming' without consulting the 'ordering physician'.

RATNER violated: *NRS.467.0104; NRS.467.100; NRS.467.1005; NRS.467.110; NRS.467.120; NRS.467.01037; NRS.§629.061; NRS.49.215.*

(iii) **TOMMY was cleared to fight.**

Defendants now contend no diagnosis of HIV was made. The physicians' physical and clinical examinations medically cleared TOMMY to fight.

A lab report is not a diagnosis of any disease, and QUEST tests purchased, performed and reported did not show that the applicant had the human immuno-deficiency virus.

 **AS TO GOODMAN:**

 **THE COURT:** **"Plaintiff has not raised facts specific to libel or slander claims"**

*(dkt#277page.11:19-20)*

(i) **"In addition Dr.Goodman is not under any obligation to gather any documents that are not in her possession."**

*Deputy Attorney General*
*(dkt#248 page 4:1-2)*

GOODMAN is a licensed physician, but not TOMMY's. GOODMAN had no legal authority, or obligation, to retrieve testing information on TOMMY, nor to further disclose information to the media.

State general, medical access law does not permit GOODMAN right of access to TOMMY's medical records maintained by QUEST. GOODMAN's reckless reporting of a *loathsome disease* based on QUEST lab reports to the media, and on her personal blog; and fraudulently misrepresenting HIATT as a licensed physician and renowned pathologist is ***intolerable, reckless* and *outrageous.***

GOODMAN violated: *NRS.49.215; Nev.Rev.Stat.§629.061; NRS 199.210; 8 U.S. Code §1342c; 18 U.S.C.§1347.*

## B.  MORRISON'S CLAIMS ARE WITHIN THE STATUTE OF LIMITATIONS.

### *18 U.S.C.§1347* Health Care Fraud Is A Continuing Offense.

The Ninth Circuit finds that health care fraud under *18 U.S.C.§1347*, holds that health care fraud is a continuing offense and not barred by the statute of limitations.

**Under the Delayed Discovery Rule**, the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of action, effective **2014.**

**Extrinsic fraud** as it exists on the record is not barred by the statute of limitations.

66

**NRS 11.930(3)(d)** provides a three-year statute of limitations for fraud actions which accrues *"upon the discovery of the facts constituting fraud"* effective *2014,2015 and 2016.*

**TIMELINE: Scenario 1.** Tommy died September 01,2013. Due diligence began Dec.21/23,2013. First filing as surviving spouse, heir at law, July 24th,2014. Case was Stayed December 2014, through October 2015, tolling statutes *(NRS.11.350),* and whilst probate court finalizing Administrator status. Court approved re-filing under Personal Representative **October 16th,2015**, after Stay was lifted. February 09th,2016, SAC filed pursuant to the Court Scheduling Order.

**TIMELINE Scenario 2. Adding:** 27 days incarceration; 70 days intubation; 7 days medically induced coma to *Defendants' claim of July 15th, 2011*, tolling **TOMMY's** 'clock' to **October 24, 2011**. TOMMY was never 'on notice' of the misrepresentations, fraud, non-disclosure of non-HIV-related conditions causing positive reactions, and that a lab report was not a diagnosis.

MORRISON's claims are within the statute of limitations.

## C.  MORRISON SATISFIED ALL THE ELEMENTS FOR HER FIRST CLAIM FOR NEGLIGENCE.

Defendants owed a legal duty to TOMMY. QUEST breached that legal duty when they did not send their lab report to the 'ordering physician' and TOMMY on February 10th, 1996.

67

NSAC, and RATNER, breached their legal duty not allowing the 'ordering physician' to interpret results directly with TOMMY.

Defendants' actions disclosing and interpreting <u>lab results</u> as confirmation that TOMMY had the virus to *third parties* resulted in harm to TOMMY, and his legacy.

HIATT's disclosure of test reports to GOODMAN, and GOODMAN's further re-disclosure to the media in 2007 breached state and federal laws and a duty of confidentiality owed to TOMMY.

## D. MORRISON SATISFIED ALL THE ELEMENTS FOR HER SECOND CLAIM FOR <u>DEFAMATION</u>.

Truth is an absolute defense to a claim.

Uttering TOMMY had the virus in his blood was false. TOMMY's reputation, legacy and good name was harmed.

Defendants knew the statements were false and acted with reckless disregard related to the accuracy of their testing and reporting.

Defendants' doubts as to the publications truth of HIATT's credentials and his ability to 'review' any test results were known at the time GOODMAN's interviews were published in the media.

///

68

### E. MORRISON SATISFIED ALL THE ELEMENTS FOR HER THIRD CLAIM FOR <u>SLANDER.</u>

Defendants failed to exercise due care regarding the falsity of claims of the virus in TOMMY's blood as opposed to a reaction to an *antibody test* that reacts to *autoimmune antibodies*.

