No. 16-17050

IN THE

**UNITED STATES COURT OF APPEALS**

FOR THE NINTH CIRCUIT

---

PATRICIA HARDING MORRISON
for the Estate of TOMMY MORRISON
*Plaintiff & Appellant,*

v.

QUEST DIAGNOSTICS INCORPORATED
JOHN HIATT
DR. MARGARET GOODMAN
NEVADA STATE ATHLETIC COMMISSION
MARC RATNER
*Defendants & Respondents.*

---

**APPENDIX C: Tabs A,B,C.**

---

**Contents:**                                                      **Tabs:**

Motions Hearing-Sep.08,2016…    …    …    …    …    …    **A.**

Motions Hearing-Mar.01,2016…    …    …    …    …    …    **B.**

Motions Hearing-Sep.14,2015…    …    …    …    …    …    **C.**

1

———————2:14-cv-01207-RFB-PAL———————

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4   PATRICIA HARDING MORRISON,      )
    individually and in her         )  Case No. 2:14-cv-01207-RFB-PAL
5   capacity as                     )
    Executor/Administrator of       )  Las Vegas, Nevada
6   the Estate of Tommy             )  Thursday, September 8, 2016
    Morrison, a deceased            )  10:00 a.m.
7   individual,                     )
                                    )  MOTIONS HEARING
8                    Plaintiff,     )
                                    )
9        vs.                        )

10  QUEST DIAGNOSTICS,
    INCORPORATED, a Nevada
11  domestic corporation; JOHN
    HIATT, an individual; DR.
12  MARGARET GOODMAN, an
    individual; NEVADA STATE
13  ATHLETIC COMMISSION, an
    unknown business entity;
14  and MARC RATNER, an
    individual,
15
                     Defendants.
16  _____

17

18             REPORTER'S TRANSCRIPT OF PROCEEDINGS

19           THE HONORABLE RICHARD F. BOULWARE, II,
                  UNITED STATES DISTRICT JUDGE
20

21  APPEARANCES:           See Next Page

22
    COURT REPORTER:        Patricia L. Ganci, RMR, CRR
23                         United States District Court
                           333 Las Vegas Boulevard South, Room 1334
24                         Las Vegas, Nevada  89101

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

2

───────2:14-cv-01207-RFB-PAL───────

```
 1   APPEARANCES:
     For the Plaintiff:
 2        PATRICIA HARDING MORRISON
          PRO SEE
 3        P.O. Box 454
          Rose Hill, Kansas 67133
 4        (865)296-9973

 5
     For Defendants Quest Diagnostics, Incorporated and John Hiatt:
 6        KEITH A. WEAVER, ESQ.
          LEWIS BRISBOIS BISGAARD & SMITH
 7        6385 South Rainbow Blvd., Suite 600
          Las Vegas, Nevada 89118
 8        (702)893-3383

 9        FAYE D. CALDWELL, ESQ.
          CALDWELL EVERSON PLLC
10        2777 Allen Parkway, Suite 950
          Houston, Texas 77019
11        (713)654-3000

12
     For Defendant Nevada State Athletic Commission:
13        VIVIENNE RAKOWSKY, ESQ.
          OFFICE OF THE ATTORNEY GENERAL
14        555 E. Washington Ave., Suite 3900
          Las Vegas, Nevada 89101
15        (702)486-3103

16

17

18

19

20

21

22

23

24

25
```

3

—————2:14-cv-01207-RFB-PAL—————

1    LAS VEGAS, NEVADA; THURSDAY, SEPTEMBER 8, 2016; 10:00 A.M.

2                          --oOo--

3                    P R O C E E D I N G S

4        THE COURT:  Please be seated.

5        COURTROOM ADMINISTRATOR:  Now calling Patricia Harding

6    Morrison versus Quest Diagnostics, Incorporated, et al., Case

7    No. 2:14-cv-01207-RFB-PAL.  This is the time for the hearing

8    regarding motions pending before the Court.

9            Starting with counsel for defendants, please note your

10   appearance for the record.

11       MS. CALDWELL:  Your Honor, Faye Caldwell for Quest

12   Diagnostics and John Hiatt.

13       MR. WEAVER:  Good morning, Keith Weaver for Quest

14   Diagnostics and John Hiatt.

15       MS. RAKOWSKY:  Good morning, Your Honor.  Vivienne

16   Rakowsky for the Nevada Attorney's General Office on behalf of

17   Nevada Athletic Commission, Dr. Margaret Goodman, and Marc

18   Ratner.

19       THE COURT:  Good morning.

20       MS. MORRISON:  Good morning, Your Honor.  My name is

21   Patricia Harding Morrison, and I am the administrator and

22   executor of the Estate for Tommy Morrison and the plaintiff in

23   this case.

24       THE COURT:  Good morning.

25       MS. MORRISON:  Good morning.

4

—————2:14-cv-01207-RFB-PAL—————

1    THE COURT:  So we are here on multiple motions in this

2  case.  By my count, last count, I think we have almost 14

3  motions in this case.  There's a set of motions to dismiss, and

4  there's a set of motions for summary judgment.  The Court is

5  going to address all of them.  Some of them procedurally relate

6  to what has been filed or not, but it does seem to me that some

7  of this can be boiled down to some very basic questions.

8    Ms. Morrison, why don't you come up to the podium

9  because I have a couple of questions that I'd like to ask you.

10    MS. MORRISON:  Okay.

11    THE COURT:  Thank you.

12    So, Ms. Morrison, a lot of your amended complaint

13  focuses on the claim that Mr. Morrison was not HIV positive.  I

14  now have in the record before me multiple tests from his own

15  doctors, treating doctors, statements from people indicating

16  that, in fact, he was HIV positive and that he was known to be

17  HIV positive by himself included starting in 1989.

18    So I'm trying to understand how some of these claims

19  move forward since your amended complaint basically is founded

20  on this assumption.  You say in the negligence claim, in the

21  fraud claim, and the negligence misrepresentation claim, and the

22  slander claims, they are all based upon this fundamental factual

23  claim that he wasn't HIV positive, that they knew he wasn't HIV

24  positive, the test results were either incorrect or improper and

25  that they knew that.

5

—————2:14-cv-01207-RFB-PAL—————

```
 1           But I have before me now multiple affidavits from
 2    various witnesses, including statements and tests from his own
 3    doctors, which indicate that he was.  So I wanted to give you an
 4    opportunity to be able to respond to that because it's hard for
 5    me to imagine how the case moves forward given that repeated
 6    confirmation of that test.
 7           MS. MORRISON:  Okay.
 8           THE COURT:  Why don't you pull that microphone in front
 9    of you so we can hear you.
10           MS. MORRISON:  Can you hear me?
11           THE COURT:  Yes.
12           MS. MORRISON:  I completely understand where you're
13    coming from.  My husband, Tommy Morrison, when he passed away,
14    he did not have the virus in his blood.
15           THE COURT:  Okay.  But that's not the question I'm
16    asking you.  You've seen these reports --
17           MS. MORRISON:  I have.
18           THE COURT:  -- from all of these doctors, right,
19    multiple doctors, some of his own doctors, right, treating
20    specialists for HIV in New York, doctors in Tulsa, different
21    doctors who confirm that they received positive test results for
22    HIV, right.  You've seen that?
23           MS. MORRISON:  I've seen that, yes.
24           THE COURT:  Right.  I have not seen anything that would
25    dispute that, what they've provided.
```

6

---------------2:14-cv-01207-RFB-PAL---------------

1           MS. MORRISON:  Right.

2           THE COURT:  So why should I not take that into

3   consideration in the context of dismissing this action?  And,

4   again, whether or not he did or didn't have this in his system

5   at the time of his death, which I'm not sure how that's verified

6   given what you've suggested, but given what are your claims in

7   this case, wouldn't the defendants have at least had a basis for

8   believing that he, in fact, had HIV and then tested positive

9   given these results?

10          I mean, why should they not be able to rely upon, one,

11  the test was performed by Quest, but also there's confirmation

12  from multiple other doctors?  Why isn't that important here?

13          MS. MORRISON:  This is very important.  This case is

14  extremely important, and the reason is is that the reports that

15  you are looking at have been generated by Quest Labs.  And on

16  the actual report you've got maybe one test or two tests.  And

17  very similar to a case that you've just worked on, I think it

18  was FTC against Health Formulas, there is no actual clinical

19  study that actually confirms or that the defense have produced

20  that confirms that that report is actually confirming the human

21  immune deficiency virus.

22          THE COURT:  Wait a minute.  They used what were

23  established CDC protocols and tests.  They used a test that was

24  an algorithm that was created by the CDC, right?

25          MS. MORRISON:  No.  It's not created by the CDC.

7

─────────────────2:14-cv-01207-RFB-PAL─────────────────

1          THE COURT:  Okay.  I'll go back and look at the

2   affidavit because that's what I thought that it actually said.

3   That there were a series of screenings and then tests that were

4   used by Quest.

5          MS. MORRISON:  This -- yeah, there's a difference

6   between a screen and a diagnosis.  And the tests that are

7   actually on the report that have been supplied multiple times,

8   Quest themselves have said that that's not a diagnosis.  You've

9   got two tests on there.  You've got the ELISA test by Abbott,

10  and you've got also the Western blot test which hasn't been

11  utilized for years here and also not in the U.K.  Both of those

12  tests do not detect the human immune deficiency virus, which is

13  a retrovirus.

14          THE COURT:  What do they detect then?

15          MS. MORRISON:  That, you need to ask Quest.

16          THE COURT:  Well, no, I'm asking you because you're

17  arguing that they don't detect something that they do.

18          MS. MORRISON:  Correct.

19          THE COURT:  What they detect it appears to be is his

20  reaction to antibodies.  That's what they say.  And so the issue

21  isn't whether or not -- well, I shouldn't say the issue isn't

22  whether or not -- they detect the virus or not.  The issue is,

23  based upon what was accepted and understood for testing for HIV

24  in 1996, was this not in fact a reasonable and accepted method

25  for testing for the virus?  Do you have any information to

8

---2:14-cv-01207-RFB-PAL---

1 suggest that it was not an accepted method for testing for HIV
2 at the time?

3 MS. MORRISON: The test kit companies themselves state
4 that they do not detect the virus. So if those two tests were
5 used then, then they should not have been used or performed or
6 reported by Quest Labs because what the Commission were
7 requiring, they were requiring for Tommy to show that he did not
8 have the human immune deficiency virus, which is HIV.

9 THE COURT: Right.

10 MS. MORRISON: Right. So the reason for Quest to
11 report to the Commission with a report is incorrect because --

12 THE COURT: So what work should they have -- what tests
13 should they have used?

14 MS. MORRISON: Exactly, what test should they have
15 used.

16 THE COURT: No, no, no. I'm asking you. Right. The
17 fact of the matter is, is that they have to use what are the
18 accepted methods for detecting HIV at the time. Are you saying
19 that that was not the accepted method or one of the accepted
20 methods for determining whether or not someone was HIV positive
21 or not? Are you saying that?

22 MS. MORRISON: I'm saying that, yes, that that is not a
23 test that detects the virus, and this has been --

24 THE COURT: Ms. Morrison, you're not hearing my
25 question. What would have been or what test should they have

9

—————————2:14-cv-01207-RFB-PAL —————————

1  used that they didn't use that was the appropriate test at that

2  time?

3          MS. MORRISON:   They should have used what Tommy

4  underwent at Boston Massachusetts General Hospital and also at

5  the University of Nebraska Medical Center where they draw your

6  blood and they actually place it under an electron microscope,

7  just like the inventor did in 1983 to detect if that person has

8  the virus.  Anybody can take an ELISA test or a Western blot

9  test.  That does not detect the virus.  It detects proteins, and

10  anybody with any kind of autoimmune disorder, which does not

11  stand for AIDS, can actually react to one of the tests that

12  Quest automatically give people and say and state to the

13  Commission that this test detects the virus when it does not.

14          And, in fact, there's multiple information in this

15  lawsuit for two years now where they actually state, This test

16  does not diagnose, this test is not supposed to be used for

17  treatment, and this report isn't supposed to be used for

18  treatment.  And, yet, all of these physicians, what are they

19  looking at, Your Honor?  They're looking at that report.

20          THE COURT:   So you're saying it wasn't reasonable for

21  them to rely upon that for making the determination that he was

22  HIV positive?

23          MS. MORRISON:   Correct.

24          THE COURT:   And that they had an obligation to produce

25  that.  Now, let me ask you this other question.  The other issue

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

10

—————2:14-cv-01207-RFB-PAL—————

1  they raise is about the statute of limitations in this case, and

2  they say the cause of action arose much earlier than when you

3  filed your complaint and certainly much earlier than when you

4  became the administrator/executor of the estate. And certainly

5  in 1997 and certainly as late as 2007 Mr. Morrison himself

6  questioned the reliability of these tests. So why wouldn't your

7  claims be barred by the statute of limitations at this point in

8  time?

9        MS. MORRISON: Because it wasn't until Tommy passed

10  away and it wasn't until he had that test drawn from his arm in

11  2012 and 2013 that we actually discovered that he did not have

12  the human immune deficiency virus, which is a retrovirus, in his

13  blood, and it was not there. And then at that point I contacted

14  Dr. Voy, Robert Voy in Las Vegas. And I asked him and I said,

15  You better have good medical malpractice insurance, Dr. Voy --

16        THE COURT: Hold on just a moment. When were -- when

17  was the test done exactly?

18        MS. MORRISON: The test was drawn from Tommy's arm on

19  September 1, 2013.

20        THE COURT: Right.

21        MS. MORRISON: And it was reported back to me on

22  September 18th, 2013, as confirmation that he did not have the

23  virus.

24        THE COURT: Right. And when did you become the actual

25  executor/administrator of the estate?

11

———————————2:14-cv-01207-RFB-PAL————

1      MS. MORRISON:  I processed the papers and I believe

2  they came through either November or December of 2000...