TOMMY being accused of having a *loathsome disease* excuses MORRISON from proving damages to prevail. QUEST <u>lab reports</u> became a *statement of fact* of a diagnosis of a *loathsome disease* damaging TOMMY's career, reputation, legacy and the people's trust still to this day. He was no longer welcome in **gyms**.

Whether a reasonable person would be likely to understand <u>QUEST lab reports</u> as an expression of Defendants' *opinion* or as Defendants' *statement of existing fact* is for the jury to decide.

Defendants' statements injured TOMMY's profession, life, family, legacy and now his Estate.

### F. MORRISON SATISFIED ALL THE ELEMENTS FOR HER FOURTH CLAIM FOR <u>LIBEL.</u>

Defendants' statements were not in relative secrecy.

This Brief proves *third parties* were privy to statements made by Defendants. GOODMAN's are permanently written on websites now reaching a wider audience.

Libel suffices that just *one* person is privy to the statements made.

69

The record shows *each* Defendant, and Counsel Caldwell, responsible for releasing information, and false diagnosis of the virus, without informed consent.

An **FDA Approval Letter** containing license #'s for <u>QUEST tests</u> to be used as a diagnosis of the human immunodeficiency virus is <u>not on the record.</u>

## G. MORRISON SATISFIED ALL THE ELEMENTS FOR HER FIFTH CLAIM FOR <u>FRAUD.</u>

> <u>THE COURT</u>: **"Quest's reporting of the 1996 test results to NSAC, and NSAC's denial of a fighting license based on that report, do not constitute false representation."**
> *(dkt#277page.12:24-26)*

Defendants intentionally concealed or suppressed a material fact and had a duty to disclose that concealed fact.

Had TOMMY and his physicians known they would have acted differently and questioned as to whether QUEST had *ruled-out* other antibodies, whether QUEST tests detected the *human immunodeficiency virus*, and whether a <u>QUEST lab report</u> is a diagnosis.

TOMMY, and legacy, sustained causation and damages as a result of concealment of facts.

## H. MORRISON SATISFIED ALL THE ELEMENTS FOR HER SIXTH CLAIM FOR NEGLIGENT <u>MISREPRESENTATION.</u>

> <u>THE COURT</u>: **"Plaintiff has presented no evidence of false information supplied by any of the defendants in this case."**
> *(dkt#277page.13:10-11)*

70

Defendants in the course of business, profession or employment, supplied false information for the guidance of others (NSAC) in their business transactions procuring a lab report as *'medical clearance or denial'* to license TOMMY, causing TOMMY pecuniary loss because of his, and NSAC's, justifiable reliance upon QUEST's information.

Defendants failed to exercise reasonable care or competence in obtaining and communicating **all** facts about their testing and a QUEST lab report is *not a diagnosis,* nor *presence of the human immunodeficiency virus, or HIV infection.*

## I. MORRISON SATISFIED ALL THE ELEMENTS FOR HER SEVENTH CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

**THE COURT: "Plaintiff has neither alleged, nor provided evidence of, any extreme and outrageous conduct on the part of any of the Defendants"**

*(dkt#277page.13:22-24)*

Defendants acted intentionally and recklessly interpreting QUEST lab reports as conclusive for 'HIV' knowing QUEST tests do not detect the virus and will result positive for *autoimmune antibodies* and other conditions.

Undisputed evidence shows TOMMY immediately harmed when RATNER, an unlicensed physician, delivered medical and bout information to unlicensed, unauthorized *third parties.*

/ / /

71

**J.      MORRISON SATISFIED ALL THE ELEMENTS FOR HER
        EIGHTH CLAIM FOR <u>INTENTIONAL INTERFERENCE</u>
        <u>WITH A CONTRACT.</u>**

> **<u>THE COURT:</u> "Ms. Morrison alleges that Quest intentionally
> interfered with Mr. Morrison's contract to box in the match scheduled
> for February 10, 1996 by conducting the blood sample test for HIV
> antibodies and reporting those results to NSAC, and that NSAC
> interfered with the contract by rejecting Mr. Morrison's application
> for a license to fight."**
>
> *(dkt#277page.14:7-10)*

NSAC has knowledge of the fight contract of February 10th, 1996, **they**
issued it *<u>(NRS.467.030(4))</u> (APP.D)*

NSAC called for QUEST <u>lab reports</u> to *'show an applicant was not infected
with the <u>human immunodeficiency virus</u>'*.

QUEST had knowledge they cannot produce such a <u>lab report</u> because they
only conduct tests for *antibodies* not 'HIV' specific.

QUEST <u>lab report</u> disrupted contractual relationships between TOMMY and
NSAC by providing a fraudulent document both parties relied upon.

The resulting damage was the cancellation of a $50,000.00 fight; immediate
indefinite suspension ending a **Don King *multi-million-dollar-fight-contract*** to
fight Tyson; cancelled license; and **stigma of a virus** for the rest of TOMMY's
life. Further interference by HIATT and GOODMAN from 2007 forward, when
both were aware of limitations in QUEST tests and the true meaning of a <u>QUEST</u>
<u>lab report</u>.