3      THE COURT:  '14.

4      MS. MORRISON:  '14, yes.

5      THE COURT:  Okay.  So one of the arguments is about the

6  survival statute under Nevada law which creates a one-year

7  limitations for -- statute of limitations for bringing survival

8  actions.  So, first, why wouldn't you be barred by that statute

9  under Nevada law given the fact that it would have been known to

10 you and to your deceased husband as late as 2000 -- I guess you

11 said September 2013, of the accrual of the action in this case,

12 but the action was not brought as a survival action until much

13 later?  Why wouldn't there be a statute of limitations issue for

14 you in the context of bringing this case?

15     MS. MORRISON:  All right.  Well, there shouldn't be any

16 issue.  They are committing fraud, Your Honor.

17     THE COURT:  Okay.  That's -- okay.  We have to follow

18 what the statute says in terms of the time frames, right.  For

19 fraud or all -- or other different types of claims, there are

20 statute of limitations and we have to follow the law as it

21 relates to them.  So that's why I want to make sure I have the

22 dates correctly to make sure I understand your argument about

23 why the case shouldn't be barred.  Okay.

24     And your husband passed on which day?

25     MS. MORRISON:  September 1, 2013.

12

—————2:14-cv-01207-RFB-PAL—————

1      THE COURT:  And you received the results back from the

2  test later that month, 2013.

3      MS. MORRISON:  Correct, September 18th.

4      THE COURT:  Okay.  And survival actions must be brought

5  under Nevada law within a year, right?

6      MS. MORRISON:  Right.  So July 24th, 2014, I filed the

7  case.

8      THE COURT:  Right.  But you weren't authorized to file

9  the case until December 2014, right?

10      MS. MORRISON:  As the administrator and the executor of

11  the estate, yes.

12      THE COURT:  Would there have been any other

13  authorization -- other legal basis for you to bring the case

14  before that as his wife?

15      MS. MORRISON:  I'm sorry.  Can you repeat that?

16      THE COURT:  Would there have been any other legal basis

17  for you to bring the case as his wife before you became the

18  executive of the estate?

19      MS. MORRISON:  Well, as far as I know, I was the

20  surviving spouse.

21      THE COURT:  Okay.  Okay.  Ms. Morrison, let me let the

22  defendants come up and respond to some of the arguments and

23  issues you've raised.  Thank you.

24      MS. MORRISON:  Okay.  Thank you.

25      THE COURT:  Why don't we have counsel for Quest and

——————————2:14-cv-01207-RFB-PAL——————

1   Mr. -- or Dr. -- I'm not sure if I'm pronouncing it correctly.

2          MS. CALDWELL:  Hiatt.

3          THE COURT:  Hiatt.  Is it Ms. Caldwell?

4          MS. CALDWELL:  It is Ms. Caldwell.  Thank you, Your

5   Honor.

6          THE COURT:  So, Ms. Caldwell, why don't we have you

7   respond to this argument about the testing for antibodies versus

8   the virus and clarify your position.

9          MS. CALDWELL:  Sure.

10         THE COURT:  Because I think some of the confusion here

11  is in part created by some of the warnings in these test kits

12  which are not a model of clarity in the context of what it is

13  that they're testing for.

14         MS. CALDWELL:  Okay.  Let's talk about, if you mind,

15  because this is really contained in our expert affidavit of

16  Dr. Branson with the CDC.  Here's the testing.  The testing that

17  was ordered was antibody testing.  Under CLIA, that's what Quest

18  had to perform, and as Dr. Branson said, that was the standard

19  of care, frankly, in 1996.

20         So there's two types of tests, and it is the algorithm

21  when Your Honor referred to.  And Dr. Branson explains it.  So

22  if -- and this is a little bit different because 1996 was a

23  little -- we've come a long way since then as far as testing.

24         THE COURT:  Right.

25         MS. CALDWELL:  There was -- there is screening tests,

14

———————2:14-cv-01207-RFB-PAL———————

1   immunoassay testing.  Okay?  And that has -- there's not

2   warnings, you understand, but there is, In and of itself does

3   not diagnose.  And the point is I'm saying up until about 1993

4   it was often common for doctors to first order a screen and

5   independently order the Western blot, not put them together.

6          THE COURT:  Right.

7          MS. CALDWELL:  There obviously became a recommendation

8   by the CDC that, No, no.  Do them all automatically, reflex

9   testing.

10         THE COURT:  Right.  There's three, actually, screens.

11         MS. CALDWELL:  Yeah, there's two...

12         THE COURT:  Well, I'm sorry.  There was the initial

13  screening, and then there was the Western blot.  So you're

14  saying the three different tests were done differently or just

15  the two were done differently?

16         MS. CALDWELL:  The first screen is done twice.

17         THE COURT:  Right.  Okay.

18         MS. CALDWELL:  So it's repeated to make sure.

19         THE COURT:  Right.

20         MS. CALDWELL:  Okay.  And that was part of the

21  algorithm.  So you do it twice.

22         THE COURT:  Right.

23         MS. CALDWELL:  And if it is reactive in the terms of

24  things, you go onto a Western blot.

25         THE COURT:  Right.

15

—2:14-cv-01207-RFB-PAL—

1    MS. CALDWELL:  Okay.  The standard of care in 1996 and
2  for many, many years when antibody testing was ordered was then
3  to reflex for what's called the Western blot, which so we're
4  clear the premarket approvals say that, No, that is indicative.
5  When done with a reactive screen and Western blot, that's HIV
6  infection.

7    THE COURT:  Right.

8    MS. CALDWELL:  Okay.  That was the exact test that was
9  done.

10    THE COURT:  Right.

11    MS. CALDWELL:  Now, Dr. Branson went on further to say,
12  to point out that in terms of Mr. Morrison, the idea of having
13  false positives from that -- first off, they're extraordinarily
14  rare, and he actually gives the statistics in his affidavit, but
15  when you have P31 or P32, it's never been known to have a false
16  positive.  So the algorithm was what was ordered, and that's
17  what was done in 1996 forward.

18    THE COURT:  Right.

19    MS. CALDWELL:  There were many other tests done, not
20  all by Quest Diagnostics.  The CDC did tests.  They did viral
21  load, which I'll talk about in a minute, to confirm and --

22    THE COURT:  Well, I mean, part of that -- I mean, I
23  asked Ms. Morrison about that, but the fact of the matter is
24  that actually doesn't matter as much for some of these claims.
25  The issue really in terms of Quest is what they used and what

16

```
------------------2:14-cv-01207-RFB-PAL-------------------
```

1  they understood and how they reported the information based upon

2  their own results.  Certainly, if there's subsequent

3  confirmation, that may address some of the issues as relates to

4  Nevada State Athletic Commission, but I think for Quest it

5  really comes down to the report that was actually -- the test

6  was actually done, the report that was provided, and whether or

7  not in the context of that report there was any sort of fraud or

8  misrepresentation.

9          MS. CALDWELL:  It was not, Your Honor.

10         THE COURT:  No, I'm saying that to you because I want

11 you to focus not on subsequent tests.  I'm well aware of how

12 many other tests were done subsequent, but that doesn't really

13 matter legally with respect to your clients because really the

14 claims as asserted with respect to your clients are based upon

15 what they would have known when they reported the results from

16 that test.  And that's why I want you to sort of focus on that.

17         MS. CALDWELL:  Yes.

18         THE COURT:  And so what I hear you saying basically,

19 which is what I read from the affidavit, which is that this was

20 in fact the standard and accepted method for testing for HIV,

21 doing this combination of -- I said three screens, but it's

22 actually, as you indicated, the first screening done twice and

23 then the subsequent screening done.  And that with that

24 screening and with the results from that screening, it was

25 accepted that that would have been appropriate then to report an

──────────2:14-cv-01207-RFB-PAL──────────

1  HIV positive result.

2       MS. CALDWELL:  Well, and let me be real clear what was

3  reported, and it's slightly different, was an HIV-1 positive

4  Western blot.  That's actually if you look at the report itself,

5  that's what was said.  It was the standard of care.  And, more

6  importantly, these are both tests, both the immunoassay and the

7  Western blot, are FDA approved.  They are the tests that were

8  approved by the federal government to do this exact testing.

9  Again, obviously this is a preemption issue.  It's not in this

10 case because it's a negligence claim.

11      THE COURT:  Right.

12      MS. CALDWELL:  But it is -- the FDA says these are the

13 ones you use.  There is no dispute that FDA-approved test kits

14 were used.

15      THE COURT:  Right.

16      MS. CALDWELL:  There is no evidence and no allegation

17 that somehow these approved test kits were used improperly.

18 There is no allegation of that and no proof of that.

19      It was -- it was a test.  It's what the -- frankly,

20 it's what the ordering physician ordered, and not surprisingly

21 it's what -- in 1996 it's what everyone ordered.

22      THE COURT:  Right.

23      MS. CALDWELL:  This is not an unusual.  And you have

24 Dr. Iole, the affidavit, the pathologist who read the Western

25 blot, and remembers it to this day and says, This is what I did.

18

─────2:14-cv-01207-RFB-PAL─────

1  I followed the standards.  The bands were all there.  So, yes,

2  there is no evidence in this case that, A, that it was not the

3  standard of care in 1996; B, that it was a breach of the

4  standard of care for 1996, and Mr. Morrison -- Quest had

5  received a form saying not only report to his physician, but

6  please call.  Because, again, this comes down to if the call

7  hadn't been made, Your Honor, Mr. Morrison would not have fought

8  because one of the requirements was that they had to have a

9  test.  Remember, this is just a couple of hours.  Mr. Morrison

10  had delayed, according to the evidence, giving a sample.

11       THE COURT:  Right, for religious reasons initially.

12       MS. CALDWELL:  That's what he said originally.  That's

13  what's on there.  That's what the evidence is, but then came

14  back the next day and gave it.

15       Put in a time crunch -- I'll be honest with you, you

16  give a specimen on Thursday afternoon and you want to fight on

17  Saturday, you know, there would have not been time.  And,

18  actually, it went to his doctor, as we said, on the 12th because

19  it would have been a standard electronic reporting.

20       So in order to even have the opportunity to comply,

21  because obviously you don't know the results when you start out,

22  the call had to be made or else Mr. Morrison would have not have

23  completed his requirements, which I'll let Ms. Rakowsky talk

24  about that.  But that's what happened.  There's no evidence in

25  this case about it.

19

————2:14-cv-01207-RFB-PAL————

1    And then of course we get into what Your Honor's
2  referred to as, you know, later tests, not just this test, but
3  many other types of tests.

4    THE COURT:  Well, and again I referenced them, but
5  again in terms of the nature of these claims, they really
6  revolve around the 1996 test before.  I mean, they may impact
7  the statute of limitations, for example, or other aspects of it,
8  but in terms of the claims involving your client, they focus on
9  that test that occurred right before the fight was supposed to
10  take place and whether or not that test was appropriately
11  administered and whether or not it was even the appropriate
12  standard of care.  Because it seems to me that's the operative
13  issue for the claims against your client because -- your clients
14  because, you know, if the answer is yes, then there's a
15  particular outcome.  If the answer's is no, then there's a
16  different outcome.

17    But I don't know that even though it may be interesting
18  in terms of the tests later in terms of the claims against your
19  client, I'm not sure how relevant they are to the legal inquiry
20  that I have to do about that report.

21    MS. CALDWELL:  The exception I would add to that is
22  that is true as far as the contract claim.  There are also other
23  claims regarding hastening his death, that it caused him to go
24  into a downward spiral, and this test in fact hastened his death
25  and caused his death are some of the allegations in the first

————2:14-cv-01207-RFB-PAL————

1  amended complaint.  And we would urge that --

2          THE COURT:  That's true, but they don't really -- none

3  of them are really stated in the context, for example, of a

4  malpractice claim or something where I would have to look at

5  that result.

6          MS. CALDWELL:  Yeah.

7          THE COURT:  I mean --

8          MS. CALDWELL:  For that day.

9          THE COURT:  -- you're right.  Potentially for

10  intentional infliction of an emotional distress claim, maybe I

11  would have to look at that, but it seems to me, again, that the

12  focus here is really on what's happened in the context of the

13  case or the facts before the 1996 test.

14          MS. CALDWELL:  Yeah.  Again, there's simply no -- on

15  the plaintiff's side no expert testimony or anything to

16  demonstrate that this was not the standard of care or that the

17  test was done somehow improperly.  There was a breach.  But,

18  yes, as to the pure -- as to the economic damages, you're

19  absolutely correct, Your Honor.

20          THE COURT:  And why don't you address briefly the issue

21  of the statute of limitations.

22          MS. CALDWELL:  Okay.

23          THE COURT:  I mean, there are sort of actually a series

24  of issues here.  One has to do with first the survival statute,

25  but then the other actually has to do with the statute of

—————2:14-cv-01207-RFB-PAL—————

1  limitations in general in terms of the two or three years,

2  depending upon which claim it is, whether or not they would be

3  barred in any event given Mr. Morrison's statements even as late

4  as 2007 saying, I actually questioned those tests or not.  So

5  why don't you address first the survival statute and then the

6  actual statute of limitations for the various claims.

7          MS. CALDWELL:  Well, Your Honor, I think Your Honor

8  actually pointed out the salient issues on the survival statute

9  already.  It's within one year, and a survival statute cannot be

10  brought until someone actually had -- is deemed the

11  administrator of the estate.  And that didn't happen for

12  approximately -- at least 15 months after death.  So, yes, we

13  would urge it was barred, simply application of the survival

14  statute.

15          And there's no case law that I'm aware of that has a

16  relation back.  And as you recall from the first motion to

17  dismiss on the original complaint, there was a lot of discussion

18  because at that point -- over standing and the idea that being a

19  widow was not sufficient to bring these claims.  And we had a

20  lot of that.

21          THE COURT:  Right.

22          MS. CALDWELL:  So I won't regurgitate that back to you.

23  So that the idea that there was some authorization prior to

24  being named the administrator is not based in Nevada law.  And

25  we -- as the Court found at that point, there was nothing that

22

—————2:14-cv-01207-RFB-PAL—————

1  would have given Mrs. Morrison the right prior to being named

2  and, in fact, Your Honor actually dismissed the case until the

3  proof of standing could be provided.