72

**K.   MORRISON SATISFIED ALL THE ELEMENTS FOR HER SECOND AMENDED COMPLAINT (DKT#105).**

**THE COURT:** **"Morrison did not move to file a Second Amended Complaint...."**

*(dkt#277page.5:3-6)*

The Courts Scheduling Order permitted parties to freely amend pleadings *without leave of court*. SAC was filed pursuant to *FRCP 15,* not *sua sponte.*

The court enlarged discovery to include TOMMY's medical data through death.

MORRISON added claims and further relief for any third party physicians relying on QUEST lab reports as definitive diagnoses of HIV, **Failure to Warn,** and **Fraudulent Concealment.**

The court improperly analyzed and over-looked numerous MORRISON's critical filings and fact-based Exhibits *(APP.A page 49).*

**CONCLUSION**

*Lane refereed Morrison's last fight loss to Lennox Lewis in Atlantic City in October. Lane told the Associated Press. "My doctor called me about 4:30 today and told me I was absolutely negative. I had blood all over me. He [TOMMY] bled all over me and everyone else."*

73

Breach and proximate cause are generally questions of fact for the jury to decide.

The Court is respectfully urged to reverse and remand with instructions.

**February 09,2017**          **Respectfully submitted,**

By _____

**Patricia Harding Morrison**

**Plaintiff-Appellant**

**Personal Representative/Administratrix**

**THE ESTATE OF TOMMY MORRISON**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

**I.**   This Brief complies with the type-volume limitation

of Fed.R.App.P.32(a)(7)(B) because the Brief contains: 13,997 words,

excluding the parts of the brief exempted by Fed.R.App.P.32(a)(7)(B)(iii).

**II.**   This Brief complies with the typeface requirements

of Fed.R.App.P.32(a)(5) and the type style requirements

of Fed.R.App.P.32(a)(6) because this Brief has been prepared

in a proportionally spaced typeface using Microsoft Word 2010,

in 14-point Times New Roman.


**February 09, 2017**          **THE ESTATE OF TOMMY MORRISON,**

By _____

PATRICIA HARDING MORRISON

PLAINTIFF-APPELLANT

PERSONAL REPRESENTATIVE /

ADMINISTRATRIX

75

## CERTIFICATE OF IDENTICAL COMPLIANCE
## OF BRIEFS

I certify that the text of the briefs sent to defense counsels are identical to

the text of this original copy sent on February 09th, 2017, to the Clerk of the Court

of the United States Court of Appeals for the Ninth Circuit.

**February 09, 2017**          **THE ESTATE OF TOMMY MORRISON,**

By _____

PATRICIA HARDING MORRISON

PLAINTIFF-APPELLANT

PERSONAL REPRESENTATIVE /

ADMINISTRATRIX

76

## CERTIFICATE OF SERVICE

## Case Name: MORRISON v QUEST ET AL

## 9th Cir. Case No: 16-17050

I am over 18 years of age and a party to this action. On February 09, 2017, I certify that I sent from Wichita, Kansas, the following documents:

### APPELLANT'S OPENING BRIEF

### APPELLANT'S APPENDIX (A, B, C, D)

by enclosing copies in envelopes and depositing the sealed envelopes with first class postage fully prepaid to the respondents' attorneys.

A true, identical, correct copy of the above documents were sent using fully prepaid Federal Express Overnight Service to the Office of the Clerk for filing.

Seven additional, bound, copies of the above documents were also sent to the Office of the Clerk.

The addresses and recipients are as follows:

Keith A. Weaver Lewis,

Lewis, Brisbois, Bisgaard & Smith LLP

6385 South Rainbow Boulevard, Suite 600,

Las Vegas, Nevada 89118

77

**and**

D.Faye Caldwell, Pro Hac Vice,

Caldwell Everson, PLLC

2777 Allen Parkway, Suite 950,

Houston, Texas 77019

*(Attorneys for Respondents Quest Diagnostics Incorporated and John Hiatt) (served via First Class Mail)*

**and**

Vivienne Rakowsky, Esq.

Deputy Attorney General

555 East Washington Avenue, Suite 3900,

Las Vegas, Nevada 89101

*(Attorney for Respondents Nevada State Athletic Commission, Marc Ratner, And Dr. Margaret Goodman (served Via First Class Mail)*

Defense counsels are registered CM/ECF users.

78

**And for scanning and filing on to the ECF system, to:**

OFFICE OF THE CLERK

James. R. Browning Courthouse,

U.S. Court of Appeals,

95 Seventh Street, San Francisco,

CA 94103-1526

(Ninth Circuit Court of Appeals)

(served via Federal Express)

I declare I am not a registered CM/ECF user.

I declare under penalty of perjury that the foregoing is true and correct.

**February 09, 2017**                    **THE ESTATE OF TOMMY MORRISON,**

By _____

PATRICIA HARDING MORRISON

PLAINTIFF-APPELLANT

PERSONAL REPRESENTATIVE /

ADMINISTRATRIX

79