4          THE COURT:  Right.

5          MS. CALDWELL:  So that's really -- it's a simple math

6  application, Your Honor, 15 months accrued.  And I'm unaware of

7  any law that would allow a relation back.

8          THE COURT:  Well, but it also seem -- and I guess this

9  is also your argument that in any event there is a statute of

10 limitation issue as to when they could have been brought because

11 Mr. Morrison himself questioned the test in 2007.

12         MS. CALDWELL:  Yeah.  Well, let me -- let me talk a

13 little bit about that.  First off, and we put this in our brief,

14 that any knowledge as to an executor is not anything determining

15 for statute of limitations or a tolling; that actually they step

16 into the shoes of the decedent.  And so what really does matter,

17 as Your Honor's pointed out, is in fact Mr. Morrison's knowledge

18 and his application.

19         And the evidence we brought forward, which has been

20 undisputed, that as early as 1996 he questioned the idea of a --

21 whether he was HIV positive.  He was on notice of all of his

22 claims.  Obviously, he knew he couldn't fight.  He knew the

23 reason.  And what was important is the testimony of both his

24 personal physician who was with him and his publicist/promoter,

25 Tony Holden, who said that when he was retested, and this is

---------------2:14-cv-01207-RFB-PAL---------------

1  important for this one, the reason he did that was to find out

2  if he had a claim against the Commission to see if he did,

3  obviously, triggering a noticing inquiry.  He took notice.  He

4  took the things as early as within it looks four to five days

5  after 1996.  That was one of the reasons why he was retested.

6          THE COURT:  What's the longest period of statute of

7  limitations for any of the claims?  I think, is it three years?

8          MS. CALDWELL:  There may be a catchall four years.  It

9  was three years that I read, but even on the most broadest

10 thing, it's four years under the catchall of 11.220.  But, no,

11 it's two years, negligence; two, years defamation; fraud, three

12 years; intentional interference with contract, three years;

13 IIED, two years.  So, yeah, we're a long ways out of that.

14         And then you go through the history, and again

15 undisputed evidence is he received treatment for HIV.  He knew

16 he had it.  He refused treatment for HIV.  He told people he

17 didn't have HIV.

18         THE COURT:  But that was later, right?

19         MS. CALDWELL:  Well, that was -- no, starting in 1996

20 he started to refuse treatment, according to Mr. Holden and

21 according to the medical records.  In 1997 and in 2001 and 2002

22 he discussed suing the NSAC for failure to issue the license on

23 the basis of the test.  In July 2006 he sent a message to his

24 second wife saying he was right all along.  He never had HIV.

25 2007 he attempted a come-back, public statements he made

24

```
------------------------2:14-cv-01207-RFB-PAL------------------------
```

1 | alleging that the 1996 was a false positive and he was not
2 | infected.

3 | Mrs. Morrison testified that when she first met him in
4 | 2009, still beyond, he told her from the minute that he met her
5 | that it was a false positive.

6 | He -- 2009 and 2010 he told Tony Holden that it was a
7 | false positive, that he didn't have HIV. All of which puts him
8 | on inquiry notice. And also, I mean, not just notice, he did
9 | it. He went out and got tested, Your Honor, for the purpose of
10 | finding out if he had a claim.

11 | THE COURT: Right.

12 | MS. CALDWELL: So -- and so the idea of any delay or
13 | lack of knowledge, it's not -- there is no -- this idea of an
14 | electron microscope, there is no evidence, expert, which is what
15 | would be required in this case, that an electron microscope is
16 | the way one discovers whether it's HIV. So that cannot be a
17 | triggering event, absent expert testimony. Of which there --
18 | the only testimony is Dr. Branson who says no.

19 | THE COURT: Okay. Thank you, Ms. Caldwell.

20 | Ms. Rakowsky, why don't you come up and just talk to me
21 | a little bit about discretionary immunity.

22 | MS. RAKOWSKY: Thank you, Your Honor.

23 | THE COURT: If you want to discuss other issues, I
24 | think you can, but I think --

25 | MS. RAKOWSKY: I think Ms. Caldwell has discussed them.

25

—————————————— 2:14-cv-01207-RFB-PAL ——————————————

1        Good morning.  Discretionary immunity applies to Nevada
2   State Athletic Commission as well as the claims against
3   Dr. Goodman as well as the claims against Marc Ratner.
4   Dr. Goodman and Marc Ratner were sued in their personal
5   capacities.  NRS 241.032, subsection 2, provides immunity for an
6   officer or an employee of the state or any of the agencies --
7        THE COURT:  Ms. Rakowsky, I'm familiar with the
8   statute.
9        MS. RAKOWSKY:  Okay.  All right.
10       THE COURT:  So you don't need to review that.  So,
11  again, I want to make sure that I understand.  Your position is
12  that based upon the tests that they received and their
13  understanding of the tests, they made the discretionary choice
14  as relates to the canceling of the fight in this case.
15       MS. RAKOWSKY:  Yes.  Nevada uses the same tests that
16  the federal government does which is the Berkovitz/Gaubert test,
17  which first asks if the alleged negligent act was done by choice
18  or discretion of the employee and the second part is whether
19  that decision was based on policy.
20       THE COURT:  So let me ask you this question because it
21  seemed to me -- now, you have other arguments about dismissal,
22  but it seems to me that it's not clear to me this is discretion.
23  The law's pretty clear if you don't provide an appropriate test,
24  right, you can't fight.  So their decision to cancel the fight,
25  was that really discretionary or wasn't it actually not

26

—————————2:14-cv-01207-RFB-PAL—————————

1 compelled by the requirements?

2        And, again, this is not to say you don't have other

3 arguments to raise with respect to the claims, but it does seem

4 to me in this case that the actions of these state officials was

5 not discretionary because once they get -- to get what they

6 believed to be a positive test, is there anything else that they

7 can do, besides cancel the fight?

8        MS. RAKOWSKY:  Well, the discretion was really in the

9 licensing issue.  The discretion is they must look at the

10 obligations and the responsibilities of the applicant.  The

11 applicant has a responsibility -- it's just not an HIV test.

12 There are a number of things.

13        THE COURT:  Right, but the HIV test is the focus of the

14 claim, right.  And so, again, I'm not saying that you don't have

15 other arguments, but my question to you really is about

16 discretionary-act immunity.  They didn't have discretion to

17 still give him the license once he tested positive, did they?

18 They didn't have the discretion to allow the fight to go forward

19 once he had what they believed to be a positive test, did they?

20        MS. RAKOWSKY:  That -- I agree with you on that

21 particular part because he failed to comply with one of the

22 requirements of the statute and the regulations, but that's --

23 that is not the true discretion.  The discretion is in the

24 licensing.  The discretion is in the decision on what is

25 necessary for licensing.

————————2:14-cv-01207-RFB-PAL————————

1        THE COURT:  No, that's true, but the question -- but

2   the issue is for an act to be covered, the act itself has to be

3   discretionary.  I don't look at the overall context of how they

4   make decisions wholistically.  I look at the context of the

5   specific case whether or not the conduct that is at issue was

6   itself discretionary or not.  And so my question to you really

7   is about the discretionary nature of the acts in this case.  And

8   in this case the decisions were for the fight not to proceed

9   based upon the fact that he didn't qualify for a license to

10  fight and meet the requirements, and that those requirements

11  were strict.  In other words, he could not have fought after

12  testing positive, right.  They didn't have the discretion to

13  say, You can still fight, did they?

14       MS. RAKOWSKY:  No, they didn't have that discretion,

15  but there was a lot of other issues in this case that were based

16  on their discretion.  For example, one of the allegations is how

17  he was told that he could not fight.  There are -- and that was

18  within his discretion.  His discretion was to say he was not

19  medically cleared to fight.  His discretion was not to go to the

20  press and say that Mr. Morrison can't fight tonight because he

21  has HIV.  No.  Instead, Mr. Ratner went to the press and said he

22  was not medically cleared.

23       So there are a number of discretionary decisions that

24  are involved in this case that may not come down to exactly the

25  interpretation of -- and a lot of it should have to do with the

28

```
                       -2:14-cv-01207-RFB-PAL-
```

1 | interpretation of the statute. The statute --

2 | THE COURT: So let me -- I'm sorry. I don't mean to

3 | interrupt you. So what you are saying is that to the extent

4 | the -- her theory is based upon decisions made about not

5 | providing the license and canceling the fight, they may not be

6 | discretionary. They had to strictly comply with that, but to

7 | the extent that they made a decision in terms of how they told

8 | Mr. Morrison about the results and how they told him how the

9 | fight was going to be cancelled, the timing of when they did

10 | that and going public, those would all have been discretionary

11 | decisions.

12 | MS. RAKOWSKY: Right, and they were based on policy.

13 | THE COURT: Okay.

14 | MS. RAKOWSKY: With respect to -- you know, you could

15 | look at the regulation, and you could say the regulation has to

16 | show that the fighter has the obligation to show that he is not

17 | carrying the HIV virus. I think that's a very clear regulation,

18 | and I think that that is not so much the discretionary thing as

19 | opposed to the entire event of how it was told, of how the fight

20 | was cancelled, of how it was portrayed in the media. And that

21 | was part of the discretionary.

22 | THE COURT: Well, no, I'm just trying to distinguish

23 | because I agree with you. I'm just saying that I don't think

24 | discretionary-act immunity covers everything that Ms. Morrison

25 | alleges in the context of the canceling of the fight based upon

29

```
                   ┌─────────────2:14-cv-01207-RFB-PAL─────────────
```

 1 | their belief that he tested positive.  I don't think the
 2 | discretionary-act immunity covers that because they have -- they
 3 | had to do that once they received the result, but it may cover
 4 | other aspects.

 5 |         And, again, it's not to say that you nonetheless can't
 6 | rely upon other arguments that you've raised about statute of
 7 | limitations or other arguments that have been raised in the
 8 | context of what Ms. Caldwell cited, but it is important for me
 9 | to be able to make sure that I focus on which acts would be
10 | covered by the discretionary-act immunity and which ones would
11 | not be in the context of deciding this case.  So I appreciate
12 | that.  Thank you.

13 |         Do you have anything else you want to add?

14 |         MS. RAKOWSKY:  No, I think Ms. Caldwell covered the
15 | survival statutes completely.  Do you have any other questions
16 | for me?

17 |         THE COURT:  I do not.  Thank you.

18 |         MS. RAKOWSKY:  Thank you.

19 |         THE COURT:  Ms. Morrison, do you want to respond to
20 | anything that has been said by opposing counsel?

21 |         MS. MORRISON:  Yes, I do.

22 |         THE COURT:  Okay.  Sure.

23 |         MS. MORRISON:  Okay.  I'd like to respond to
24 | Ms. Caldwell, first of all.  The Nevada Commission for their
25 | ruling requests that the boxer provide something that says that

30

—2:14-cv-01207-RFB-PAL—

1    he does not have the human immune deficiency virus.  Quest

2    cannot legally provide that information, and that is because

3    what they're printing out, Your Honor, is based on the ELISA

4    test which does not --

5              THE COURT:  What about the Western blot test?  That

6    combination --

7              MS. MORRISON:  The Western blot --

8              THE COURT:  Okay.  Let me finish.

9              MS. MORRISON:  Yes.

10             THE COURT:  I have an expert affidavit, Mr. Branson,

11   who goes through in significant detail why these tests were used

12   and what their reliability was and the fact that they were the

13   standard of care for testing for HIV at the time, that there was

14   not a requirement for there to be a reviewing of blood samples

15   under a scan in any way.  So I want you to focus -- to the

16   extent that you want to respond, focus on that affidavit.

17             MS. MORRISON:  Right.

18             THE COURT:  Because he's very clear about what he says

19   in there.  I don't have anything from you from an affidavit that

20   I can see that would be equally based upon knowledge of the

21   regulations and the science at the time that would rebut what he

22   says.  So if you want to attack that, you should attack that

23   affidavit because that's an affidavit, quite honestly, the Court

24   finds compelling given his background and expertise.  So why

25   shouldn't I rely upon that?

31

—————————————2:14-cv-01207-RFB-PAL——————————

1        MS. MORRISON:  You should not rely upon that because

2   Dr. Branson doesn't even list the disclaimers, the limitations,

3   the intended use of the Western blot test, and neither does he

4   do that for the ELISA test.  The Western blot test is no longer.

5   They have discovered that that test does not detect or confirm

6   the virus, and the same goes for the ELISA.  Your Honor, if they

7   were --

8        THE COURT:  But the question isn't that.  The question

9   is at the time what was the understood method --

10        MS. MORRISON:  Right.

11        THE COURT:  -- for testing.  If they subsequently

12   learned that the test was incorrect, that's something that's

13   different than -- your argument is that at the time they had to

14   have understood that what they were doing was negligent, because

15   you can't establish negligence retroactively based upon

16   information that's subsequently learned, right.  It has to be a

17   breach of the duty of care or misrepresentation based upon

18   what's known at the time.

19        So I want you to focus on why at the time this would

20   have been negligent or misrepresenting.

21        MS. MORRISON:  At the time nobody was informed of the

22   disclaimers and intended use inside those package inserts, and I

23   know you say it's not valid retroactive.  At the time in 1996

24   those tests already contained those disclaimers, already

25   contained the intended use, and they were not told to the

32

—————————2:14-cv-01207-RFB-PAL—————————

1   public.  They were not told to Tommy.  They probably haven't
2   even been told to the Nevada Commission.  Otherwise, they
3   wouldn't be requesting an HIV test that does not detect HIV.
4           So there is no statute of limitations as far as I'm
5   aware of where there's fraud.
6           THE COURT:  Well, there is, actually.
7           MS. MORRISON:  Oh.  Is there?
8           THE COURT:  Yes.
9           MS. MORRISON:  Okay.
10          THE COURT:  And so Nevada law is fairly clear about
11  when that happens and when these claims can in fact be brought.
12  And the Court has to determine when the cause of action accrues
13  to make a decision about whether or not there is a prohibition
14  on the cause of action.  But there are absolutely causes of
15  action for -- excuse me -- statute of limitations for the claims
16  that you have raised.  And that's why I had asked you about
17  that.
18          MS. MORRISON:  All right.
19          THE COURT:  But I understand your point basically is,
20  if I understand it correctly, is that the providers of the tests
21  themselves presented caveats and warnings --
22          MS. MORRISON:  Yes.
23          THE COURT:  -- that Quest disregarded --
24          MS. MORRISON:  Yes.
25          THE COURT:  -- when they communicated what the results

33

———————————2:14-cv-01207-RFB-PAL——————————

1  meant --

2          MS. MORRISON:  Yes.  Correct.

3          THE COURT:  -- to Nevada State Athletic Commission.

4          MS. MORRISON:  You've got it, yes.  And they still are.

5  And the same goes for all of the other pieces of paper that you

6  see that you've said, Oh, you know, he definitely had HIV

7  because look at all of these reports.  Those reports do not mean

8  a diagnosis.  Those reports do not mean that you can receive

9  treatment, and that comes directly from Quest themselves.

10 And --

11         THE COURT:  But that's something separate.  What I am

12 saying is there's a separate issue about the reason why the

13 reports actually matter in terms of what the results were is if

14 your former husband was told repeatedly that he had HIV by

15 various doctors, including his own, if he's questioning the

16 diagnosis, when he questions it or when he decides that there

17 may be an issue is important for me in determining when the

18 statute of limitations may or may not run --

19         MS. MORRISON:  Right.

20         THE COURT:  -- regarding causes of action.  So it does

21 matter in terms of the claims that are raised in this case as to

22 what he was told and when he was told about whether or not he

23 had HIV and how often and who told him that.

24         MS. MORRISON:  Right.

25         THE COURT:  But I understand your argument basically is

34

————————2:14-cv-01207-RFB-PAL————————

1  that the Court should rely upon primarily, if I'm understanding

2  your argument, the very warnings of the test providers

3  themselves.

4       MS. MORRISON:  Yes, correct.  And it's not backed up by

5  any human clinical trials, Your Honor, to say that it does

6  detect the virus.

7       THE COURT:  But, again, that's -- again, Ms. Morrison,

8  I want to be clear.  That's a separate issue.  If a test even

9  detecting for reactive antibodies was the method for testing for

10  the virus even indirectly, that would be sufficient.  So the

11  issue to me, Ms. Morrison, isn't whether or not there's a test

12  exactly for the virus itself.  The question is whether or not

13  these reactive tests were deemed to be appropriate and accepted

14  by the medical community as testing for the virus.  Whether they

15  specifically did or not in terms of what was technically done is

16  separate from whether or not the medical community at the time

17  accepted the tests as confirmation of the existence of the virus

18  in a person.  That's two separate things.

19       MS. MORRISON:  Right.

20       THE COURT:  They don't have to have confirmed the

21  existence of the virus for the test to have been medically

22  accepted as a means of confirming the virus.  Those are two

23  separate things.

24       MS. MORRISON:  Right.  And the manufacturer does not

25  accept that as being a test that detects the virus.  The only

35

—————————2:14-cv-01207-RFB-PAL—————

 1  corporation that does is Quest, Quest Diagnostics.  And they're
 2  forcing the Commission to accept their lab report as being
 3  confirmation that, Hey, yes, we found the virus or, no, we
 4  didn't.  They're forcing the medical establishment to read off
 5  that piece of paper with tests that do not detect the virus.
 6          THE COURT:  Okay.  Thank you, Ms. Morrison.
 7          MS. MORRISON:  Thank you.
 8          THE COURT:  Ms. Caldwell, I know you're going to want
 9  to come up and talk to me just a few minutes more.
10          MS. CALDWELL:  Sure, Your Honor.  Thank you very much.
11          THE COURT:  So just talk to me a little bit about the
12  warnings and what they mean because there is an issue there
13  about what these warnings say.  They do have this very
14  lawyer-like language about what the results can and can't be
15  used for.  And I think they create at least a legitimate issue
16  about how the results can be presented.  So talk to me about
17  these inserts and the warnings associated with them.
18          MS. CALDWELL:  I'm going to talk to you about two
19  things, one is Dr. Branson's report and also CLIA, the Clinical
20  Laboratory Improvement Act, which regulates how reports are
21  issued.  And that's in our briefing.  There's not a lot of
22  discretion, by the way, for laboratories of what they put on
23  reports and what they don't put on reports.  Okay?
24          So, first off, Dr. Branson talks at length about what
25  he's going to call warnings, and he said first off he disagrees.

36

—————2:14-cv-01207-RFB-PAL—————

1  They are not warnings.  They're not limitations.  They talk in

2  the premarket approval which is -- he refers to this in his

3  affidavit about the individual tests.  And there is no dispute

4  here that an immunoassay screening on its own would never be a

5  final laboratory result, very, very clear.  It didn't happen in

6  this case.

7          There are no such warnings that have been brought

8  forward as to the Western blot and, most importantly, not as to

9  the algorithm of them, but let's talk a little bit about what

10 should be on a report because there's been a lot of talk in that

11 area.  And I will point out we have no expert information from

12 the plaintiffs of what should be on the report or not.  We

13 really are left with Dr. Branson.

14         THE COURT:  And with the inserts, that's why I want to

15 focus on whatever those warnings or not mean in connection with

16 the reports.

17         MS. CALDWELL:  Yeah, but they are not warnings.  What

18 it says, as I understand it, is that -- and these are all

19 information for the immunoassay done by itself, okay, because

20 there are warnings -- warnings is probably the wrong word that

21 Dr. Branson would use, but we'll -- okay.  The information given

22 is, so for an immunoassay, Do not rely upon this solely for a

23 confirmation of HIV.  You get to the Western blot, by the way,

24 it says the same thing.

25         THE COURT:  Right.

37

------------------2:14-cv-01207-RFB-PAL------------------

```
 1          MS. CALDWELL:  Not the combination, you understand, but
 2  individually used the accepted method in 1996 was to do -- in
 3  other words, it wasn't right to go straight to the Western blot
 4  and call it.  It wasn't right to go to the immunoassay.  You had
 5  to do them together.
 6          So let's talk about who determines it.  I know it's
 7  been Quest determines it a lot.  Well --
 8          THE COURT:  Well, no, I didn't say that.
 9          MS. CALDWELL:  I know.  Mrs. Morrison did.  I
10  understand that.
11          THE COURT:  But the algorithm actually wasn't created
12  by Quest.  That would be --
13          MS. CALDWELL:  Well, it was an FDA issue.
14          THE COURT:  Right.  You don't have to establish the
15  fact --
16          MS. CALDWELL:  I would also have mentioned --
17          THE COURT:  Let me finish.
18          MS. CALDWELL:  I'm so sorry, Your Honor.  I am so
19  sorry.
20          THE COURT:  That's all right.
21          You don't have to establish, because I understand,
22  where the algorithm came from, the fact that the algorithm was
23  used.  The only issue for me in this case that potentially
24  creates an issue for the plaintiff's case are the fact that the
25  warnings or the statements or the information themselves suggest
```

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

38

———————2:14-cv-01207-RFB-PAL ———

1  that they shouldn't be -- that the tests shouldn't be used for

2  confirmation.  And I understand your argument.  I just wanted to

3  give you a chance to respond to that.

4          MS. CALDWELL:  Yeah.

5          THE COURT:  That -- let me finish.

6          MS. CALDWELL:  Go ahead.  I'm sorry.

7          THE COURT:  That those information statements or

8  warnings have to be understood in the context of the tests being

9  administered individually and not in combination with each

10  other, and that the algorithm was created to increase the

11  accuracy of the testing by using the multiple tests together.

12          MS. CALDWELL:  And Dr. Branson talks about the idea it

13  would be inappropriate, inappropriate in tests such was done

14  here to put any of that information on it.  He actually goes the

15  opposite because it was -- it would lead to, according to FDA

16  approval and CDC recommendations, to perhaps a physician

17  inappropriately using a result.

18          THE COURT:  Or denying that a result was actually what

19  it was.

20          MS. CALDWELL:  Correct.  That would actually be not.

21  And then you go further.  Under the Clinical Laboratory

22  Improvement Act, it is very specific of what has to be on a test

23  and it does of course vary by test, but as we have it, for

24  example, the only information that would be given to a physician

25  in this case would be -- I don't know the cite, Your Honor, but

─────────2:14-cv-01207-RFB-PAL─────────

1   would be if the physician had requested in writing to receive
2   additional information -- and there's no evidence in this case
3   that the ordering physician ever asked that -- that that would
4   not be the appropriate, and that would actually violate the
5   standard of care to have put that information on it.
6           THE COURT:  Okay.
7           MS. CALDWELL:  And I would -- it's really Dr. Branson
8   does a much better job of this than I do.
9           THE COURT:  Well, no, no, no.  Look, again, I wanted to
10  give you an opportunity.  I mean, I've gone through
11  Dr. Branson's affidavit a few times since it takes a few times
12  to actually I think understand what he's saying.  And I think
13  part of it is also understanding that the tests aren't for the
14  virus itself.  The tests are for sort of antibody reactions or
15  proteins or I'm not sure what even the appropriate medical term
16  would be, but it's to test the body for what would be the body's
17  reaction to the existence of the virus within the body and
18  understanding how to measure what those reactions are to be able
19  to confirm the existence of the virus even if you're not
20  specifically testing for it.
21          MS. CALDWELL:  There are --
22          THE COURT:  We wouldn't even be having this discussion
23  if the test was specific for the existence of the virus or not.
24  That's obviously why there's even the possibility of a claim
25  that the tests didn't test for the virus.

40

—————2:14-cv-01207-RFB-PAL—————

1      But I appreciate your argument, Ms. Caldwell.  I don't

2  know if you have anything further to add than what you've

3  already added.

4      MS. CALDWELL:  I don't think so, Your Honor.

5      THE COURT:  All right.  Thank you.

6      So let me just deal with a few housekeeping issues in

7  the context of this case.  We have all of these motions that

8  would need to be addressed in the context of what should or

9  should not be stricken from the record in this case.  You know

10 what.  Actually, what I'll do is I'll just address them in my

11 written ruling.  I think that many of them will be mooted by

12 whatever I decide in the context of this case.  So I don't think

13 we need to go through them all at this time.

14     So if there's nothing else that we need to do at this

15 point in time, we are adjourned on this matter.  I'm going to

16 stay on the bench for the next matter.  Thank you.

17     MS. CALDWELL:  Your Honor, could I ask one thing?

18     THE COURT:  Yes.

19     MS. CALDWELL:  There is one motion that I would ask the

20 Court to rule on.  I have personally been asked for a motion for

21 contempt on me for altering records.

22     THE COURT:  Yes.  Well, I'm going to -- I'll stop you

23 right there.  I'm going to deny that motion.  I've reviewed the

24 record on that motion.  I don't find any basis for holding

25 defense counsel in contempt in this case.  I've reviewed the

41

---2:14-cv-01207-RFB-PAL---

1  record.  I don't see any basis for that.  And so I am going to
2  deny that motion on the record at this point in time.
3         MS. CALDWELL:  Thank you, Your Honor.
4         THE COURT:  Okay.  And I'll issue a written ruling with
5  respect to the remaining claims in this case.  So we are
6  adjourned.  Thank you.
7         MS. CALDWELL:  Thank you.
8         MS. MORRISON:  Thank you.
9         MS. RAKOWSKY:  Thank you, Your Honor.
10        (Whereupon the proceedings concluded at 10:55 a.m.)
11                         --oOo--
12             COURT REPORTER'S CERTIFICATE
13
14        I, PATRICIA L. GANCI, Official Court Reporter, United
15  States District Court, District of Nevada, Las Vegas, Nevada,
16  certify that the foregoing is a correct transcript from the
17  record of proceedings in the above-entitled matter.
18
19  Date:  November 7, 2016.
20                              /s/ **Patricia L. Ganci**
21                              Patricia L. Ganci, RMR, CRR
22                              CCR #937
23
24
25

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF NEVADA

3  PATRICIA HARDING MORRISON,      )
   individually and in her         )
4  capacity as                     )
   Executor/Administrator of       )
5  the estate of Tommy             )
   Morrison, a deceased            )
6  individual,                     )
                                   )   Case No. 2:14-cv-1207-RFB-PAL
7          Plaintiff,              )
                                   )   Las Vegas, Nevada
8      vs.                         )   March 1, 2016
                                   )   9:15 a.m. – 9:41 a.m.
9  QUEST DIAGNOSTICS               )
   INCORPORATED, a Nevada          )
10 domestic corporation; JON       )
   HIATT, an individual; DR.       )
11 MARGARET GOODMAN, an            )
   individual; NEVADA STATE        )
12 ATHLETIC COMMISSION, an         )
   unknown business entity;        )
13 MARC RATNER, an individual;     )
                                   )   Motion Hearing
14         Defendants.             )
   _____)

15
                     TRANSCRIPT OF PROCEEDINGS
16          BEFORE THE HONORABLE PEGGY A. LEEN
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
17

18 APPEARANCES:

19 For the Plaintiff:

20         PATRICIA HARDING MORRISON, PRO SE
           P.O. Box 454
21         Rose Hill, KS 67133

22

23 Transcribed by:  Katherine Eismann, CSR, CRR, RDR
                    (702)431-1919  eismann.csr@gmail.com
24

   Proceedings recorded by electronic sound recording, transcript
25 produced by mechanical stenography and computer.

2

1    APPEARANCES CONTINUED:

2    For the Defendant Quest Diagnostics Incorporated:

3                FAYE D. CALDWELL, ESQ.
             Caldwell Everson, PLLC
4            2777 Allen Parkway, Suite 950
             Houston, TX 77019
5
             KEITH D. WEAVER, ESQ.
6            Lewis Brisbois Bisgaard & Smith
             6385 South Rainbow Boulevard, Suite 600
7            Las Vegas, NV  89118

8    For the Defendant Dr. Margaret Goodman:

9                VIVIENNE RAKOWSKY, ESQ.
             Office of the Attorney General
10           555 E. Washington Ave., Suite 3900
             Las Vegas, NV 89101
11
     Recorded by:  Jeff Miller
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1           (Tuesday, March 1, 2016, 9:15 a.m.)

2                        --oOo--

3              P R O C E E D I N G S

4           COURTROOM ADMINISTRATOR:  All rise.

5           THE COURT:  Good morning.  Please be seated.

6      (Chorus of "Good morning.")

7           COURTROOM ADMINISTRATOR:  Your Honor, we are now

8   calling the motion hearing in the matter of Patricia Harding

9   Morrison versus Quest Diagnostics Incorporated.  The case

10  number is 2:14-cv-1207-RFB-PAL.

11          Beginning with the plaintiff, parties please state

12  your names for the record.

13          MS. MORRISON:  Good morning.  My name is Patricia

14  Harding Morrison.

15          MS. CALDWELL:  I'm Faye Caldwell representing Quest

16  Diagnostics and Dr. John Hiatt.

17          MR. WEAVER:  Good morning.  Keith Weaver also for

18  Quest Diagnostics and Dr. John Hiatt.

19          MS. RADKOWSKY:  Good morning, Your Honor.  Vivienne

20  Radkowsky from the Attorney General's Office representing the

21  Athletic Commission, Dr. Goodman, and Marc Ratner.

22          THE COURT:  Okay.  This is on calendar on two

23  separate motions.  I know additional motions have been filed

24  since these two matters were set for hearing.  However, they

25  are not before me this morning, and I frankly don't have time,

4

1  given the number of other matters on my calendar, to address

2  them.

3      So the first is with respect to plaintiff's motion

4  that was filed challenging the subpoenas.  She filed an

5  objection which I construed as a motion to quash.  That's the

6  term that's used by the federal rules, but it basically --

7      MS. MORRISON:  I --

8      THE COURT:  -- I understood what you were getting at.

9      I required the defendants, who served the 23

10  subpoenas that were at issue, to supplement their papers to

11  tell the Court why it is that you believe these 23 individuals

12  and entities had relevant and discoverable information in this

13  case.  You have now done that.

14      I have reviewed the defendants' responses in that

15  regard, and I have a number of questions from -- for Quest, and

16  I'd like some clarification on the record.

17      With respect to a number of these individuals and

18  entities, you have responded that you obtained Quest records

19  indicating that a doctor or a medical facility collected

20  specimens and/or tested the late Mr. Morrison for HIV and/or

21  other things.

22      And I'd like you to describe for me how it is that

23  you obtained access to those Quest records that do not deal

24  with the entity that's been served in this case.

25      MS. CALDWELL:  Okay.  Your Honor, Quest Diagnostics

5

1  obviously is a nationwide company, and we had obviously
2  Mr. Morrison's name and date of birth.  And we also knew from,
3  frankly, Internet research as well as the pleadings in this
4  matter the likely places where he had lived over the periods of
5  time.  So --
6          THE COURT:  You accessed your national database to --
7          MS. CALDWELL:  Well, what we actually did is there
8  are -- under Quest Diagnostics, there are individual lab
9  locations which all are Quest Diagnostics.  And so it is not a
10  national database.  It's a regional or a laboratory-based
11  database.
12          And we asked those individuals to see if they had
13  records.  I mean, the Quest Diagnostics location.  But it is a
14  Quest Diagnostics location.
15          THE COURT:  All right.  And so what I'm going to
16  require you to do is supplement your Rule 26(a)(1) initial
17  disclosures and serve plaintiff with your supplemental initial
18  disclosures that disclose each and every Quest lab from whom
19  you inquired and obtained any indication that medical records
20  pertaining to Tommy Morrison were available.
21          MS. CALDWELL:  We're happy to.  We also have copies
22  today for -- of those individual test records.  We didn't know
23  how the Court wanted to handle confidentiality, so I didn't
24  want to serve the commission with things that the Court may --
25  but, absolutely, we'll be happy to do that.

6

1      THE COURT:  No, I --

2      MS. CALDWELL:  We did, in our initial disclosures,

3  indicate we had such records.  We did not have it then.

4      THE COURT:  Okay.

5      MS. CALDWELL:  But we'll do that.

6      THE COURT:  Well, I want Miss Morrison to know

7  exactly who you contacted and exactly from which laboratories

8  you obtained information.  She's entitled to know that.  Rule

9  26(a)(1) requires you to disclose the -- all individuals who

10  have knowledge that may be used to support claims and defenses,

11  and you are clearly using this to support your -- your

12  defenses.

13      And so you're going to have to disclose and provide

14  the information as required by Rule 26(a)(1) to the plaintiff.

15  Is there any reason why you can't do that in the next 14 days?

16      MS. CALDWELL:  Absolutely not, Your Honor.  We'd be

17  happy to do that.

18      THE COURT:  Very well.  Then with respect to you have

19  served Miss Morrison with medical records that you did receive

20  from a couple of the providers after my January order was

21  entered requiring you to do so.  And you've received some

22  requests from -- or responses from some other individuals that

23  they don't have any records, or they used to but they don't

24  now.  And you've now put that in writing, and, of course, are

25  bound by those responses to the Court.

7

1        And with respect to some other individuals and

2   entities, they have responded that they have documents that

3   have been requested, but that they are waiting for the outcome

4   of this hearing to determine whether to turn them over to you;

5   is that correct?

6        MS. CALDWELL:  It is.  There are some that because we

7   got the objections, who either were served or we got -- or it

8   wasn't the right spot, we obviously made no further efforts to.

9   And those are all indicated here where we obviously didn't go

10  back and try to go any further once the objection was received.

11  We told our process server to stop everything.

12        THE COURT:  With respect to those who have not been

13  served, is that the reason is because of the order that I

14  entered that set this for hearing on the merits?

15        MS. CALDWELL:  Yes.

16        THE COURT:  And do you -- depending on whether you

17  are allowed to do so or not, is it your intention to still

18  serve the other providers that have not yet been served?

19        MS. CALDWELL:  If the Court allows it, yes.

20        THE COURT:  Well, have you been negotiating with any

21  of the providers to narrow the scope of the very broad

22  subpoenas that were served?

23        MS. CALDWELL:  We have -- once we got the objection,

24  we stopped everything, Your Honor.  We had -- we had had no

25  discussion with them prior, and we've had -- about the scope at

8

1   all.  We simply told everyone that there was -- you know, we

2   would wait until the outcome on it and obviously comply with

3   the Court's order.

4             THE COURT:  Miss --

5             MS. CALDWELL:  And we have not had --

6             THE COURT:  Miss Morrison believes that you've had

7   communications with the individual providers following up on

8   your request; is that true?

9             MS. CALDWELL:  They are as listed.  The only -- we

10  have not called.  We have received phone calls, like, as was

11  said in our subpoena, if there was a cost, you know, to contact

12  my office with the cost.

13            The only contact that -- that our office had of a

14  substantive nature is after we filed the report to the Court,

15  we did receive a call -- I received a call from

16  Dr. Schuchmann's office saying to me of we've received a call

17  from Mrs. Morrison threatening to sue us, and I -- I didn't say

18  anything.

19            And they said we had had the objection beforehand.

20  And I said, "Well, all I can tell you is the Court is going to

21  have a hearing on this, and, you know, I'm not your attorney."

22  I didn't say anything further.

23            That is the only -- and that was after the

24  February 10th report was filed and after we gave the documents.

25  But other than that, we have had no -- we had no conversations

9

1   prior, and we didn't -- we've not had -- other than issues of
2   cost and everyone -- a cost issue that arose, once the
3   objection was filed, we simply said, "An objection has been
4   filed.  We'll take that up once the Court has a ruling."
5               THE COURT:  All right.
6               MS. CALDWELL:  I should also point out that the issue
7   of the other ones, there is apparently -- I got last night,
8   while I was traveling, an issue of whether we have turned over
9   all the records for Dr. Schuchmann.  Apparently there's a
10  letter that says there are 23 pages, and we have five.
11              I brought today for the Court and for Mrs. Morrison
12  the fax that we got showing there were six pages.  I -- I don't
13  know anything else to tell anyone.
14              THE COURT:  You know what you received.  Whether or
15  not those are -- Miss Morrison naturally believes that there's
16  more records especially with respect to the one doctor that --
17  that treated him up until the time of his death.
18              MS. MORRISON:  Correct.  Yes.  And I've spoken to
19  them, and I've got something in writing from them that they
20  sent 23 pages.  So --
21              MS. CALDWELL:  I brought the original fax.  It shows
22  one of six including the fax cover sheet --
23              THE COURT:  Well --
24              MS. CALDWELL:  -- and I can give that to the Court
25  and everyone.

10

1           THE COURT:  First of all, provide it to the

2    plaintiff.  And then Miss Morrison, provide to opposing counsel

3    the contrary information that you have.

4           Unfortunately, it's not at all uncommon when you deal

5    with health care providers.  It depends on who you get and how

6    they read the subpoena --

7           MS. MORRISON:  Right.

8           THE COURT:  -- about what they think is responsive.

9    It's not at all unusual for an initial response to be made, and

10   then they go back and say, "No, there are more records," or "We

11   don't know if you want these or you don't want these."  And

12   they find additional things that they think are responsive to

13   the subpoena.

14          So, that's -- that's not the entity that serves the

15   subpoena.  It's the entity that receives the subpoena that

16   sometimes provides conflicting information.  So that's not at

17   all uncommon.

18          MS. MORRISON:  Right.

19          THE COURT:  And I can understand how that may have

20   happened.  So you need to exchange the information among

21   yourselves so that you can see if you can get to the bottom of

22   that --

23          MS. MORRISON:  Okay.

24          THE COURT:  -- and we'll go from there.  With respect

25   to your request to quash all of these subpoenas, I'm going

11

1  to -- I have carefully reviewed all of your moving and

2  responsive papers.  I -- I know what you have to say about

3  this, and I -- I think I have a pretty good handle on what your

4  position is in this regard.  I know you want to keep focusing

5  this case solely on what happened right around February 10th,

6  1996.

7          MS. MORRISON:  Uh-huh.

8          THE COURT:  However, the allegations that you have

9  raised in the complaint are not limited to that day.  I know

10  your quest is to find -- that's probably -- I didn't select

11  that word on purpose.  Your desire in this case is to find out

12  who did what on February 10th that resulted in your late

13  husband not fighting --

14          MS. MORRISON:  Right.

15          THE COURT:  -- here in Nevada on that date.  However,

16  your complaint allegations are very broad, and you seek damages

17  up until the time of his death on the theory that what they did

18  on that day caused a whole series of consequences to occur.

19  And you have, in the Court's view, put at issue --

20          MS. MORRISON:  Uh-huh.

21          THE COURT:  -- his medical condition over the years,

22  and whether he was not fighting, or whether he was not

23  gainfully employed, or whether he lost certain opportunities

24  that you are complaining about in your complaint and in your

25  papers as a result of their conduct or as a result of other

12

1    things.  And as a result, I am not going to quash the
2    subpoenas.

3           I do admonish the defendants, however, for issuing
4    extraordinarily overbroad subpoena duces tecum.  When you sign
5    the discovery request, you do so under penalty of Rule 26(g),
6    which says that it's not unduly burdensome either on the other
7    side or the party on whom you are serving.

8           And in this case, these are nonparties who -- there
9    was no temporal limitation whatsoever on these subpoenas in
10   this case, and that should not occur.  If you had information
11   that you provided to me and on the record now that they had
12   records over certain periods of time, it was incumbent upon you
13   to narrow your subpoenas for the period of time in which you
14   had a reason to believe that you had subpoenas.

15          So they are modified in that I am not going to permit
16   you to obtain medical records from these various 23 providers
17   or individual entities for the period of time for which you do
18   not have a good faith belief that they have relevant and
19   admissible evidence or relevant and discoverable evidence.

20          And Miss Morrison, those are two different things.
21   Whether this evidence that they collect ultimately gets in
22   front of the trial judge or in front of a jury at trial is
23   different from whether they are entitled to obtain it in the
24   first instance --

25                MS. MORRISON:  Uh-huh.

13

1    THE COURT:  -- to see if it may be admissible.  And

2    so I'm going to allow them to obtain records for the period of

3    time that they have a good faith belief that the various

4    individuals and entities have information about your husband's

5    health, because your late husband's health at various points in

6    time is at issue in this complaint.

7    But they will be modified so that they are not

8    open-ended, and they are not permitted to get every piece of

9    paper that mentions Mr. Morrison's name from 1969 until his

10   death.  So it's -- her objections are sustained to the extent I

11   am going to modify the subpoenas to a shorter time period and

12   denied with respect to the request to quash.

13   Turning next to the motion for protective order that

14   has been filed.

15   MS. CALDWELL:  Judge, may I ask a question?  We -- to

16   be fair, I don't want to mislead the Court.  There have been

17   obviously supplemental discovery responses and identification

18   by Mrs. Morrison of additional providers.  And I don't want

19   to -- it is our intention, if the Court allows us under those

20   terms to also seek information from the ones we didn't know

21   about that Mrs. Morrison has identified --

22   THE COURT:  Yes.

23   MS. CALDWELL:  -- or maybe could take --

24   THE COURT:  I have explained that.  That I believe

25   that Mrs. Morrison has put at issue her husband's medical

14

1   condition over the years beginning in 1996 and up until the

2   time of his death.

3           MS. CALDWELL:  Okay.

4           THE COURT:  Because among her allegations is that

5   what occurred on February 10th, 1996, set into motion a chain

6   of events that resulted from severe economic consequences and

7   to a downward spiral of his life.  And she believe caused his

8   premature death in 2013, although she acknowledges some other

9   doctor apparently did something very wrong --

10          MS. MORRISON:  Right.

11          THE COURT:  -- as well.  So I'm going to permit you

12  to obtain medical records, because I have found that his

13  medical condition is at issue from 1996 moving forward.  But

14  what I am telling you is you must tailor any subpoenas that you

15  serve to the time period that you have reason to believe that

16  the provider treated him, a reasonable period of time, a year

17  before, and up until the time of his death.  And that's it.

18  All right?

19          MS. CALDWELL:  Thank you, Your Honor.

20          MS. MORRISON:  And can I mention something?

21          THE COURT:  Yes, Miss Morrison.

22          MS. MORRISON:  Okay.  I have made a few notes here.

23  Actually, there was no condition diagnosed on February 10th,

24  1996.

25          THE COURT:  Yes, I understand your position.

15

```
 1              MS. MORRISON:  Okay.
 2              THE COURT:  I absolutely understand your position
 3     that a test result was not an indication of a diagnosis.
 4              MS. MORRISON:  Correct.
 5              THE COURT:  And I clearly --
 6              MS. MORRISON:  Okay.
 7              THE COURT:  -- get where you are going at -- going to
 8     there.
 9              MS. MORRISON:  Okay.
10              THE COURT:  However, still, at the end of the day,
11     the question is going to be was he ill?  Was he not ill?  Did
12     he test positive?  Did he not test positive?
13              MS. MORRISON:  Uh-huh.
14              THE COURT:  And those issues are something that they
15     are entitled to find out about during the discovery process,
16     and then it will be up to your trial judge to decide what of
17     the evidence they collect or the materials --
18              MS. MORRISON:  Okay.
19              THE COURT:  -- that they collect during discovery --
20              MS. MORRISON:  Sorry.
21              THE COURT:  -- may be admitted in evidence.
22              MS. MORRISON:  Okay.  Thank you.
23              THE COURT:  All right.  With respect to the motion
24     for protective order, I have carefully reviewed your moving and
25     responsive papers.  And I am going to grant the motion for
```

16

1  protective order with respect to Mr. Hiatt.  And the reason for

2  that, Miss Morrison, is because he has now answered

3  interrogatories, under penalty of Rule 26(g), indicating that

4  he has no -- I'm trying to find my notes, so I -- I wrote it

5  down.

6       He's answered interrogatories indicating that he was

7  not involved in the 1996 testing or reporting of Tommy

8  Morrison's blood specimen and has no personal knowledge or

9  first-hand knowledge of the alleged events on February 10th,

10  1996.

11       That testimony is now under oath, and it's subject to

12  his obligations under Rule 26.  And because he has answered

13  that interrogatory, the request for admissions that are

14  directed to him that go over some more specifics of the same

15  subject matter are unduly burdensome and oppressive --

16       MS. MORRISON:  Okay.

17       THE COURT:  -- where he does not have personal

18  knowledge or first-hand knowledge.  And so his responses in

19  great detail would be busy work, number one; and, number two,

20  he would be speculating on the results where he's answered --

21       MS. MORRISON:  All right.

22       THE COURT:  -- he doesn't know.

23       MS. MORRISON:  Okay.  Thank you.

24       THE COURT:  However, with respect to the request for

25  admissions that are directed to Quest, I'm going to grant the

17

1  motion in part and deny the motion in part.  Ms. Morrison, some
2  of your requests -- I know you are a lay person, and you are
3  doing your best to --

4            MS. MORRISON:  Uh-huh.

5            THE COURT:  -- frame appropriate requests for
6  admissions.  However, requests for admissions under the Federal
7  Rules of Civil Procedure are not a discovery device.  They are
8  sought first to facilitate proof with respect to issues that
9  cannot be eliminated from the case and second to narrow the
10  issues by eliminating those that can be.

11            Rule 26(a) of the Federal Rules of Civil Procedure --
12  and frequently in your papers you cite the Nevada Rules of
13  Civil Procedures.  And a lot of times they are very, very
14  close, because the Nevada rules are patterned after the federal
15  rules.  But there are some differences.  And one of those is,
16  for example, the 15-day notice requirement --

17            MS. MORRISON:  Right.

18            THE COURT:  -- under Rule 45.  The Nevada rule is
19  different from the Federal Rule 45.  But the Federal Rule
20  36(a), the cases that -- from the Ninth Circuit Court of
21  Appeals and the cases in this circuit which address Rule 36(a)
22  say that the rule seeks to serve two important goals; truth
23  seeking in litigation and efficiency in disbursing justice.
24  And the purpose is to eliminate from the trial matters as to
25  which there is no genuine dispute.

18

1    But some of the -- and the defendants cite this, and
2  I have cited this in some prior orders in which I have decided
3  disputes about the appropriateness of requests for admissions
4  under Rule 36.

5    Some of the greatest scholars in the area are Wright
6  and Miller on federal practice and procedure. And they note
7  and the courts have concurred that strictly speaking, Rule 36
8  is not a discovery procedure at all, since it presupposes that
9  the party proceeding under it knows the facts or has the
10 document and merely wishes its opponent to concede their
11 genuineness.

12   A party who desires to discover what the facts are
13 should resort to other discovery methods and not to Rule 36 as
14 an end around the limitations, basically, that the rules
15 provide for the number of interrogatories that you can
16 interpose.

17   So I've carefully reviewed each of the requests that
18 have been served by you, and I am overruling Quest's objections
19 to certain of them. Certainly she could have better phrased
20 some of them. Some of them, ma'am, frankly just are
21 argumentative and compound, and they are very difficult to
22 follow or understand. And that's not appropriate for a request
23 for admission.

24   However, I do believe that Quest can and should
25 comply with its Rule 36 obligations to admit or deny, or admit

1  as much as you can and deny, and state the reasons why you are

2  unable to admit or deny with respect to Requests for Admissions

3  No. 4, 5, 6, 12, 14, 15, 20, 21, 22, 25, 26, 28.

4          So you will be compelled to provide responses to

5  those requests for admissions that are fully compliant with

6  your obligations under Rule 36. And the motion for protective

7  order is denied with respect to those but granted with respect

8  to Hiatt and denied in all other respects.

9          So those are the ones I will enter a written order,

10 so that you don't have to have these memorized what I just -- I

11 spent hours going over those papers --

12             MS. MORRISON: Okay.

13             THE COURT: -- and looking at them.

14             MS. MORRISON: Uh-huh.

15             THE COURT: And I have decided that they should have

16 to -- just like when they were seeking to compel you to

17 respond --

18             MS. MORRISON: Right.

19             THE COURT: -- to certain other requests, I went over

20 every single one of them and decided that some of them were

21 appropriate. Some of them weren't.

22             MS. MORRISON: Uh-huh.

23             THE COURT: And I have now made my rulings, so you --

24 you will get supplemental responses to your request for

25 admission. And is there any reason why those requests for

20

1  admissions for these limited numbers cannot be responded to

2  within 14 days, Miss Caldwell?

3       MS. CALDWELL:  No.  14 days would be fine after we

4  receive the written order with the numbers, Your Honor.

5       THE COURT:  That's --

6       MS. CALDWELL:  That will be fine.

7       THE COURT:  -- that will be the order.  So they will

8  get 14 -- they need to see the written order.

9       MS. MORRISON:  Right.

10       THE COURT:  So they -- and I'll try to get that out

11  later --

12       MS. MORRISON:  Do you think you could repeat those

13  numbers again, just --

14       THE COURT:  Yes, ma'am.  4, 5, 6, 12, 14, 15, 20, 21,

15  22, 25, 26 and 28.

16       MS. MORRISON:  Okay.  Thank you.

17       THE COURT:  So you will get responses to those, and

18  you will not get responses to the rest.

19       MS. MORRISON:  Okay.

20       THE COURT:  Very well.  So, as I said, I'm aware you

21  have other motions on calendar that have been filed, but they

22  are not on calendar today, and I have not had an opportunity.

23  Some of the replies were just filed yesterday, so --

24       MS. MORRISON:  Yes.

25       THE COURT:  -- I haven't been able to read those

21

1  papers.  But you will either be set for hearing or I may decide
2  it just on -- on the papers in a written order.

3         Our local rules of practice permit the Court to
4  decide matters without oral argument.  And depending on whether
5  I think oral argument is required, I either will or will not
6  demand oral argument.  You are both -- you are located out of
7  state, ma'am.  And counsel for Quest and Hiatt are also
8  primarily out of state counsel.

9         I do not mind having you appear telephonically so
10 that you don't have to travel to court on every occasion, as
11 long as it's a matter that can be done in an orderly way.

12              MS. MORRISON:  Thank you.

13              THE COURT:  So if you want an opportunity to appear
14 telephonically, please just file a -- a simple request asking
15 to appear telephonically once you get a notice of a hearing.  I
16 try to remember to give you an opportunity, and all I ask for
17 is -- if it's a routine matter -- some things require your
18 presence.

19         If it's a routine matter, I ask only that if I give
20 you permission to appear telephonically, that you respect the
21 fact that because you can't see each other and you can't see
22 who's talking and --

23              MS. MORRISON:  Uh-huh.

24              THE COURT:  -- when someone's stopping and when they
25 are not, that you not interrupt each other, and that you wait

1    until you're called upon to make a statement for the record.

2    And, of course, any telephonic conferences are on the record

3    just as all court proceedings are on the record as well.  They

4    are recorded, and at the request of either side, a transcript

5    may be prepared.

6                   MS. MORRISON:  Okay.

7                   THE COURT:  Thank you for being here today, and I

8    will get to your other motions as soon as I possibly can.

9                   MS. CALDWELL:  Your Honor, there's only one other

10   matter that's not on calendar.  I don't know how you'd wish us

11   to address it.

12                  Our scheduling order currently, for example, requires

13   experts to be disclosed by the 10th of March.  Obviously, our

14   experts were planning on using medical records, et cetera.  We

15   obviously have this issue of what is going to be the live

16   pleading at trial.

17                  What would be the proper method you'd like us to sort

18   of address that subject?

19                  THE COURT:  Well, you first talk to the other side

20   about -- you are indicating that you may need additional times

21   to designate -- additional time to designate your expert,

22   because your experts be will be opining based on medical

23   records that you have not yet obtained via subpoena.  So, first

24   confer with Miss Morrison to see -- Miss Morrison, do you

25   expect to retain an expert in this case?

23

1      MS. MORRISON:  Yes.

2      THE COURT:  And in what field, if I may ask, please?

3      MS. MORRISON:  In the medical field.

4      THE COURT:  Very well.

5      MS. MORRISON:  Yes.

6      THE COURT:  Do you need any additional time --

7      MS. MORRISON:  No.

8      THE COURT:  -- in order to designate an expert?  And

9  the Rule 26 requires you to provide a very detailed report.

10  The expert himself or herself has to prepare the report, and

11  the Rule 26 outlines in detail what information you are

12  required to prepare in an expert report.

13      MS. MORRISON:  Right.

14      THE COURT:  What they're saying is because they don't

15  have the medical records that they need to get to their expert,

16  they're not going to be able to comply with the

17  March 10th deadline.

18      MS. MORRISON:  I'm going to take a deep breath here.

19  They have been complaining about the scheduling all along.  I

20  have emails of them wanting to reschedule everything.  I'm

21  ready for March 10th.  And if they are not, that is not my

22  problem.

23      THE COURT:  Very well.  So here's what I will require

24  you to do.  File a motion with the Court requesting an

25  extension of the expert deadline and state with specificity why

1    it is that you think you are entitled to any additional time.

2            Miss Morrison will have an opportunity to respond to

3    that and file her objection, and then I'll decide.

4            The briefing necessarily is going to exceed the

5    March 10th deadline, so you are either going to get it or you

6    are not.  And you're going to have to plan accordingly, since

7    you're raising this for the first time here today.

8            MS. CALDWELL:  Thank you, Your Honor.  We also have

9    not -- although we've requested Mrs. Morrison provide us the

10   deposition dates on several occasions for herself, we have not

11   yet heard back.  We'd also ask that she respond so that we can

12   schedule that.

13           THE COURT:  I'm afraid, ma'am, they are entitled to

14   take your deposition.

15           MS. MORRISON:  Absolutely.  Yeah.  And I will get my

16   work schedule actually this week for the dates that they are

17   requesting.  So --

18           THE COURT:  Very well.

19           MS. MORRISON:  I do plan on emailing her back.  Yeah.

20           THE COURT:  Thank you.  So I ask that you please do

21   that --

22           MS. MORRISON:  Absolutely.

23           THE COURT:  -- within the next week to firm up a date

24   so that your deposition can be taken.

25           MS. MORRISON:  Yep.

25

1            THE COURT:  And we'll go from there.

2            MS. MORRISON:  Okay.  Thank you.

3            THE COURT:  Thank you, folks.

4            MS. MORRISON:  Is the second amended complaint, is

5   that one of the motions that's still pending?

6            THE COURT:  It is, ma'am.

7            MS. MORRISON:  Okay.

8            THE COURT:  I saw that you filed it on the last day

9   for filing a motion to amend the complaint.

10           MS. MORRISON:  Right.

11           THE COURT:  And the briefing -- some papers were just

12  filed last night.

13           MS. MORRISON:  Yes.

14           THE COURT:  And so I haven't looked at that yet.

15           MS. MORRISON:  Okay.

16           THE COURT:  I looked to see whether the -- your trial

17  judge referred it to me, and it is.

18           MS. MORRISON:  Okay.

19           THE COURT:  It's shown as something he wants me to

20  decide.  And so that's one of the motions that's before me as

21  well as the state filing a motion to require you to disclose a

22  ghost writer.

23           MS. MORRISON:  Yes.  That's me.

24           THE COURT:  All right.

25           MS. MORRISON:  All right.

26

1          THE COURT:  So as soon as the briefing is finished,

2   I'll do my best to get you a decision as fast as I can.  This

3   is not my only case.

4          MS. MORRISON:  I know.  I appreciate it.

5          THE COURT:  I have about 600 cases, so I do the best

6   I can to get you as timely a decision as possible, but

7   sometimes it's -- in federal court, it's hurry up and wait

8   sometimes.

9          MS. MORRISON:  All right.

10         THE COURT:  All right.

11         MS. MORRISON:  Thank you.

12         THE COURT:  Thank you, folks.  Good day now.

13         MS. MORRISON:  Thank you.

14         MS. CALDWELL:  Thank you, Your Honor.

15      (Recess, 9:41 a.m.)

16

17

18

19

20

21

22

23

24

25

1                              --oOo--

2                    TRANSCRIBER'S CERTIFICATE

3       I, KATHERINE EISMANN, court-approved transcriber, certify

4   that the foregoing is a correct transcript from the official

5   electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9   Date:   July 8, 2016.

10                          /s/ *Katherine Eismann*

11                              Katherine Eismann

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

──────────2:14-cv-01207-RFB-PAL──────────

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEVADA

3

4   PATRICIA HARDING MORRISON,      )
    individually and in her         )  Case No. 2:14-cv-01207-RFB-PAL
5   capacity as                     )
    Executor/Administrator of       )  Las Vegas, Nevada
6   the Estate of Tommy             )  Monday, September 14, 2015
    Morrison, a deceased            )  3:16 p.m.
7   individual,                     )
                                    )  MOTIONS HEARING
8                Plaintiff,         )
                                    )
9         vs.                       )

10  QUEST DIAGNOSTICS,
    INCORPORATED, a Nevada
11  domestic corporation; JOHN
    HIATT, an individual; DR.
12  MARGARET GOODMAN, an
    individual; NEVADA STATE
13  ATHLETIC COMMISSION, an
    unknown business entity;
14  and MARC RATNER, an
    individual,
15
                 Defendants.
16  ─────────────────────────────────

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19          THE HONORABLE RICHARD F. BOULWARE, II,
                UNITED STATES DISTRICT JUDGE
20

21  APPEARANCES:          See Next Page

22
    COURT REPORTER:          Patricia L. Ganci, RMR, CRR
23                           United States District Court
                             333 Las Vegas Boulevard South, Room 1334
24                           Las Vegas, Nevada  89101

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

2

─────────────────────2:14-cv-01207-RFB-PAL─────────────────────

1 | APPEARANCES:
    For the Plaintiff:
2 | **PATRICIA HARDING MORRISON**
    PRO SEE
3 | P.O. Box 454
    Rose Hill, Kansas 67133
4 | (865)296-9973

5 |
    For Defendants Quest Diagnostics, Incorporated and John Hiatt:
6 | **KEITH A. WEAVER, ESQ.**
    LEWIS BRISBOIS BISGAARD & SMITH
7 | 6385 South Rainbow Blvd., Suite 600
    Las Vegas, Nevada 89118
8 | (702)893-3383

9 | **FAYE D. CALDWELL, ESQ.**
    CALDWELL EVERSON PLLC
10 | 2777 Allen Parkway, Suite 950
    Houston, Texas 77019
11 | (713)654-3000

12 |
    For Defendant Nevada State Athletic Commission:
13 | **VIVIENNE RAKOWSKY, ESQ.**
    OFFICE OF THE ATTORNEY GENERAL
14 | 555 E. Washington Ave., Suite 3900
    Las Vegas, Nevada 89101
15 | (702)486-3103

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

3

────────────────── 2:14-cv-01207-RFB-PAL ──────────────────

1    LAS VEGAS, NEVADA; MONDAY, SEPTEMBER 14, 2015; 3:16 P.M.

2                              --oOo--

3                          P R O C E E D I N G S

4        THE COURT:  Please be seated.

5        COURTROOM ADMINISTRATOR:  Now calling Patricia Harding

6    Morrison versus Quest Diagnostics, Incorporated, et al., Case

7    No. 2:14-cv-01207-RFB-PAL.  This is the time for the hearing

8    regarding Docket 12, motion to dismiss, and Docket 11, motion to

9    dismiss regarding complaint.

10        Counsel, please note your appearances for the record.

11        MS. MORRISON:  My name is Patricia Harding Morrison.

12        THE COURT:  Good afternoon.

13        MS. MORRISON:  Good afternoon.

14        MS. CALDWELL:  Your Honor, I'm Faye Caldwell for

15    Defendant Quest Diagnostics and Dr. John Hiatt.

16        THE COURT:  Good afternoon.

17        MR. WEAVER:  Good afternoon.  Keith Weaver for Quest

18    Diagnostics.

19        THE COURT:  Good afternoon.

20        MS. RAKOWSKY:  Good afternoon, Your Honor.  Vivienne

21    Rakowsky from the Attorney General's Office for the Nevada State

22    Athletic Association -- Commission, I'm sorry, Marc Ratner, and

23    Dr. Margaret Goodman.

24        THE COURT:  Good afternoon.  Give me a moment here to

25    pull up my notes.

4

———2:14-cv-01207-RFB-PAL———

1    Okay.  What I'm going to do is review some background

2 facts to talk about what I understand the issues to be in this

3 case, and then we will have a little discussion about the

4 different motions that have been filed.

5    Plaintiff Patricia Harding Morrison filed a pro se

6 complaint in this court on July 24th, 2014.  Her complaint

7 alleges the following facts.  Ms. Morrison is the surviving

8 spouse of Tommy David Morrison, a former heavy-weight boxing

9 champion.  On February 10, 1996, Defendant Quest Diagnostics

10 produced a laboratory report following a blood test of Tommy

11 Morrison.  Relying on the laboratory report, Quest diagnosed

12 Tommy Morrison as having the disease, HIV, and reported this

13 diagnosis to Defendant Nevada State Athletic Commission.  Upon

14 receiving this information, the Commission and Defendant Marc

15 Ratner also diagnosed Tommy Morrison as having HIV, which

16 disqualified him from participating in an upcoming boxing match

17 and caused him to allegedly lose -- caused him to lose a

18 contract worth more than $10 million.

19    In 2007, Defendant John Hiatt, an employee of Quest,

20 retrieved an archived copy of the laboratory report and

21 confirmed Quest's diagnosis of Tommy Morrison as having HIV.

22 Hiatt shared this information with the media.  Defendant

23 Dr. Margaret Goodman, an employee of the Commission, also

24 requested the Quest lab report in 2007.  Quest provided this

25 report and informed Dr. Goodman that the results were ironclad

5

-2:14-cv-01207-RFB-PAL-

1  and unequivocal.  Dr. Goodman then informed the media that Tommy
2  Morrison's diagnosis of HIV had been confirmed.

3        Tommy Morrison died on September 1st, 2013.  An autopsy
4  was performed, and his blood was found to have no evidence of
5  HIV or AIDS.

6        Construing the complaint liberally, Ms. Morrison
7  alleges the following causes of action, first, negligence.
8  Ms. Morrison alleges that the defendants negligently diagnosed
9  her late husband with HIV when in fact he did not have that
10 disease.  She also states that Quest performed several blood
11 tests on her husband and that each contained warnings or
12 disclaimers that they were not to be used as conclusive HIV
13 tests.  Ms. Morrison alleges that Quest ignored these
14 disclaimers and reported a diagnosis of HIV positive to the
15 Athletic Commission, which accepted Quest's diagnosis and
16 treated it as conclusive.

17       The Court also finds that she has sought to allege a
18 defamation cause of action.  Ms. Morrison alleges that
19 Defendants Hiatt and Goodman informed the media that her husband
20 was diagnosed with HIV when in fact he did not have that
21 disease.  Ms. Morrison also states that defendants reported the
22 false diagnosis to the Department of Health and Human Services.

23       Ms. Morrison also appears to allege a HIPPA violation.
24 Ms. Morrison alleges that Quest released Tommy Morrison's
25 personal medical information to the Athletic Commission and to

6

—————2:14-cv-01207-RFB-PAL —————

1  the media without authorization, in violation of the Health

2  Insurance Portability and Accountability Act of 1996.

3  Ms. Morrison also alleges the defendants' diagnosis of her

4  husband as having HIV constitutes the unauthorized practice of

5  medicine as the defendants are either not licensed to practice

6  medicine or were not his attending physician.

7       Finally, Ms. Morrison alleges that Quest misrepresented

8  themselves as being physicians capable of diagnosing Tommy

9  Morrison as HIV positive.

10      The Athletic Commission, Marc Ratner, and Dr. Margaret

11  Goodman filed a motion to dismiss on October 3rd, 2014.  Quest

12  and John Hiatt also filed a motion to dismiss on the same date.

13  Ms. Morrison filed a motion for partial summary judgment against

14  Hiatt on June 5th, 2015, and against Dr. Goodman on July 16th,

15  2015, and against Quest on August 20th, 2015.

16      Defendants' response to these motions are not due until

17  the Court has resolved the motions to dismiss and defendants

18  have filed answers to the complaint.  Discovery in this case is

19  also temporarily stayed until the Court resolves the motions to

20  dismiss.

21      With respect to the legal standard for a motion to

22  dismiss, in order to state a claim upon which relief can be

23  granted, a pleading must contain a short and plain statement of

24  the claim showing that the pleader is entitled to relief,

25  pursuant to Federal Rule of Civil Procedure 8(a)(2).

7

─────────────2:14-cv-01207-RFB-PAL─────────────

1          In ruling on a motion to dismiss for a failure to state
2     a claim, all well pleaded allegations of material fact in the
3     complaint are accepted as true and are construed in the light
4     most favorable to the non-moving party.  And that's Faulkner v.
5     ADT Security Services, Incorporated, 706 F.3d 1017 at 1019
6     (Ninth Circuit 2013.)

7          To survive a motion to dismiss, a complaint must
8     contain sufficient factual matter, accepted as true, to state a
9     claim to relief that is plausible on its face, meaning that the
10    Court can reasonably infer that the defendant is liable for the
11    misconduct alleged.  That's Ashcroft v. Iqbal, 556 U.S. 662 at
12    678 (2009).

13         So let's talk about the arguments here.  In both
14    motions to dismiss, the defendants argue that the complaint must
15    be dismissed because Ms. Morrison has not shown that she has
16    standing to bring this action on behalf of her late husband.  So
17    as I understand it, the argument here is that while the Nevada
18    Revised Statute would permit an executor or an administrator to
19    bring a survival action, which is what this is, an heir cannot
20    bring this claim.  An heir can bring a wrongful death claim on
21    behalf of themselves and also an administrator or an executor
22    could bring that claim, but not an heir such as Ms. Morrison.
23    Is that right?

24         MS. CALDWELL:  Yes.  This is Faye Caldwell for Quest
25    Diagnostics.  Of course, this is not a wrongful death action.

8

─────2:14-cv-01207-RFB-PAL ─────

1  It's a negligence claim.  And we believe the law is clear that

2  the burden is upon the person suing to show that she has

3  standing to do so, and we cited the cases for that.  And to our

4  knowledge, to date, has not provided the Court with that

5  information which of course would be her burden under the law to

6  show that she's the one that should bring these claims.

7          THE COURT:  And, Ms. Morrison, you understand the

8  nature of that argument, right?  That basically that the state

9  law doesn't permit you to bring this claim unless you're either

10 the executor or an administrator, right, of your late husband's

11 estate.

12         MS. MORRISON:  Right.  Yeah.  I understand.  And a copy

13 of the executor papers are right here, and a copy is up there at

14 the bench.

15         THE COURT:  Okay.  Well, that may address then an issue

16 with respect to amendment in this case because my reading of the

17 statute is it would require that.  Are you saying, Ms. Morrison,

18 that you are the executor of her estate?

19         MS. MORRISON:  Yes, I am.

20         THE COURT:  Okay.  Well, Ms. Caldwell, that would seem

21 to resolve that issue.  It doesn't mean that there aren't

22 substantive issues as it relates to the claims, but is there any

23 reason why at least with respect to that issue I shouldn't allow

24 Ms. Morrison to amend her complaint to allege that in fact or to

25 state in fact that she's the executor?

9

—————2:14-cv-01207-RFB-PAL —————

1          Now, we can talk about the substantive issues, but in
2     the context of this particular issue, is there any reason why
3     you see that I couldn't permit that?
4          MS. CALDWELL:  I haven't seen the papers, but of course
5     not, Your Honor.  I mean, if that's true, that's all we've ever
6     said is not that she was or she wasn't, but she just hadn't
7     established it.  We haven't looked at it and seen it, but of
8     course.
9          THE COURT:  Okay.  And I'm sorry.  Is it Ms. --
10    Mr. Weaver and Ms. Rakowsky?
11         MR. WEAVER:  Thank you, Your Honor.  I'm -- I'll defer
12    to Ms. Caldwell.  We're cocounsel on this.  So she can -- she
13    can more than adequately speak for me as well.  Thank you.
14         THE COURT:  And I'm going to address the substantive
15    aspects of the complaint, too, but I wanted -- I mean,
16    obviously, Ms. Morrison, the reason why this is important
17    because if you didn't have a standing, basically all of these
18    claims would have to be dismissed because they're all -- as I
19    see them, these are all what we call survival actions.  They're
20    not a wrongful death action here that I see.  And so that's why
21    I wanted to address that.  As a threshold matter, you'd have to
22    have that standing.  Okay.
23         MS. MORRISON:  Right.  Yeah, I understand.
24         THE COURT:  Okay.
25         MS. RAKOWSKY:  And, Your Honor, the State does not

10

—————————————2:14-cv-01207-RFB-PAL—————————————

1   object to Ms. -- to the plaintiff bringing an amendment to the
2   complaint.

3           THE COURT:  Okay.  So what I'm going to do is because I
4   do agree that I think that the Nevada Revised Statute says that
5   a person -- which is Nevada Revised Statute Section 41.100,
6   paragraph 1, says:  No cause of action is lost by reason of
7   death of any person, but may be maintained by or against the
8   person's executor or administrator.

9           I do read that to require that the person must be an
10  executor or administrator within the definition of the law to be
11  able to bring a survival action as opposed to a wrongful death
12  action.  And so the Court agrees with the defendants in this
13  case that that is required by the law.  And I think there's a
14  Ninth Circuit case, while not binding, which also indicates
15  that, which is the case of Moreland v. Las Vegas Metropolitan
16  Police Department, 159 F.3d 365 at 370 (Ninth Circuit 1998),
17  which also indicates that under Nevada law survival actions are
18  limited to duly appointed representatives of a deceased's
19  estate.

20          So let me focus then in terms of the leave to amend on
21  the different claims.  Unless you all have further argument, I'm
22  going to go through my analysis on the different claims and talk
23  about which ones I think could be potentially amended and some
24  of them I'm not sure can be amended.  And, Ms. Morrison, I may
25  not permit you to do that in some instances.  So I'm going to go

11

———2:14-cv-01207-RFB-PAL———

1   through my analysis on those different claims, unless you all

2   have something further to add to what you've submitted.

3          MS. CALDWELL:  We have nothing further to add on

4   standing, Your Honor.

5          THE COURT:  Ms. Morrison?

6          MS. MORRISON:  No, I only just want to say that you can

7   actually go online to see that I am the executor of my husband,

8   but I did bring an affidavit here signed if they would like a

9   copy.

10          THE COURT:  Well, no, Ms. Morrison.  What the law

11   really only requires in terms of the pleading is that you

12   establish you have standing.  So, in other words, you have to

13   allege or say --

14          MS. MORRISON:  Right.

15          THE COURT:  -- in the complaint that you're the

16   executor.  Right.  They don't have any requirement to actually

17   go and look to determine whether or not you have a right to

18   bring the survival action.  You have an obligation as the person

19   bringing the suit to allege enough facts in the complaint for

20   them to be able to know that you have standing.

21          MS. MORRISON:  Right.

22          THE COURT:  And so it would appear that based upon that

23   that you may be able to satisfy that requirement.  Again, the

24   Court can't rule upon that and they can't know until they

25   actually see the documentation, but I'm not requiring you to

12

———————2:14-cv-01207-RFB-PAL———————

1   produce that in court today.  You don't have to provide it to

2   me.  It's not really important to me at this point.  It's

3   important that you indicated that.  That way the Court can and

4   will allow you to amend on that basis certain claims that I

5   think can be amended.  So I'm going to go through my analysis of

6   the claims themselves.

7           So the Court does find that in this case amendment

8   would be appropriate given the fact Ms. Morrison is representing

9   herself and it does appear to be justified based upon what she

10  stated thus far.  And I'll go through each of the different

11  claims.

12          Here, the Court finds that Ms. Morrison must be given

13  leave to amend for her negligence, defamation, and fraud claims.

14  However, Ms. Morrison's claims for a HIPPA violation and for the

15  unauthorized practice of medicine, the Court does not find can

16  be cured by amendment.  The Court finds for Ms. Morrison to

17  allege a set of facts that constitute -- excuse me.  The Court

18  finds it possible for Ms. Morrison to allege a set of facts to

19  constitute claims of negligence and defamation.

20          Now, the defendants have also argued that these claims

21  are barred by the statute of limitations.  While it is true that

22  the events alleged in 1996 and 2007 are past the limitations

23  period, the Court does find that Ms. Morrison may be able to

24  allege facts establishing that the statute of limitations should

25  be tolled until the autopsy on her late husband revealed that he

13

─────2:14-cv-01207-RFB-PAL─────

1   did not have HIV.  And that's pursuant to Petersen v. Bruen, 792

2   P.2d 18 at 20 (1990).  Under the discovery rule, the statutory

3   period of limitations is tolled until the injured party

4   discovers or reasonably should have discovered facts supporting

5   a cause of action.  Therefore, Ms. Morrison's claims are not

6   necessarily barred at this time by the statute of limitations.

7        Defendants also argue that Ms. Morrison's negligence

8   claim is barred by the economic loss doctrine.  This doctrine

9   states that generally a plaintiff cannot bring a tort claim for

10  purely economic losses without any claim of personal injury or

11  property damage.  And that's pursuant to Terracon Consultants

12  Western, Incorporated versus Mandalay Resort Group, 206 P.3d 81

13  at 86 (Nevada 2009).

14       Although Ms. Morrison's claims are currently allege --

15  as currently alleged would be barred by the economic loss

16  doctrine, the Court finds that Ms. Morrison may be able to

17  allege additional facts to save her negligence claim.

18  Therefore, Ms. Morrison shall have leave to amend her negligence

19  claim.

20       Now, do you understand that, Ms. Morrison?  Because I

21  want to be clear.  What I am saying is, is that you have alleged

22  a negligence claim here.  Based upon the economic loss doctrine,

23  I don't know -- I shouldn't say I don't know.  I don't believe

24  at this point and it is a finding of the Court that it would not

25  survive the bar under the economic loss doctrine.  However,

—————————————2:14-cv-01207-RFB-PAL—————————————

```
 1  based upon the facts that you have alleged in the complaint, I'm
 2  going to give you an opportunity to be able to amend your
 3  negligence claim to address this issue.
 4          Now, I am not permitted, even though you're
 5  representing yourself pro se, to advise you about how to do
 6  that.  I can merely tell you what I've stated here in court,
 7  which is that the economic loss doctrine bars a tort claim for
 8  purely economic losses without any claim of personal injury or
 9  property damage, which the Court finds at this point you have
10  not alleged appropriately a claim for personal injury or
11  property damage such that you could overcome the bar based upon
12  the economic loss doctrine.  Do you understand that?
13          MS. MORRISON:  Right.  Yes.
14          THE COURT:  Okay.  But I'm going to give you an
15  opportunity to amend and I'll tell you at the end how much time
16  you'll have.  And you can talk to me about how much time you
17  think that you need.
18          The Athletic Commission also argues that they are
19  entitled to discretionary-act immunity under Nevada Revised
20  Statute 41.032.  The discretionary-act immunity doctrine states
21  that certain governmental officials are immune from suit for
22  acts or decisions that, one, involve an element of individual
23  judgment or choice and, two, are based on considerations of
24  social, economic, or political policy.  And that's Martinez v.
25  Maruszczak, 168 P.3d 720 at 729 (Nevada 2007).
```

15

—————————————2:14-cv-01207-RFB-PAL —————

1    The Court agrees that the Athletic Commission
2  defendants are likely protected by a discretionary-act immunity
3  from the claims as currently alleged in the complaint.  However,
4  the Court finds that Ms. Morrison could potentially allege
5  additional facts showing that the Athletic Commission defendants
6  made decisions that were not discretionary in nature or were not
7  based on policy considerations.  Therefore, Ms. Morrison's
8  claims against the Athletic Commission defendants are not
9  necessarily barred at this time by the discretionary-act
10  immunity doctrine.

11    Again, what I am saying here, Ms. Morrison, is that I
12  think that since you are going to amend the complaint, I'm going
13  to give you an opportunity to be able to allege facts that would
14  allow you to overcome the discretionary-act immunity that exists
15  under the law in Nevada.

16    MS. MORRISON:  Right.

17    THE COURT:  However, I'm not saying right now, and I
18  don't know that I could say right now, that your complaint as
19  alleged would survive that, but at this point I'm not going to
20  reach a final determination because you are going to amend the
21  complaint anyway.  I'm going to give you an opportunity to amend
22  it as well with respect to the Athletic Commission defendants.

23    MS. MORRISON:  Okay.  Thank you.

24    THE COURT:  Fraud, the Court finds that Ms. Morrison
25  could potentially allege additional facts in an amended

16

──────────────2:14-cv-01207-RFB-PAL──────────────

1 complaint to meet the elements of fraud and satisfy the

2 particularity requirement of Federal Rule of Civil Procedure

3 9(b). Therefore, Ms. Morrison shall have leave to amend her

4 fraud claim as well.

5       HIPPA violation claim, Ms. Morrison shall not have

6 leave to amend her HIPPA violation claim because HIPPA itself

7 does not provide for a private right of action. And that's

8 pursuant to Webb v. Smart Document Solutions, LLC, 499 F.3d 1078

9 at 1082 (Ninth Circuit 2007).

10       This means that private citizens are not entitled to

11 sue in court for violations of the HIPPA statute. This claim,

12 therefore, is dismissed with prejudice.

13       With respect to Ms. Morrison's claim for the

14 unauthorized practice of medicine which appears to be asserted

15 under Nevada Revised Statute 630.400, this statute provides for

16 criminal penalties for individuals who practice medicine without

17 a license or present fake documents to the Board of Medical

18 Examiners. The statute also explicitly authorizes the Board of

19 Medical Examiners to issue citations, fines, and cease and

20 desist orders to persons violating the statute.

21       This statute does not contain a private right of

22 action. There is no ability for private individuals to sue

23 under this statute. However, the Court is not completely clear

24 as to the exact claim Ms. Morrison is bringing when she alleges

25 the defendants engaged in the unauthorized practice of law --

17

```
----------------------2:14-cv-01207-RFB-PAL----------------------
```

1  excuse me -- unauthorized practice of medicine.  Therefore, this

2  claim is dismissed with prejudice to the extent it attempts to

3  state a claim under Nevada Revised Statute 630.400.  However,

4  Ms. Morrison shall have leave to amend if she's not pursuing a

5  claim under that statute.

6           And what I'm saying, Ms. Morrison, is that I don't

7  really understand what claim you're making here, but you can't

8  bring a claim under the Section 630.400.  It doesn't create a

9  private right of action for you to bring a claim as you brought

10 it here, and so you can't amend your complaint to bring that

11 type of action.  However, if there's some related type cause of

12 action that I'm not aware of or that you're trying to assert,

13 I'm not going to stop you from bringing that, but you have to

14 allege sufficient facts to bring -- to be able to bring that

15 claim.

16           MS. MORRISON:  Okay.

17           THE COURT:  Okay?

18           So that means I'm going to grant the motions to dismiss

19 in part and deny them in part.  Okay.  And that means that,

20 Ms. Morrison, the Court is going to order that your complaint be

21 dismissed without prejudice.  You will have leave to amend your

22 negligence, defamation, and fraud claims.  Dismissal is with

23 prejudice regarding your HIPPA claim and for any unauthorized

24 practice of medicine claim to the extent it's brought under

25 Nevada Revised Statute 630.400.  You will have 30 days from

18

─────────────── 2:14-cv-01207-RFB-PAL ───────────────

1   today to amend your complaint.

2          The Court is going to lift the discovery stay at this

3   point in time.  A joint copy -- excuse me.  A jointly submitted

4   discovery order will be submitted to the Magistrate Court within

5   two weeks, and this case will proceed.

6          Are there any questions or inquiries or comments with

7   respect to the Court's order so far?  Ms. Morrison?

8          MS. MORRISON:  Do I get a copy of what you just said?

9          THE COURT:  What I've said will be available for you to

10  order it in terms of the transcript of this proceeding.  There

11  will be a minute order which will basically summarize my

12  findings, but there will not be a written order, other than what

13  I have read out loud today or discussed today.  You can always

14  order a copy of the transcript --

15         MS. MORRISON:  Okay.

16         THE COURT:  -- that will discuss that.

17         From the defense side, is anything further that the

18  Court needs to do today?

19         MS. CALDWELL:  No, Your Honor.

20         THE COURT:  Okay.

21         MS. RAKOWSKY:  No, Your Honor.

22         MR. WEAVER:  No, sir.

23         THE COURT:  Okay.  Just one moment.

24         (Court conferring with law clerk.)

25         THE COURT:  So what I think I'm going to do is I will

19

```
                  —2:14-cv-01207-RFB-PAL—
```

 1 issue a written order on the motions in part because, otherwise,

 2 you will have to order the transcript which not only can be

 3 expensive, but it can take time if you don't order it on an

 4 expedited basis.  And then you'd be asking for more time to

 5 amend, which I don't want to prolong that process anymore

 6 because they need time to be able to respond because I

 7 anticipate that they're going to file a motion to dismiss as

 8 soon as you file your amended complaint.

 9             MS. MORRISON:  Right.

10             THE COURT:  Right, Ms. Caldwell?

11             MS. CALDWELL:  We'll have to look at it obviously, but

12 I think that may be the case.

13             THE COURT:  Right.  I would be shocked if that didn't

14 happen.  And so I'll issue a written order.  That way, you'll

15 have a copy of the order.  Ms. Morrison, you'll have a copy to

16 be able to assist you in at least understanding further --

17             MS. MORRISON:  Okay.

18             THE COURT:  -- the Court's order today.  And that way,

19 we don't have to wait for the transcript to be ordered by

20 Ms. Morrison, although of course you're free to do that if you

21 want to, but I expect that I'll be able to get the order out

22 within the next two days.

23             MS. MORRISON:  Great.  Thank you very much.

24             THE COURT:  So that shouldn't be an issue.

25             MS. MORRISON:  Thank you.

20

—————2:14-cv-01207-RFB-PAL—————

1        THE COURT:  Is there anything else that we need to do

2 today?  Ms. Morrison?

3        MS. MORRISON:  No.  Looks like I've got some work to

4 do.  I appreciate your time.  Thank you.

5        THE COURT:  No.  You're welcome.

6        Ms. Caldwell?

7        MS. CALDWELL:  No.  Nothing, Your Honor.  Thank you.

8        THE COURT:  Okay.  And Mr. Weaver and Ms. Rakowsky?

9        MS. RAKOWSKY:  Thank you, Your Honor.

10        MR. WEAVER:  Thank you.

11        THE COURT:  Okay.  Then we are adjourned.  Thank you

12 all.  Have a good day.

13        (Whereupon the proceedings concluded at 3:42 p.m.)

14               --oOo--

15        COURT REPORTER'S CERTIFICATE

16

17        I, PATRICIA L. GANCI, Official Court Reporter, United

18 States District Court, District of Nevada, Las Vegas, Nevada,

19 certify that the foregoing is a correct transcript from the

20 record of proceedings in the above-entitled matter.

21

22 Date:  December 15, 2016.

23               /s/ **Patricia L. Ganci**

24               Patricia L. Ganci, RMR, CRR

25               CRR #937

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670